IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**CHAD LOCHRIDGE, HEATHER LOCHRIDGE,**          **PLAINTIFFS**
**EVERETTE LOCHRIDGE, TWYLA LOCHRIDGE,**
**KEVIN KORNEGAY, LINDA DANFORTH, PATRICIA**
**LEACH, DEBRA McKEE, BRIAN McKEE, PATSY**
**PICKEL, STEVEN PICKEL, CARLIS SMITH, LYDIA**
**SMITH, REBECCA SMITH, JUDY KATHRYN HALE,**
**SHERRY JENKINS, PEARSON JENKINS, and**
**RYAN AGEE, Each Individually and on Behalf**
**of All Persons Similarly Situated**


vs.                       No. 5:12-cv-05047


**LINDSEY MANAGEMENT CO., INC.**
**and JAMES E. LINDSEY**                        **DEFENDANTS**

<u>**AMENDED BRIEF IN SUPPORT OF AMENDED MOTION FOR CERTIFICATION OF**
**COLLECTIVE ACTION, FOR DISCLOSURE OF CONTACT INFORMATION FOR**
**POTENTIAL OPT-IN PLAINTIFFS, AND TO SEND COURT-APPROVED NOTICE**</u>


**I.**

<u>**INTRODUCTION**</u>

COME NOW Plaintiffs Chad Lochridge, Heather Lochridge, Everette Lochridge,

Twyla Lochridge, Kevin Kornegay, Linda Danforth, Patricia Leach, Debra McKee, Brian

McKee, Patsy Pickel, Steven Pickel, Carlis Smith, Lydia Smith, Rebecca Smith, Judy

Kathryn Hale, Sherry Jenkins, Pearson Jenkins and Ryan Agee, each individually and

on behalf of others similarly situated, by and through undersigned counsel, and for their

Brief in Support of their Motion for Certification of Collective Action, for Disclosure of

Potential Opt-In Plaintiffs' Contact Information, and Court-Approved Notice, against

**Page 1 of 22**
**Chad Lochridge, et al. v. Lindsey Management Co., Inc., et al.**
**U.S.D.C. (W.D. Ark.) 5:12-CV-05047**
**Brief in Support of Motion for Certification of Collective Action**

Defendants Lindsey Management Co., Inc., and James E. Lindsey (hereinafter referred to as "Defendant"), and in support thereof they do hereby state and allege as follows:

Pursuant to 29 U.S.C. § 216(b), Plaintiffs filed their current Motion for Conditional Certification of their claims as a representative Fair Labor Standards Act ("FLSA") class under 29 U.S.C. § 216(b) which provides:

> An action to recover the liability prescribed . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees similarly situated.   No employee shall be a party [P]laintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Plaintiffs—former Community Directors, Resident Managers, or Assistant Managers who lived and worked for Defendant in Alabama, Mississippi, Oklahoma, and Tennessee—ask this Court to certify two classes, consisting of the following persons, for reasons which shall be thoroughly described below:

> All current and former employees of Defendant, who were employed as Community Directors, Resident Managers, or Assistant Managers in Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma or Tennessee at any time during the three (3) years preceding the filing of Plaintiffs' Complaint on March 15, 2012, who were misclassified as salaried exempt from the overtime provisions of the FLSA and who are accordingly entitled to be paid for all of their hours in excess of forty (40) hours each week; and

> All current and former employees of Defendant, who were employed as Community Directors, Resident Managers, or Assistant Managers in Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma or Tennessee at

any time during the three (3) years preceding the filing of Plaintiffs' Complaint on March 15, 2012, who were hourly employees of Defendant but who were not paid regular wages and overtime compensation for hours they worked in excess of forty (40) hours for each week.

## II.

## STATEMENT OF FACTS AND SUMMARY OF PROCEEDINGS

Defendant Lindsey Management Co., Inc., based in Fayetteville, Arkansas, is "the largest property management firm of multi-family housing in the state of Arkansas" and holds a "strong presence in the states of Alabama, Kansas, Mississippi, Missouri, Nebraska, Oklahoma and Tennessee."[1] Defendant James E. Lindsey is the Chairman/CEO and namesake of Defendant Lindsey Management Co., Inc., which manages "over 35,000 apartment homes in over 120 apartment communities, as well as 42 golf courses located throughout" the eight states in which it maintains a presence.[2] Plaintiffs who were paid on an hourly basis allege that they and other hourly employees were not paid for all the hours they worked for Defendants. Plaintiffs who were paid on a so-called salary basis allege that they and others similarly situated were misclassified by Defendants as "FLSA exempt," i.e., Defendants classified Plaintiffs and putative plaintiffs as exempt from the overtime requirements under federal law, when in fact they were nonexempt and were accordingly required to be paid for each and every hour of overtime that they worked for Defendants.

Plaintiffs—largely former Community Directors, Residence Managers, and Assistant Managers of Defendant—filed this lawsuit individually and on behalf of others

---

[1] *Our Company*, LINDSEY MANAGEMENT CO., INC., *available at* http://www.lindseymanagement.com /cgi-bin/index.cgi?page=pub _company (last visited Oct. 18, 2012) (Doc. No. 45-7).

[2] *Id.*

similarly situated for unpaid overtime and other compensation against Defendant on March 15, 2012.[3]  The Complaint has been amended, including the Third Amended and Substituted Complaint, conventionally filed on August 16, 2012, which contains all of the current claims and causes of action upon which Plaintiffs' Motion for Certification is based.[4] The lawsuit brings the claims of eighteen employees and/or former employees of the Defendants, individually and on behalf of other similarly situated employees and former employees pursuant to 29 U.S.C. § 216(b).[5]

Every Lindsey Management Community Director, Resident Manager,[6] and Assistant Manager was required to live on site; all Community Directors and most Resident Managers were paid a salary of at least $455.00 per week, plus bonuses that were not discretionary in nature but were based on certain performance and financial metrics that were set by the Defendants.[7] The remainder of Resident Managers and all Assistant Managers were paid on an hourly basis; however, Defendant failed to pay them for all hours that they worked.[8]

With few exceptions, Lindsey Management Community Directors[9] were never paid more than $100,000.00 in any calendar year by Defendants while in their employ.[10]

_____

[3] Collective Action Complaint at Doc. No. 1 ("Complaint").

[4] Third Amended and Substituted Complaint at Doc. No. 36.

[5] Third Amended and Substituted Complaint at Doc. No. 36, ¶ 1, 2, 34, 49-52, 58-60.

[6] According to Defendant's website, the only difference between Community Directors and Resident Managers is the number of units in the apartment complex where they work. LINDSEY MANAGEMENT CO., INC., CAREER OPPORTUNITIES, APARTMENT EMPLOYMENT, http://www.lindseymanagement.com/cgi-bin/employment_list.cgi?employment_type=%41%70%61%72% 74%6D%65%6E%74%20%45%6D%70%6C%6F%79%6D%65%6E%74> (last visited Oct. 18, 2012). (Doc. No. 45-7) See also Affidavit of Ray Danforth (Doc. No. 45-3) ("Danforth Aff.") at ¶ 5 ("Just to make things clear, "Resident Managers" and "Community Directors" are different job titles for the exact same job…"); Affidavit of Chad Lochridge, (Doc. No. 45-4) ("Chad Lochridge Aff.") at ¶ 4.

[7] Chad Lochridge Aff. at ¶ 5, 11, 14, 16. (Doc. No. 45-4)

[8] Ray Danforth Aff. ¶ 10–12, 15. Affidavit of Patsy Pickel (Doc. No. 45-5) ("Patsy Pickel Aff.") at ¶ 5.

[9] See supra note 2, explaining that the "Community Directors" and "Resident Managers" perform the same functions and are subject to the same conditions.

Defendants concede that Plaintiffs and all current and former Community Directors[11] employed during the FLSA recovery period were "generally paid a base salary of $455.00 per week for all hours worked."[12]

Per universal Lindsey Management policy, salaried employees were required to work either sixty (60) hours per week[13] or an alternating schedule of fifty (50) hours one week followed by sixty-five (65) hours the next[14] but, if salaried, were never paid more than their base salaries, or if hourly, were never paid for their hours worked in excess of fifty (50) or sixty-five (65), depending on the week (plus occasional non-discretionary bonuses which were automatically paid when certain performance markers were met).[15] Likewise, hourly employees were told that they had to meet certain minimum thresholds of overtime each week (generally, fifteen (15) hours of overtime each week), but Defendant consistently and willfully failed to pay them for all the hours they worked.[16]

Every Lindsey Management Community Director,[17] including and just like Chad Lochridge and all of the other Plaintiffs, was assigned and did perform or adhere to job duties, work schedules, requirements of clocking in and out, time off that was scheduled and dictated to them by the Defendants, and a requirement to be on call 24/7 during the entirety of their periods of employment with the Defendants.[18] All these requirements

---

[10] Chad Lochridge Aff. at ¶ 5 (Doc. No. 45-4).
[11] *See supra* note 2.
[12] Answer at ¶ 28.
[13] Manager Compensation Schedule (Doc. No. 45-8).
[14] Memorandum from Jim Lindsey re: Community Director Work Schedule (Doc. No. 45-9). (*See also* Chad Lochridge Aff. at ¶ 14, stating he and other Community Directors were expected to work fifty (50) hours one week followed by sixty-five (65) hours the next) (Doc. No. 45-4).
[15] Ray Danforth Aff. at ¶ 6, 20 (Doc. No. 45-3); Patsy Pickel Aff. at ¶ 5 (Doc. No. 45-5); Chad Lochridge Aff. at ¶ 20 (Doc. No. 45-4).
[16] *Id.*
[17] *See supra* note 2.
[18] See Chad Lochridge Aff. at ¶ 11-13 (Doc. No. 45-4); *see also Apartment Employment*, LINDSEY MANAGEMENT CO., INC., *available at* http://www.lindseymanagement.com/cgibin/

are pursuant to the common practice and universal written policies, directives, forms and checklists of the Defendants for all Community Directors.[19] Every Lindsey Management Community Director,[20] including and just like Plaintiffs, performed essentially the same duties in different geographic locations within the regional footprint of Defendants' business.[21]

Ray Danforth worked for Defendants for several years as a Regional Supervisor where he managed many Plaintiffs and putative class members.[22] The policies he implemented per Defendant's instructions and observed as Regional Manager were not limited to his region; Lindsey Management applied the same universal policies nationwide.[23]  Throughout his affidavit he stresses that the Defendant's business was run according to uniform policies. For example, he says "If there could only be three words that described the operation of Lindsey Management, it would be uniformity, micromanagement, and cheap—Mr. Lindsey himself made sure that everything all on all his properties was done to his personal specifications…."[24] He goes on to say, "everything I have described above is uniform for all Resident Managers and Community Directors, regardless of where the apartment complex is that the worker works."[25]

---

employment_list.cgi?employment_type=Apartment%20Employment ("Leasing offices are open seven days a week and management is available 24 hours a day.") (last visited Oct. 18, 2012) (Doc. No. 45-7).
   [19] *See supra* note 2; *see also* Chad Lochridge Aff. at ¶ 12 (Doc. No. 45-4); Ray Danforth Aff. at ¶ 5, 20 (Doc. No. 45-3).
   [20] *See supra* note 2.
   [21] Chad Lochridge Aff. at ¶ 11-13 (Doc. No. 45-4); Ray Danforth Aff. at ¶ 5 (Doc. No. 45-3); Patsy Pickel Aff. at ¶ 16 (Doc. No. 45-5).
   [22] Ray Danforth Aff. at ¶ 4 (Doc. No. 45-3).
   [23] *Id.* (Doc. No. 45-3).
   [24] *Id.* at ¶ 9 (Doc. No. 45-3).
   [25] *Id.* at ¶ 20 (Doc. No. 45-3).

Many of Lindsey Management's universal policies are contained in a handbook called *Nuts & Bolts of Property Management*,[26] which every Community Director, Resident Manager, and Assistant Manager received and was required to follow.[27] This handbook contains numerous checklists that effectively micromanage how Plaintiffs and putative class members—so-called "managers"—should spend every moment of their time.[28] For instance, there are five pages of checklists for what to do when the phone rings[29] and when the door opens,[30] seven pages of checklists listing tasks to be completed on a daily, weekly, monthly, or quarterly basis,[31] an extremely detailed requirement that each prospective client  be contacted ten times on specific days and what to say on each day,[32] and a "Management Staff Personal Checklist" instructing employees to "[b]athe or shower daily" and "[u]se antiperspirants and freshen throughout the day if necessary."[33] These are just a few examples of the extraordinarily specific, time-consuming, uniform policies applied by Lindsey Management. Further, many of these tasks relate to maintenance-type work, such as picking up cigarette butts and other litter.[34]

Chad Lochridge's affidavit states therein, in relevant part, that he performed the tasks delineated by Defendant and that he observed other Community Directors[35] performing essentially the same tasks and operating under the same directives,

---

[26] *Nuts & Bolts of Property Management* (hereinafter "Nuts and Bolts Handbook") (Doc. No. 45-6).
[27] Ray Danforth Aff. ¶ 17, 23 (Doc. No. 45-3); *see also* Chad Lochridge Aff. ¶ 7, 26 (Doc. No. 45-4).
[28] Chad Lochridge Aff. ¶ 7 (Doc. No. 45-4).
[29] Nuts & Bolts Handbook at 14-17 (Doc. No. 45-6).
[30] *Id. at 20* (Doc. No. 45-6).
[31] *Id.* at 7, 30-32, 37-39 (Doc. No. 45-6).
[32] *Id.* at 12 (Doc. No. 45-6).
[33] *Id.* at 36 (Doc. No. 45-6).
[34] *Id.* at 30–40; 43–46 (Doc. No. 45-6).
[35] *See supra* note 2.

checklists, forms and policies company-wide, without significant variations. Specifically,

he states as follows:

> Every single aspect of my job that I have described herein was not singular or unique to me. On the contrary, Defendants ran their business in an excruciatingly systemized manner. Everything that I have said about my job as Community Director is true about and accurately describes the job of any Community Director anywhere and everywhere in the company; we were subjects of a unified and uniform policy that was evenly and intentionally applied across the board, universally, to each person in the same position at any property managed and/or owned by Defendants. Until this particular fact is understood, one cannot fully appreciate the degree to which all Community Directors were in fact directors of nothing.
>
> As a Community Director, my work duties, work schedule, the requirement of clocking in and out, the dictated time off, and Defendants' 24/7 on-call requirement were all pursuant to the common practice and universal written policies of Lindsey Management for all Community Directors.
>
> I witnessed first hand, experienced and communicated with Defendants and with other Community Directors regarding these common practices and universal policies of Lindsey Management and their implementation evenly throughout the United States. Lindsey Management's policies were uniformly applied to all Community Directors and were set out in writing.[36]

Chad Lochridge and Ray Danforth estimate that there were approximately five

hundred (50) similarly situated employees who worked for Defendant under the same

basis with similar duties and compensation arrangements.[37]

Since the filing of the initial Complaint, fourteen (14) former employees who

worked for the Defendants have filed Opt-In Consents to become plaintiffs in this

overtime lawsuit, showing the great interest that employees and former employees have

---

[36] Chad Lochridge Aff. at ¶ 11–13 (Doc. No. 45-4); See also Patsy Pickel Aff. at ¶ 16 (Doc. No. 45-5).

[37] Chad Lochridge Aff. at ¶ 22 (Doc. No. 45-4); Ray Danforth Aff. at ¶ 25 (Doc. No. 45-3).

in joining the lawsuit and their belief they are owed overtime based on the conduct of the Defendants referenced above.[38]

III.

**ARGUMENT**

### 3.1.    Similarly Situated and the Two-Step Inquiry.

In *Hoffman-La Roche, Inc. v. Spering*, the Supreme Court of the United States held that district courts have the discretion to certify a class and issue orders authorizing notice to potential members of a collective action of the opportunity to "opt-in" to a collective action.[39]   The key issue presented to the court exercising such discretion is whether the persons to whom notice would go are similarly situated to plaintiffs.[40]   The Fifth Circuit's approach to the question of courts certifying a class and issuing notice to potential members of a collective action is similar to other circuits, but is perhaps more well-defined. The Fifth Circuit Court of Appeals utilizes a two-tiered certification approach on an ad hoc, case-by-case basis to determine whether the plaintiffs are similarly situated.[41] This two-step certification inquiry is described in *Mooney v. Aramco Service* as follows:

> The first determination is made at the so-called "notice-stage." At the notice stage, the district court makes a decision—usually only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members.
>
> Because the Court has minimal evidence this determination is made using a fairly lenient standard and typically results in

---

[38] *See* Notice of Filing Opt-In Consents of Kevin Kornegay, Linda Danforth, Patricia Leach, Debra McKee, Brian McKee, Patsy Pickel, Steven Pickel, Carlis Smith, Lydia Smith, Rebecca Smith, Judy Kathryn Hale, Sherry Jenkins, Pearson Jenkins, and Ryan Agee at Doc. Nos. 8, 9, 10, 17, 18, and 36-1.

[39]    493 U.S. 165, 169, 110 S.Ct. 482 (1989).

[40]    *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001).

[41]    *Mooney v. Aramco Service, Co.*, 4 F. 3d 1207, 1213-14 (5th Cir. 1995).

"conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

The second determination is typically precipitated by a motion for "decertification" by the Defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in Plaintiffs are dismissed without prejudice. The class representatives—i.e., the original Plaintiffs—proceed to trial on their individual claims.[42]

In recent cases, courts in the Eastern and Western Districts of Arkansas have followed the framework of the two-tiered approach outlined in *Mooney*.[43]  A majority of district courts in the Eighth Circuit have adopted the two-step process under which a district court conditionally orders the class to proceed as a collective action at the notice stage and later permits motions by the defendant to decertify at the conclusion of discovery.[44]

At the notice stage, a court does not make findings on legal issues or focus on

---

[42]     *Mooney*, 54 F.3d at 1213-14.

[43]     *See, e.g., Alesa Lambert, et al. v. Sykes¸* 4:11-cv-0850 (BSM) (E.D. 2012); *Almeda v. Crittenden County,* 3:05-CV-00024 JLH (E.D. Ark. 2005); *Musticchi v. Little Rock*, Case No. 4:08-CV-00419 SWW (E.D. Ark. 2008); *Resendiz-Ramirez v. P & H Forestry, LLC, et al*, Case No. 07-CV-1028 (W.D. Ark. September 27, 2007); *Allen v. Little Rock School District*, Case No. 4:02-CV-00479 SWW (E.D. Ark. 2002); Beasley v. Lee School District, Case No. 2:02-CV-112 GH (E.D. Ark. 2002); *Mason v. Marion School District*, Case No. 3:02-CV-277 JMM (E.D. Ark. 2002); Clark v. West Memphis School System, Case No. 3:02-CV-279 WRW (E.D. Ark. 2002); *Lotefield v. Earle School System*, Case No. 3:02-CV-337 GTE (E.D. Ark. 2002).

[44]     *Smith v. Frac Tech Services, Ltd.*, No. 4:09CV000679 JLH (E.D.Ark. 2009), *citing In re Pilgrim's Pride Fair Labor Standards Act Litigation*, 2008 WL 4877239, at *3 (W.D. Ark. Mar. 13, 2008) (collecting cases); *McQuay v. Am. Int'l Group, Inc.*, 2002 WL 31475212, at *2 (E.D. Ark. Oct. 25, 2002).

whether there has been an actual violation of the law.[45]   The Court also refrains from making credibility determinations or resolving contradictory evidence.[46]   The plaintiffs' burden is lenient and may be met by making substantial allegations of class-wide discrimination that are supported by affidavits.[47]   Plaintiffs need not show that his position is identical to the putative class members' positions, only that their position is similar to those of the absent class members.[48]

The "similarly situated" determination requires only a modest factual showing.[49] Although not defined by the FLSA, case law typically requires some showing that the plaintiffs and putative members were victims of a common decision, policy, or plan of the employer that affected all class members in a similar fashion.[50]   For example, the District Court of the Eastern District of New York determined that the plaintiffs had satisfied their first-stage "substantial similarity" burden by submitting a declaration "confirming that all [employees] . . . [had] been subjected to a policy that require[d] them to work through much of their lunch hour, as well as additional hours off the clock."[51]

In *Longcrier v. HL-A Co., Inc.*,[52] a case from the Southern District of Alabama, six plaintiffs brought claims against the defendant, alleging violations of the FLSA.   All plaintiffs alleged that they were hourly, nonexempt employees who employed by

---

[45]     *Id.*, *citing In re Pilgrim's Pride*, 2008 WL 4877239, at *3.
[46]     *Id.*
[47]     *Freeman v. Wal-Mart Stores, Inc.*, 256 F.Supp.2d 941 (WD Ark. 2003).
[48]     *Id.*, *citing Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996).
[49]     *Perez-Benites v. Candy Brand, LLC*, 2008 WL 4809105, at *3 (W.D. Ark. Oct. 31, 2008).
[50]     *Smith v. Frac Tech Services, Ltd.*, No. 4:09CV000679 JLH (E.D.Ark. 2009), *citing Resendiz-Ramirez v. P & H Forestry, LLC*, 515 F. Supp. 2d 937 (W.D. Ark. 2007); *Katusch v. Premier Communications*, 504 F. Supp. 2d 685 (W.D. Mo. 2007)); see also *Thiessen,* 267 F.3d at 1102 (first-round "similarly situated" determination "requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.").
[51]     *Bowens v. Atlantic Maintenance Corp.*, 546 F. Supp.2d 55, 82-83 (E.D.N.Y. 2008).
[52]     No. 08-0011-WS-C (S.D. Ala. 2008).

defendant in various capacities at its automobile parts manufacturing facility.[53]  Plaintiffs averred that the potential class was comprised of any and all persons employed as hourly employees by the defendant at any time during the three (3) years preceding the filing of the complaint.[54]  Even with so broad a proposed class, plaintiff's conditional class was certified and court-approved notice was granted. In <u>Longcrier</u>, the plaintiffs submitted declarations from named and prospective opt-in plaintiffs, stating that: (1) the defendant had a policy of requiring or permitting its hourly employees to work "off the clock" both before and after their shifts; (2) that defendant had a policy of failing to pay its hourly employees for work performed during their lunch breaks and of deducting 30 minutes from their pay each day for meal periods not taken; and (3) that defendant had a policy of consistently and systematically rounding hours down in the defendant's own favor, thereby artificially reducing hours paid relative to hours worked for all of its nonexempt hourly employees. The defendant argued that the plaintiffs were not "similarly situated" because the hourly positions held by putative class members covered a wide range of job titles, duties, pay ranges, and supervisors.[55]  The defendant denied the existence of any company policy concerning pre-shift or lunch break work, instead attributing those decisions solely to the discretion of individual supervisors.[56]  Over defendant's objections, the court held that plaintiffs' declarations and complaint allegations amounted to a substantial showing that all defendant's nonexempt employees were treated similarly and were subject to the same pay practices and policies with regard to "off the clock" work, rounding hours, and unpaid work during meal

---

[53]     *Id.*
[54]     *Id.*
[55]     *Id.*
[56]     *Id.*

breaks.[57]  The court further stated:

> At most, Defendant's evidence may create disputes of fact as to whether all hourly employees are or are not subject to the same policies.  Those factual disputes may properly be addressed after discovery at the second stage of the FLSA collective action process [ . . . ], but they do not constitute a valid basis for denying conditional class certification today.[58]

Other courts have rejected similar arguments put forth by defendants when confronted with similar evidentiary showings.[59]  In *Longcrier*, the defendant also argued that the proposed boundaries of the class ("all current and former hourly employees who worked for the company within the three years predating the filing of this action") were overly broad.[60]  The defendant argued that such a sweeping class definition would embrace administrative, maintenance, quality, production and warehouse employees, as well as subgroups of same.[61]  The court rejected defendant's argument, stating in the relevant part:

> Contrary to Defendant's insinuation, however, there is no categorical bar on certifying classes that embrace all hourly employees at a facility, nor is there any requirement that the class be artificially confined to a particular segment or subsection of affected employees based on job duties or the like.  The critical inquiry for defining the scope of the class is whether all included prospective class members are similarly situated, meaning that they are all collectively victims of a single policy or plan.[62]

---

[57]    *Id.*

[58]    *Id., citing Carmody v. Florida Ctr. For Recovery, Inc.*, 2006 WL 3666964, *4 (S.D. Fla. Nov. 8, 2006) (explaining that it would be improper to indulge in fact-finding to determine conclusively as to whether the putative plaintiffs are similarly situated, where pleadings and supporting affidavits alleged facts sufficient to satisfy conditional class certification inquiry).

[59]    *See also Hens v. Client Logic Operating Corp.*, 2006 U.S.Dist. LEXIS 69021, 2006 WL 2795620 (W.D.N.Y.2006) ("[T]he substantial number of declarations submitted by potential opt-in plaintiffs belie Defendant's suggestion that the wage violations were isolated rather than systemic").

[60]    *Longcrier v. HL-A Co., Inc.*, No. 08-0011-WS-C (S.D. Ala. 2008).

[61]    *Id.*

[62]    *Id.*

The court found that the plaintiffs had made an adequate showing at the preliminary stage to warrant inclusion of all hourly employees in the class definition.[63] Plaintiffs have adequately and sufficiently demonstrated that other current and former above-styled employees of Defendant are similarly situated to them, as other members of the potential class are or have been subject to a singular, common policy, practice and plan of Defendant that violates the FLSA.

This case is at the notice stage and as such is subjected to a more lenient standard based solely on pleadings and affidavits. The pleadings and attached affidavits contain an abundance of corroborated information supporting the Plaintiffs' and putative class members' claim that there are many other individuals similarly situated. Plaintiffs represent a class of Community Directors, Resident Managers, and Assistant Managers who entered into an employment relationship with Defendant.  Every class Plaintiff's relationship with Defendant was subject to Defendant's universal policies, which violated the FLSA, among other laws.

All Plaintiffs allege that they were subject to similar rules and controls placed upon them by Defendant, but were not compensated as required by the FLSA.  All allege that Defendant engaged in a common practice, policy, or plan of misclassifying "salary" Plaintiffs and refusing to pay hourly Plaintiffs regular wages or overtime wages in violation of the FLSA.  Thus, Plaintiffs and putative class members are all collectively victims of a single policy or plan imposed by Defendant.

---

[63] *Id.*; *see also Ruggles v. Wellpoint, Inc.*, --- F.R.D. ----, 2008 WL 4866053, *5 (N.D.N.Y. Nov. 6, 2008) ("At this initial stage where all that is being determined is whether potential opt-in plaintiffs may be similarly situated, the court does not weigh the ultimate merits of the claims, resolve factual disputes, make credibility determinations, nor decide substantive issues.")

### 3.2.    The Court Should Approve and Allow the Distribution of Plaintiffs' Collective Action Notice.

The Court should authorize collective notice at this stage of litigation as it would appropriately advance the remedial goals of the FLSA and promote judicial efficiency, and should approve of Plaintiffs' proposed Notice, which is fair and balanced, as well as Plaintiffs' proposed Consent to Become a Party Plaintiff.[64]   Section 216(b) of the FLSA authorizes trial courts to provide that court-approved notice be sent to potential plaintiffs to inform them of an action and allow them an opportunity to opt-in.[65]  In *Hoffman-La Roche*, the Supreme Court of the United States held that such notice should be sent in the early stages of litigation, noting the "wisdom and necessity" of early court involvement in managing opt-in cases and facilitating notice.[66]   The Court further observed that allowing plaintiffs to proceed collectively benefits individuals by allowing them to pool resources and benefits the judicial system by allowing for efficient resolution of common issues of law and fact.[67]

Sending court-approved notice early in a case promotes the "broad remedial purpose" of the FLSA and promotes efficient management by insuring that similar cases are combined in one proceeding.[68]  Plaintiffs seek to send a Notice with the class defined by salaried positions to putative plaintiffs who were paid a salary and a Notice with the class defined by hourly positions to putative plaintiffs who were paid by the

---

[64]        Notice of Right to Join Lawsuit (Doc. No. 45-1); Consent to Become a Party Plaintiff (Doc. No. 45-1).

[65]        *Hoffman-La Roche Inc.,* 493 U.S. at 165.

[66]        *Id.* at 171.

[67]        *Id.* at 170.

[68]        *Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991); *White v. Osmose*, 204 F.Supp.2d 1309, 1312 (M.D. Ala. 2002) ("§ 216(b) reflects a policy in favor of judicial economy."); *Hoffman v. Sbarro Corp.*, 982 F.Supp. 249, 262 (S.D.N.Y. 1997) ("Courts have endorsed the sending of notice early in the proceedings, as a means of facilitating the FLSA's broad remedial purpose and promoting efficient case management.").

hour. Putative plaintiffs who held both types of positions would receive both Notices. Plaintiffs also request that the Court grant counsel a period of ninety (90) days—running from the date on which the Defendants release the potential putative class members' contact information to Plaintiffs' counsel—during which to distribute notice and file opt-in Plaintiffs' consent forms with the Court.   Plaintiffs' request is reasonable in light of time and coordination required to notify the putative class members of the opportunity to opt-in to this lawsuit and to receive response in return.   Many of the potential class members may have current addresses and phone numbers that will differ from Defendant's records.   In order for the court-authorized notice to offer these potential plaintiffs a meaningful opportunity to join this suit, Plaintiffs' counsel will need at least ninety (90) days to coordinate locating and effectively sending notice to class members.

### 3.3    The Court Should Order Defendant to Provide the Names and Last Known Home, Work, and Email Addresses of Potential Opt-in Plaintiffs.

To facilitate the sending of the notice and consent forms, Plaintiffs also ask this Court, in accordance with prevailing practice, for an Order directing Defendant to provide all contact information of anyone who worked as a Community Director, Resident Manager, or Assistant Manager for Defendant any time from March 15, 2009, through the present. This includes but is not limited to: (1) the names of each and every potential Plaintiff for any period of time between March 15, 2009, and the present, including any known aliases they may have gone by or go by now; (2) the last known home and work addresses of the employee for the same time period; and (3) email addresses of any kind which Defendant is aware of any such employee, from March 15, 2009, to the present.   Further, the information provided by Defendant should include information regarding whether each individual was paid a salary, hourly, or both at

various times during the relevant statutory period.

Because of the fact that many of the potential plaintiffs may have current addresses and phone numbers that will differ from Defendant's records, direct mailing and sending mail via electronic transmission is a necessary and cost-effective manner to provide notice to these potential opt-in plaintiffs.  The names and last known work and home physical and email addresses of putative class members are in Defendant's possession, not Plaintiffs'.

In *Hoffman-La Roche*, the Supreme Court held that it was appropriate for the district court to permit disclosure of the names and addresses of possible opt-in plaintiffs.[69]  Trial courts routinely grant disclosure of the names and addresses of potential opt-in plaintiffs in conjunction with authorizing notice.[70]  As such, Plaintiffs respectfully ask that the Court order Defendant to produce the full names, last date(s) of employment of all putative class members who were/are Community Director, Resident Manager, or Assistant Managers for Defendant, information on whether each was paid hourly or salary, and their last known work and home physical and email addresses from March 15, 2009, to the present, no later than two (2) weeks after the date of the entry of the Order.

Under the present circumstances, it is hard to fathom how justice is not served by employees receiving notice of this lawsuit's existence and having an opportunity to join the lawsuit if and only if they so desire. Plaintiffs—whose lawyers will bear the entire expense of the notice process—ask for nothing more.

---

[69] *Id.,* 493 U.S. at 170.

[70] *Id.*

### 3.4     Plaintiffs have exceeded their burden at this initial notice stage.

Plaintiffs have met and exceeded their burden at this initial notice stage. Specifically, Plaintiffs have shown that the similarly situated employees were all similarly situated as to compensation arrangements—that they were all misclassified on "salary" and/or paid an hourly rate[71] that equaled at least $455.00 per week, plus non-discretionary performance-based bonuses while employed by Defendant.[72]

Plaintiffs have also shown (i) that the similarly situated employees were all similarly situated as to job activities;[73] (ii) that the Defendants' corporate office had centralized supervisory control over the similarly situated employees;[74] (iii) that the Defendants' corporate office and Defendant Jim Lindsey himself, as CEO and head of that corporate structure, had implemented and monitored a universal custom, practice or policy that applied to each and every Community Director and Resident Manager across the United States requiring them to work either fifty-five (55) to sixty (60) hours per week[75] or fifty (50) hours one week followed by sixty-five (65) hours every other week;[76] (iv) that the Defendants had a universal custom, pattern or policy of requiring all Similarly Situated Employees to comply, to the letter, with excruciatingly detailed corporate directives on every possible aspect of their jobs and record such uniform

---

[71] *See* Ray Danforth Aff.  ¶ 6 ("[T]hough all Resident Managers and Community Directors were paid basically the same, Resident Managers at apartment complexes of 179 units or less were paid on an hourly basis while Resident Managers at apartment complexes of 180 or more were paid on "salary." The hourly rate was generally minimum wage for the first forty (40) hours, and time-and-a-half for the next fifteen (15) hours, working out to be approximately $455.00 per week per person.") (Doc. No. 45-3); Ray Danforth Aff. ¶ 20 ("Resident Managers at smaller facilities were paid hourly at minimum wage, but were not paid for all the hours that they worked—indeed, we told them not to clock any more hours than the number that was also the minimum we required.") (Doc. No. 45-4).

[72] Complaint at ¶ 15; Answer at ¶ 15, 28; Lochridge Aff. at 5 (Doc. No. 45-4).

[73] Chad Lochridge Aff. at ¶ 15-18 (Doc. No. 45-4); Patsy Pickel Aff. at ¶ 16 (Doc. No. 45-5); Ray Danforth Aff. at ¶ 5, 17, 18, 20 (Doc. No. 45-3).

[74] Ray Danforth Aff. at ¶ 5, 9, 19, 20, 23 (Doc. No. 45-3).

[75] Ray Danforth Aff. at ¶ 16 (Doc. No. 45-3).

[76] Memorandum re: Community Director Work Schedule (Doc. No. 45-9); Manager Compensation Schedule (Doc. No. 45-9); Chad Lochridge Aff. at ¶ 14 (Doc. No. 45-4).

compliance through the use of hundreds of corporate forms, checklists and the filing of detailed daily reports;[77] (v) that these numerous and voluminous policy handbooks, checklists, formbooks, forms and directives were provided to every Lindsey Management Community Director, Resident Manager, and other Similarly Situated Employees and that it was mandatory that every Lindsey Management Community Director, Resident Manager, and other Similarly Situated Employees at every Lindsey location nation-wide read and abide by these universal directives that told them how to make every decision in doing their jobs, from telling them which telephone ring on which to answer the phone, to giving them a "Personal Checklist" for them to do each day, on which the first duty is to "[b]athe or shower daily;"[78] and (vi) that fourteen other employees within the class of similarly situated employees have subsequently filed opt-in consents to join this lawsuit while others have expressed their interest in or are believed to be interested in joining this overtime lawsuit.[79]

## IV.

## CONCLUSION

Plaintiffs' burden at this stage is lenient and easily met.  Attached to Plaintiffs' Motion are the affidavits of several of Defendant's former employees, including Plaintiffs and a Regional Supervisor.  These affidavits each describe Plaintiffs' and putative class members' respective duties and announce the existence of additional similarly situated

---

[77] Chad Lochridge Aff. at ¶ 7 (Doc. No. 45-4); Ray Danforth Aff. at ¶ 9, 23 (Doc. No. 45-3); Nuts & Bolts Handbook (Doc. No. 45-6).

[78] Chad Lochridge Aff. at ¶ 8, 16 (Doc. No. 45-4); Ray Danforth Aff. at ¶ 23 (Doc. No. 45-3).

[79] Chad Lochridge Aff. ¶ 15, 16 (Doc. No. 45-4); Ray Danforth Aff. at ¶ 23, 24 (Doc. No. 45-3); *See Barron v. Henry County School System*, 242 F. Supp. 2d 1096, 1101-1102 (M.D. Ala. 2003) (granting conditional certification under FLSA based on affidavits showing the non-payment of overtime and the filing of "opt-in" authorizations); *see also Dietrich v. Liberty Square, L.L.C.*, 230 F.R.D. 574, 579 (N.D. Iowa 2005) (conditionally certifying collective action based on motion and two supporting affidavits alleging "off the clock" violations).

Community Directors, Resident Managers, and Assistant Managers.  These Affidavits provide a sufficient factual description of the uniformity of treatment Plaintiffs and members of the putative class endured as a result of Defendant's policies and procedures which resulted in misclassification of Plaintiffs and putative plaintiffs and Defendant's failure to compensate Plaintiffs and putative plaintiffs for all hours worked by them. The Affidavits attached to the Motion provide an ample factual basis to support certification at this point.

For these reasons, Plaintiffs respectfully request that this Court: (1) certify the instant class, as described above; (2) order Defendant to produce the full names, aliases, and last date(s) of employment or engagement of all potential putative class members, and the last known work and home physical and email addresses of those putative class members since March 15, 2009, to the present, and designate those who were paid salary and those who were hourly, no later than two weeks after the date of the entry of the Order; (3) approve the notice and consent to join attached to the accompanying Motion; and (4) give putative opt-in Plaintiffs the opportunity to choose whether or not to join this case.

Respectfully Submitted,

**CHAD LOCHRIDGE, HEATHER LOCHRIDGE, EVERETTE LOCH-RIDGE, TWYLA LOCHRIDGE, KEVIN KORNEGAY, LINDA DAN-FORTH, PATRICIA LEACH, DEBRA McKEE, BRIAN McKEE, PATSY PICKEL, STEVEN PICKEL, CARLIS SMITH, LYDIA SMITH, REBECCA SMITH, JUDY KATHRYN HALE, SHERRY JENKINS and PEARSON JENKINS, Each Individually and on Behalf of Others Similarly Situated, PLAINTIFFS**

DAVID HUGHES, ASB-3923-U82D
HUGHES HARDIN, LLP
2121 14th ST
TUSCALOOSA, AL 35401
PHONE: (205) 345-6690
FACSIMILE:  (205) 345-6188
dhughes@hardinhughes.com

and

SANFORD LAW FIRM, PLLC
ONE FINANCIAL CENTER
650 S SHACKLEFORD STE 400
LITTLE ROCK, AR 72211
PHONE: (501) 221-0088
FACSIMILE: (888) 787-2040

/s/ Josh Sanford_____
Josh Sanford
Ark. Bar No. 2001037
josh@sanfordlawfirm.com

Anne Milligan
Ark Bar No. 2010263
anne@sanfordlawfirm.com

## **CERTIFICATE OF SERVICE**

I, Josh Sanford, hereby certify that on October 24, 2012, I electronically filed the foregoing AMENDED BRIEF IN SUPPORT OF AMENDED MOTION FOR CONDITIONAL CERTIFICATION with the Clerk of Court using the CM/ECF system and that the attorneys named below have consented to the electronic distribution of pleadings by the CM/ECF system:

Ms. Eva C. Madison
Ms. Kim F. Coats
LITTLER MENDELSON, P.C.
3739 Steele Blvd., Suite 300
Fayetteville, Arkansas 72703
Telephone: (479) 582-6100
Facsimile: (479) 581-6111
emadison@littler.com

/s/ Josh Sanford_____
 Josh Sanford