## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

CHAD LOCHRIDGE, HEATHER LOCHRIDGE,
EVERETTE LOCHRIDGE, TWYLA
LOCHRIDGE, KEVIN KORNEGAY, LINDA
DANFORTH, PATRICIA LEACH, DEBRA
McKEE, BRIAN McKEE, PATSY PICKEL,
STEVEN PICKEL, CARLIS SMITH, LYDIA
SMITH, REBECCA SMITH, JUDY KATHRYN
HALE, SHERRY JENKINS, PEARSON JENKINS,
and RYAN AGEE, Each individually and on behalf
of all persons similarly situated                                    PLAINTIFFS

vs.                                        Case No. 12-cv-05047

LINDSEY MANAGEMENT CO., INC. and
JAMES E. LINDSEY                                                     DEFENDANTS

### DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CERTIFICATION OF COLLECTIVE ACTION, FOR DISCLOSURE OF CONTACT INFORMATION FOR POTENTIAL OPT-IN PLAINTIFFS, AND TO SEND COURT-APPROVED NOTICE

### ORAL ARGUMENT REQUESTED

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT FACTS ........................................................................................... 1

        A.      Overview Of Lindsey Management's Operations ................................... 1

        B.      Overview Of Community Directors, Resident Managers, And Assistant
                Managers ................................................................................................ 2

        C.      The Putative Exempt Class Consists Of Community Directors Who
                Perform A Wide Range Of Exempt Management Functions Specific To
                The Unique Community That They Manage ........................................... 3

        D.      The Putative Nonexempt Class Consists Of Resident Managers And
                Assistant Managers Who Are Compensated For All Hours Worked And
                Whose Job Duties And Responsibilities Differ ...................................... 6

                1.      Resident Managers ..................................................................... 6

                2.      Assistant Managers .................................................................... 6

        E.      Defendants Maintain And Follow Proper Time Keeping And Reporting
                Policies And Practices ............................................................................ 7

        F.      Plaintiffs' Own Timekeeping And Payroll Records Contradict Their
                Allegations ............................................................................................. 9

        G.      Plaintiffs' Proposed Classes Do Not Even Include Individuals Who Have
                Already Opted Into This Litigation ....................................................... 10

III.    ARGUMENT ..................................................................................................... 11

        A.      Legal Standard ..................................................................................... 11

                1.      Authorization Of Notice Under The FLSA Is Discretionary And
                        Should Only Be Granted In Appropriate Cases ....................... 11

                2.      Plaintiffs Must Establish That They And The Putative Class Are
                        "Similarly Situated" And Were Victims Of A Common Policy ............ 13

                3.      The Two-Step Analysis Plaintiffs Endorse Is Inappropriate And
                        Inconsistent With The Supreme Court's Insistence On "Common
                        Questions With Common Answers" ......................................... 13

        B.      Plaintiffs Cannot Establish That They And The Putative Class Members
                Are Similarly Situated .......................................................................... 19

                1.      The Evidence Plaintiffs Have Submitted is Insufficient to Satisfy
                        Their Burden of Demonstrating That They And The Putative Class
                        Members Are Similarly Situated .............................................. 20

i

TABLE OF CONTENTS
(CONTINUED)

PAGE

2.   Plaintiffs Are Not Similarly Situated Because Individualized Inquiries Germane To The Exemption Analysis Preclude Certification ........................................................................... 22

3.   Individualized Inquiries Into The Actual Duties Performed Further Render Collective Action Treatment Inappropriate................................. 25

4.   Plaintiffs Are Not Similarly Situated and Individualized Inquiries Germane to Plaintiffs' Off-The-Clock Claims Cannot be Ignored.......... 27

C.   Plaintiffs Cannot Demonstrate That The Putative Class Was Subjected To A Common Policy That Violated The Law ........................................... 31

1.   Plaintiffs' Argument That The Common Policy That Binds The Putative Exempt Class Together Is Exempt Classification Has been Uniformly Rejected.................................................................................. 31

2.   Plaintiffs Cannot Rely On Conclusory And Unsupported Allegations Regarding "Off-The-Clock" Work To Establish The Existence Of A Common Policy, Plan or Practice ................................. 32

3.   Plaintiffs Cannot Rely On The Nuts & Bolts Guide To Bind The Putative Class Together ........................................................................ 33

D.   The Cases Cited By Plaintiffs Demonstrate That Conditional Certification Is Wholly Inappropriate Here ............................................................... 34

IV.   CONCLUSION.............................................................................................. 36

## I.   INTRODUCTION

Plaintiffs seek to represent, and have requested conditional certification of two classes of potential plaintiffs, which they define as "[a]ll current and former employees of Defendant, who were employed as Community Directors, Resident Managers, or Assistant Managers in Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma or Tennessee at any time during the three years preceding the filing of Plaintiffs' Complaint on March 15, 2012[:]"

> (1) "who were misclassified as salaried exempt . . . ." (referred to herein as the "Putative Exempt Class"); and

> (2) "who were hourly employees of Defendant but who were not paid regular wages and overtime compensation for hours they worked in excess of forty (40) hours for each week" (referred to herein as the "Putative Nonexempt Class")[1].

Plaintiffs' request for class certification must be denied because they have failed to make the requisite showing that the alleged classes have been subjected to an improper common policy or scheme, that questions common to the proposed classes predominate over individual issues, or that the named Plaintiffs are similarly situated to the proposed classes.  Moreover, Plaintiffs' claims are rife with personal determinations that cannot be attributed to the class as a whole, which further shows the lack of similarity between named Plaintiffs and the proposed classes they wish to represent.  This Response Brief is supported by the following points and authorities, exhibits and declarations attached hereto, and any oral argument permitted by the Court.

## II.   RELEVANT FACTS

### A.   Overview Of Lindsey Management's Operations

Lindsey Management Co., Inc. ("Lindsey Management" or "the Company,") based in Fayetteville, Arkansas, began its operations in 1985.[2]  The Company presently manages over 150

---

[1] Docket Entry 49.

[2] Def. App. 200 [Declaration of Job Branch ("J. Branch Decl."), ¶ 3;  *Our Company*, Lindsey Management Co., Inc., available at http://www.lindseymanagement.com/cgi-bin/index.cgi?page=pub_company (last visited Nov. 29, 2012)].

1

apartment communities ranging from as few as 64 units to as many as 672 units.[3]   The communities, owned by a number of independent legal entities and individuals are located in eight states across the country.[4]   Amenities vary by community.[5]   Some communities feature clubhouses, fitness centers, pools, tennis courts and lakes.[6]   Other communities also feature business centers, game rooms, tanning beds, whirlpools, saunas, and resort-style pools.[7]   In addition, there are currently 42 communities with Pro Shops and golf courses in the eight-state area, and the golf courses range from 9-hole Par 3s to 27-hole Championship courses.[8]

Communities holding in excess of 300 apartment units are generally, but not always, managed by a two-person Community Director team.[9]   Each community with less than 300 apartment units is managed by an individual Community Director or Resident Manager, or a two-person management team.[10]   Communities are also staffed with up to two "Assistant Managers," and other non-exempt, hourly employees such as a "Senior Leasing Consultant," "Leasing Consultant," "Senior Maintenance Technician," "Maintenance Technician," "Clubhouse Attendant," and/or "Groundskeeper."[11]

## B.    Overview Of Community Directors, Resident Managers, And Assistant Managers

Community Directors are classified as exempt and are paid on a salaried basis.[12] Resident Managers and Assistant Managers, on the other hand, are classified as non-exempt, and are paid on an hourly basis for all hours worked.[13]   Resident Managers and Assistant Managers

---

[3] Def. App. 200 [J. Branch Decl. ¶ 4].
[4] Def. App. 200 [J. Branch Decl. ¶ 4].
[5] Def. App. 23, 200 [ J. Branch Decl.  ¶ 5; Declaration of Eddie Smith (E. Smith Decl., ¶ 4)].
[6] Def. App. 200-201 [J. Branch Decl. ¶ 5].
[7] *Id.*
[8] *Id.*
[9] Def. App. 136-137 [Declaration of Betsy Fox ("B. Fox Decl.")].
[10] *Id.*
[11] Def. App. 201 [J. Branch Decl. ¶ 8].
[12] Def. App. 201 [J. Branch Decl. ¶ 9].
[13] Def. App. 120, 124, 128 [Declaration of La'Karen Porter ("K. Porter Decl."), ¶ 4; Declaration of Cynthia Tucker ("C. Tucker Decl.") ¶3; Declaration of Megan Vanhoy ("M. Vanhoy Decl.") ¶5].

are paid overtime at the rate and one and one half times their regular rate for all hours worked over forty in a week.[14]

Due to the unique nature and multiple aspects of the apartment management business, two-person management teams are generally more efficient for larger apartment communities (above 300 units).[15]   The two-person team is usually comprised of individuals sharing a personal relationship, such as two spouses.[16]   However, that is not always the case, and the Company has staffed communities with individuals sharing no personal relationship.[17]   Community Directors and Resident Managers report to a Regional Supervisor, and the degree and manner by which each individual interacts with their Regional Supervisor varies significantly.[18]   Assistant Managers, who are classified as non-exempt and are paid on an hourly basis, work under the supervision of Community Directors or Resident Managers.[19]

### C.   The Putative Exempt Class Consists Of Community Directors Who Perform A Wide Range Of Exempt Management Functions Specific To The Unique Community That They Manage[20]

Community Directors assume responsibility for all aspects of managing larger apartment communities, which may also include managing a 9-hole golf course, Pro Shop and/or grill.[21] Community Directors regularly perform exempt functions specific to the unique community they manage, and to the unique role that they fulfill within that community.[22]   Some Community

---

[14] Def. App. 136, 201 [J. Branch Decl. ¶ 11; B. Fox Decl. ¶ 6].

[15] Def. App. 136-137 [B. Fox Decl. ¶ 12].

[16] Def. App. 8, 22 [Declaration of Kathy Smith ("K. Smith Decl.") ¶2; E. Smith Decl. ¶2].

[17] Def. App. 137 [B. Fox Decl. ¶ 13-14].

[18] Def. App. 23, 107, 202 [J. Branch Decl. ¶ 13 ; E. Smith Decl. ¶ 9; Declaration of Mary Carlat ("Carlat Decl."), ¶ 4].

[19] Def. App. 132 [Declaration of Janet Willcutt ("J. Willcutt Decl.")  ¶2].

[20] Although Plaintiffs define the Putative Exempt Class as all exempt Community Directors, Resident Managers and Assistant Managers, the only individuals who are actually classified as exempt are Community Directors.  Likewise, Plaintiffs define the Putative Nonexempt Class as all nonexempt Community Directors, Resident Managers and Assistant Managers, but only Resident Managers and Assistant Managers are classified as nonexempt.

[21] Def. App. 202 [J. Branch Decl. ¶ 15].

[22] Def. App. 202 [J. Branch Decl. ¶ 16].

3.

Directors describe their primary duty as running the community as if they owned the business.[23] In fact, when Diane Leach – a former Community Director and putative class member – decided to end her employment with the Company in May 2012, she sent a resignation letter to Mr. Lindsey thanking him for the opportunity to manage a community and stating,

> "**When you promoted me to Manager at the Fairways at Marion, I didn't realize it at first, but this was my opportunity to run my own business**. **I have certainly enjoyed the opportunity to manage the Fairways all of these years and want to thank you from the bottom of my heart for the trust you have shown in me**."[24]

Community Directors also supervise and manage anywhere from two to 14 other employees within a community.[25]

The job duties of Community Directors vary significantly. Community Directors determine, amongst themselves and without supervisory direction, how to allocate the various tasks associated with managing a community.[26] For instance, some Community Directors divide their responsibilities by having one assume responsibility for "inside" duties, such as leasing, marketing and staffing related to same, while the other assumes responsibility for "outside" duties, such as overseeing and supervising maintenance, grounds keeping, addressing resident complaints and compliance issues, as well as assessing and overseeing the repair of vacated units.[27] However, this is not always the case. In some communities one individual has taken the full responsibility for the majority of the Community Director's responsibilities rather than

---

[23] Def. App. 18, 23, 139, 159-199 [E. Smith Decl. ¶ 10 (testifying that he manages his community ". . . as if it is my own business and I run it as if I owned this business"); K. Smith Decl. at ¶ 40 ( "Jim Lindsey has always told us to run the community like you own it—take care of it as if it is your own business and that is what we have always tried to do over the years."); B. Fox Decl. ¶ 22 and Exh. 3].
[24] Def. App. 139, 145-147 (emphasis added) [B. Fox Decl. ¶ 22 and Exh. 3]
[25] Def. App. 24, 202 [J. Branch Decl. ¶ 18; E. Smith Decl. ¶ 11].
[26] Def. App. 202-203[J. Branch Decl. ¶ 19, 20].
[27] Def. App. 202-203 [J. Branch Decl.¶20].

splitting it with another Community Director, due to their personal needs, such as when undergoing marital separation or due to the health conditions of one of the partners.[28]

The significance of this difference in the job duties between proposed class members— even those holding the same position—cannot be understated. To be clear, one Community Director might manage all aspects of a community related to leasing, marketing and staffing while another might oversee maintenance, which sometimes involves varying degrees of manual labor, while yet another might manage all of these aspects alone.[29] It is therefore impossible to determine whether the proposed class members were properly classified as exempt under the executive, administrative or combination exemptions to the FLSA without conducting an individualized analysis of each class member's job duties.

Even amongst Community Directors who have divided the management of a community in a similar manner, there is significant variance in the way the Community Directors carry out their responsibilities.[30] Therefore, the job duties and responsibilities entailed in managing a community managed by Lindsey Management vary from Community Director to Community Director and from community to community based on a variety of factors including, but not limited to, the division of labor amongst the Community Directors, the number of units in a community, the number of employees working at a community, regional manager preferences, the age of the community, the location of the community, the onsite facilities, the vacancy rate, training responsibilities, whether the community includes corporate suites and the hours of operations.[31]

In addition to Plaintiffs' sparse evidence, the record evidence includes declarations from 10 Community Directors submitted by Defendants. These declarations remove any doubt that

---

[28] Def. App. 137-138 [B. Fox Decl. ¶ 13-15].
[29] Def. App. 202-203 [J. Branch Decl. ¶20].
[30] Def. App. 203 [J. Branch Decl. ¶21].
[31] Def. App. 203 [J. Branch Decl ¶22].

the duties and responsibilities for the putative class members are widely disparate.  The evidence already before the Court, summarized in Exhibit A, demonstrates that a blanket determination of the exempt status of the Putative Exempt Class will be impossible.

**D.    The Putative Nonexempt Class Consists Of Resident Managers And Assistant Managers Who Are Compensated For All Hours Worked And Whose Job Duties And Responsibilities Differ**

**1.    Resident Managers**

Resident Managers oversee the operations of smaller communities.[32]   They are compensated on an hourly basis and are eligible for overtime pay whenever they work more than 40 hours in a workweek.[33]  The hours worked, job duties, and responsibilities of each Resident Manager differ from that of Community Directors and Assistant Managers, but also differ from that of other employees within the same Resident Manager position.[34]   The amount and frequency of overtime worked by each Resident Manager also varies, with some Resident Managers typically working about five to ten hours of overtime per week, while others typically work 10-15 hours of overtime each week.[35]  Some Resident Managers attest to never performing work when they are not clocked in for the day or without adjusting their time records, while others answer brief calls after work and elect not to report that time.[36]

**2.    Assistant Managers**

Assistant Managers work under the supervision of Community Directors or Resident Managers.[37]  They are hourly employees whose schedules vary depending on each community's and their personal needs.[38]   That is so even according to Plaintiffs' own evidence, which

---

[32] Def. App. 124, 203 [J. Branch Decl. ¶ 23; C. Tucker Decl. ¶ 2].
[33] Def. App. 124-126, 136 [B. Fox Decl. ¶ 6; C. Tucker Decl. ¶¶ 3, 6; Carlat Decl. ¶ 5].
[34] Def. App. 204 [J. Branch Decl. ¶25].
[35] Def. App. 108, 125 [C. Tucker Decl. ¶ 7; Carlat Decl. ¶ 12].
[36] Def. App. 125-126 [C. Tucker Decl. ¶ 9-10].
[37] Def. App. 107, 114 [Declaration of Ashley Crow ("A. Crow Decl.") ¶ 2; Carlat Decl. ¶ 3].
[38] Def. App. 107 [Carlat Decl. ¶ 5].

acknowledges that Assistant Managers at smaller apartment communities reported "fewer hours," while those in larger apartment communities reported more.[39]

Assistant Managers are eligible for overtime pay whenever they work more than 40 hours in a workweek, but the frequency and amount of overtime that each Assistant Manager works also varies, with some Assistant Managers not working overtime on a regular basis, to others who typically work no more than one to two hours of overtime in a week, and yet to others who worked more overtime hours.[40]   While Plaintiff Chad Lochridge states that, as an Assistant Manager he had to perform work whether he was "on-the-clock or not," for which he alleges he was not compensated,[41] other Assistant Managers did not perform work while off-the-clock, and fully reported and were properly compensated for their overtime work.[42]   Some Assistant Managers have performed work after hours and have had their time record adjusted for work performed after working hours, others have not.[43]

## E. Defendants Maintain And Follow Proper Time Keeping And Reporting Policies And Practices

Lindsey Management maintains a Timekeeping Policy that explicitly requires its employees and the employees of the properties it manages to accurately record time worked, and defines time worked as including "all time that an employee is physically at work performing tasks for the company."[44]   That policy also makes clear that non-exempt employees are paid one and one-half times their regular hourly rate for all hours worked in excess of 40 hours in a given week.[45]   Consistent with that policy, the Company instructs its employees and the employees of the properties it manages to use the biometric hand scanning system to record all hours worked,

---

[39] Docket Entry 49-3 [Declaration of Ray Danforth ("Danforth Decl.") ¶ 11-12].

[40] Def. App. 108, 114, 117-118, 136 [B. Fox Decl. ¶ 6; Declaration of Kevin Crow ("K. Crow Decl."), ¶ 5-6; A. Crow Decl. ¶ 6; Carlat Decl. ¶ 11].

[41] Docket Entry 49-3 [Declaration of Chad Lochridge ("Lochridge Decl."), ¶ 15].

[42] Def. App. 115 [A. Crow Decl. ¶¶ 7-8].

[43] Def. App. 115 [A. Crow Decl. ¶ 9].

[44] Def. App. 135, 141 [B. Fox Decl. ¶ 5 and Ex. 1].

[45] Def. App. 136, 141 [B. Fox Decl. ¶ 6 and Ex. 1].

to review their payroll records for accuracy, and to report any error to their supervisors, managers, Human Resources, or Company's Payroll Department for review and correction.[46] The Company does not set a specific limit of overtime hours that employees may work in a given week, and does not counsel or discipline employees for working above a certain number of overtime hours.[47]  Quite the contrary, they are instructed that if they work in excess of 40 hours in a work week, they must report the additional time worked and they are compensated for the hours.[48]

Various communities apply different practices to ensure the accuracy of time records before payment is issued to employees.[49]  By way of example, at the Greens at Hurricane Creek, Community Directors require Assistant Managers to review the hours reported for each pay period before processing their payments in order to ensure accuracy.[50]   At the Lake Point Apartments, the Resident Manager reviews a report of the hours to be paid each pay period for accuracy before payroll checks are issued, and corrects errors when necessary.[51]  At The Links at Springdale, Community Director Kathy Smith requires non-exempt hourly employees to maintain a call log indicating any calls answered after work hours, which she adds to each employee's payroll.[52]

In the past, Plaintiffs' witness, former Regional Manager Ray Danforth, contacted Human Resources disputing the approval of overtime hours worked by his subordinates, but the

---

[46] Def. App. 14-15, 28, 109, 114, 118, 126, 136 [B. Fox Decl. ¶ 7; E. Smith Decl. ¶ 26; A. Crow Decl. ¶ 6; C. Tucker Decl. ¶ 14-15; K. Crow Decl. ¶ 10; Carlat Decl. ¶ 18].
[47] Def. App. 108-109, 114, 118, 126, 136 [B. Fox Decl. ¶ 9; A. Crow Decl. ¶ 6; C. Tucker Decl. ¶ 14; K. Crow Decl. ¶ 10; Carlat Decl. ¶ 12, 18].
[48] Def. App. 115-117, 125-126, 136 [B. Fox Decl. ¶ 6-8; A. Crow Decl. ¶ 11; C. Tucker Decl. ¶ 8, 14; K. Crow Decl. ¶ 7 ].
[49] Def. App. 204[ J. Branch Decl. ¶32].
[50] Def. App. 115 [A. Crow Decl. ¶ 10].
[51] Def. App. 126 [C. Tucker Decl. ¶ 12].
[52] Def. App. 8, 14-15 [K. Smith Decl. ¶ 2, 29].

8.

Company paid the employees for all overtime hours reported despite Danforth's concern.[53]   For instance, on August 31, 2009, Danforth informed VP/Human Resources Director Betsy Fox that he had not approved 64.5 hours of overtime reported in a biweekly pay period by one of his subordinates.[54]   In response, Ms. Fox reminded Mr. Danforth that the Company absolutely pays for all overtime hours worked.[55]   Accordingly, to the extent Mr. Danforth denied overtime compensation to his subordinates, he did so in direct and blatant disregard of Company policy and Ms. Fox's directives.

### F. Plaintiffs' Own Timekeeping And Payroll Records Contradict Their Allegations

In a futile attempt to create an unlawful common policy or practice that binds all putative class members where there is none, Plaintiffs state that non-exempt, hourly employees were "required to work off the clock" and were "instructed that they were not allowed to clock in or alternatively – even if clocked in – would not be paid for all hours worked."[56,57]   Plaintiffs further claim that Resident Managers were scheduled for fifty-five (55) or sixty (60) hours per week and were not permitted to report more hours than they were scheduled, even if they actually worked more hours.[58] In her sworn declaration testimony, Plaintiff Patsy Pickel further states that she was only paid "minimum wage for forty (40) hours and time and a half for the next fifteen (15) hours per week," and that "even though [she] almost always worked more hours than that," she "was *never* compensated for these hours."[59]   A mere cursory look at a sampling of Pickel's Earnings Statements for the relevant time period, however, makes clear that her sworn declaration statements are false.   **Contrary to her claim that she was "never" compensated**

---

[53] Def. App. 136 [B. Fox Decl. ¶ 11].
[54] Def. App. 136, 142-144 [B. Fox Decl. ¶ 11 and Exh. 2].
[55] Def. App. 136 [B. Fox Decl. ¶ 11].
[56] Docket Entry 50, p. 3 [Plaintiffs' Brief]; Docket Entry 49- 4 ¶ 15 [Lochridge Decl.]; Docket Entry 49-3 ¶ 15 [Pickel Decl.].
[57] Docket Entry 49-3 ¶ 13-15, 19-20 [R. Danforth Decl.]
[58] Docket Entry 49-3 ¶ 13-15, 19-20 [R. Danforth Decl.].
[59] (emphasis added)  Docket Entry 49-5 ¶ 5 [P. Pickel Decl.].

**for more than 15 hours of overtime per week, on several occasions Pickel reported, and was fully paid, for more overtime hours than that.**[60]  To be clear, Pickel is not an anomaly.  A sampling of the timecards and payroll records of other named and opt-in Plaintiffs also reveal that, undisputedly, they regularly reported a wide range of regular rate and overtime hours, including hours in excess of 55 or 60 per week, and the Company fully compensated them for those hours.[61]

### G.    Plaintiffs' Proposed Classes Do Not Even Include Individuals Who Have Already Opted Into This Litigation.

Further demonstrating Plaintiffs' inability to show that they are similarly situated to the putative class members they seek to represent, some Plaintiffs never even held job titles that fall within either of their proposed classes. Plaintiffs seek to represent Community Directors, Resident Managers and Assistant Managers.  **However, some of the Plaintiffs who are asking this court to allow them to represent the proposed classes do not even fall within the Plaintiffs' proposed classes because they never held any of the relevant job positions.** Plaintiff Judy Kathryn Hale's last position with the company was Sales Specialist.[62]  She never held any of the relevant positions and was not assigned to any particular community.[63]  Plaintiff Vachelle Wheaton was a Leasing Consultant.[64]  She never held any of the relevant positions.[65]  Finally, Plaintiff Kevin Kornegay was a Maintenance Manager who never held any of the relevant positions.[66]

---

[60] Compare Docket Entry 49-5 ¶ 5 [P. Pickel Decl.] to Def. App. 148-158 [sampling of Ms. Pickel's Earnings Statement attached as Exhibit 4].
[61] Def. App. 136, 142-144, 148-158 [sampling of timecards and payroll records of other named and opt-in Plaintiffs attached as Exhibit 4 and B. Fox Decl. ¶ 11 and Exh. 2 thereto].
[62] Def. App. 138 [B. Fox. Decl. ¶16].
[63] *Id*.
[64] Def. App. 139 [B. Fox. Decl. ¶21].
[65] *Id.*
[66] Def. App. 138 [B. Fox. Decl. ¶19].

10.

Plaintiffs cannot credibly claim that they are similarly situated to the putative class members – they never even held the same job positions.

## III.    ARGUMENT

### A.    Legal Standard

#### 1.    Authorization Of Notice Under The FLSA Is Discretionary And Should Only Be Granted In Appropriate Cases

There is no right in a collective action pursuant to § 216(b) for court supervised notice. *See Fetrow-Fix v. Harrah's Entm't, Inc.*, No. 2:10-cv-00560-RLH-PAL, 2011 U.S. Dist. LEXIS 150116, at *19 (D. Nev. Dec. 30, 2011) ("The FLSA does not require certification of collective actions."); *Harris v. FFE Transp. Servs., Inc.*, No. 3:05-CV-00777-P, 2006 U.S. Dist. LEXIS 51437, at *5 (N.D. Tex. May 15, 2006) (court-facilitated notice "is by no means mandatory"). That is, the FLSA does not expressly – or impliedly – require the judicial intervention Plaintiffs seek in their Motion. *Id.*  Rather, the FLSA permits an individual to bring an action on behalf of themselves "and other employees similarly situated." 29 U.S.C. § 216(b).  Whether the Court elects to intervene is a matter committed to the Court's sound discretion. *Fetrow-Fix,* 2011 U.S. Dist. LEXIS 150116, at *19.

In *Hoffmann-La Roche, Inc. v. Sperling*, the Supreme Court held that district courts "have discretion, *in appropriate cases* to implement" the collective action mechanism under § 216(b) "by facilitating notice to potential plaintiffs." 493 U.S. 165, 169 (1989) (emphasis added); *see also Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1233 (M.D. Ala. 2003) ("The power to authorize notice must, however, be exercised with discretion and only in appropriate cases").

In support of this conclusion, the Supreme Court pointed to the systemic benefits derived from a process that permits the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [. . .] activity." *Hoffmann-La Roche, Inc., supra,* at 170. "In other words, the court must be satisfied that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case." *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003); *see also*

11.

*Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1136 (D. Nev. 1999) (noting that "the Supreme Court has approved of applying at least some of the incidents of Rule 23 class actions to § 216(b)"). Absent the requisite commonality, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Horne*, *supra*, at 1234. Thus, courts and litigants alike have a "responsibility to refrain from stirring up unwarranted litigation" and a duty to avoid unduly burdening employers by permitting "a frivolous fishing expedition conducted by the plaintiff at the employer's expense." *Lentz v. Spanky's Rest. II, Inc.,* 491 F. Supp. 2d 663, 669 (N.D. Tex. 2007); *see also Horne*, 279 F. Supp. 2d at 1237; *Fetrow-Fix,* 2011 U.S. Dist. LEXIS 150116, at *10; *Songer v. Dillon Res., Inc.*, 569 F. Supp. 2d 703 (N.D. Tex. 2008) (denying certification and acknowledging the Court's duty to avoid stirring up litigation and unduly burdening employers by permitting frivolous fishing expeditions). Where, as here, Plaintiffs seek court-authorized notice merely as a means of "asking the court to assist in their efforts to locate potential [p]laintiffs and expand the scope of litigation the request for authorized notification must be denied." *Fetrow-Fix*, 2011 U.S. Dist. LEXIS 150116, at *10.

As succinctly noted by the Eastern District of Arkansas:

> A variety of factors may be considered in determining whether a case is suited to proceed as a collective class action, including (1) disparate factual and employment settings of the individual plaintiffs, (2) defenses available to the defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations.

*Wright v. Pulaski County*, No. 4:09CV00065 SWW, 2010 U.S. Dist. LEXIS 87283, at *34 (E.D. Ark. Aug. 24, 2010). Here, the record indicates that putative class members work in different Communities, hold different job titles, perform different job duties, have different job responsibilities, oversee different staffing, and work under different supervisors, "all of which present disparate factual and employment settings that affect [whether or not any violation occurred]." *Id*. at *35. Thus, Plaintiffs are not similarly situated with respect to their claims and certification should be denied. *Id*.

2.      **Plaintiffs Must Establish That They And The Putative Class Are "Similarly Situated" And Were Victims Of A Common Policy**

Moreover, it is the Plaintiffs' burden to establish "'similarity among the individual situations' and 'a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice.'" *Hinojos v. The Home Depot, Inc.,* No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434, at \*5 (D. Nev. Dec. 1, 2006) (citing *Bonilla,* 61 F. Supp. 2d at 1138 n.6) (plaintiff must demonstrate the existence of a policy or practice of "general effect;" collective action cannot be maintained if "the action relates to other specific circumstances personal to the plaintiff")); *see also Severton v. Phillips Beverage Co.,* No. 3-90 CIV 304, 1991 U.S. Dist. LEXIS 10561, at \*4-5 (D. Minn. June 27, 1991).   In other words, Plaintiffs must show "that they and potential plaintiffs together were victims of a *common policy or plan that violated the law.*" *Hoffmann v. Sbarro, Inc.,* 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (emphasis added); *see also Guillen v. Marshalls of MA, Inc.,* No. 09-Civ-9575 (LAP) (GWG), 2012 U.S. Dist. LEXIS 4364, at \*15 n.2 (S.D.N.Y. Jan. 13, 2012).   Further, "unsupported assertions of widespread violations *are not sufficient* to meet Plaintiff[s'] burden." *Freeman v. Wal-Mart Stores, Inc.,* 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (emphasis added).   That is, with regard to Plaintiffs' burden of showing they are similarly situated to other employees, "mere allegations will not suffice; some factual evidence is necessary." *Bernard v. Household Int'l, Inc.,* 231 F. Supp. 2d 433, 435 (E.D. Va. 2002).   As another court phrased the principle, "[a] Plaintiff must provide actual evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations." *Prizmic v. Armour, Inc.,* No. 05-CV-2503 (DLI) (MDG), 2006 U.S. Dist. LEXIS 42627, at \*7 (E.D.N.Y. June 12, 2006); *Guillen,* 2012 U.S. Dist. LEXIS 4364, at \*11-12.

3.      **The Two-Step Analysis Plaintiffs Endorse Is Inappropriate And Inconsistent With The Supreme Court's Insistence On "Common Questions With Common Answers"**

13.

Plaintiffs here ask the Court to apply a two-step approach to their request for an order conditionally certifying this action and the "notice" that comes with it.[67]  In so doing, Plaintiffs suggest that the Court is bound to apply a "lenient" standard in assessing the sufficiency of their motion, noting that such a standard generally leads to conditional certification. *Id.*  Though Plaintiffs are correct that some courts have applied such a two-step approach in appropriate cases, Plaintiffs are incorrect in several other material respects.

First, Plaintiffs' reliance on *Mooney v. Aramco Serv. Co.*, 4 F. 3d 1207, 1213-14 (5th Cir. 1995) (rev'd on other grounds), in support of the application of a two-tiered certification approach flatly contradicts the actual language of the case.  What the Fifth Circuit actually states in *Mooney* is: "we specifically *do not* endorse the methodology employed by the district court, and *do not* sanction any particular methodology." *Id.* (emphasis added).  Although the Fifth Circuit did not expound on its reasoning for declining to endorse a particular methodology, the variety of approaches utilized by federal courts across the country demonstrates that one size does not fit all.  Moreover, the fact that the Fifth Circuit has recently taken the highly unusual step of ordering briefing in a mandamus proceeding addressing this very issue demonstrates the reasonable difference of opinion that may exist regarding the proper standard for certification under § 216(b).  *See In re: Wells Fargo Banks, N.A.*, United States Court of Appeals for the 5th Circuit, No. 12-20605 (Docket Entries 3 and 4).[68]

Second, as noted above, even under a so-called "lenient" first-stage standard, Plaintiffs bear the burden of establishing, based on "substantial allegations," that the class they seek to represent is similarly situated and that they "were subject to a single decision, policy or plan that

---

[67] Docket Entry 50, pgs. 9-11.  The two-step approach Plaintiffs endorse here, an *ad hoc* procedure invented by the lower courts for determining the question of certification with regard to collective actions brought pursuant to § 216(b) of the FLSA, seems to have been coined in the case *Lusardi v. Lechner*, 855 F.2d 1062, 1074 (3d Cir. 1988), an action under the Age Discrimination in Employment Act.

[68] Original court proceeding at *In re Wells Fargo Wage and Hour Empl. Practices Litig.*, 4:11-MD-2266 (S.D. Tex.).

14.

violated the law." *Fetrow-Fix*, 2011 U.S. Dist. LEXIS 150116, at *17; *see also Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *5. Third, even at the first stage, this Court must consider whether, as the Supreme Court observed in *Hoffmann-La Roche, Inc.*, the notice Plaintiffs seek will result in the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [. . .] activity." *Hoffmann-La Roche, Inc., supra*, at 170. Fourth, the "first-stage" analysis endorsed by the Plaintiffs still requires that the Court consider manageability concerns raised by conditional certification of the proposed class. *See Bonilla*, 61 F. Supp. 2d at 1138 n.6 (noting, in conducting a "first stage" § 216(b) analysis, that "district court has discretion to determine whether individualized defenses make manageability of class impossible"); *Severtson*, 1991 U.S. Dist. LEXIS 10561, at *7 ("As a matter of sound case management, a court should, before offering [to assist plaintiff in locating additional plaintiffs], make a preliminary inquiry as to whether a manageable class exists."); *see also Hoffmann-La Roche, Inc.*, 493 U.S. at 171 ("One of the most significant insights that skilled trial judges have gained in recent years is the wisdom and necessity for early judicial intervention in the management of litigation. [. . .] A trial court can better manage a major ADEA action if it ascertains the contours of the action at the outset.") (citations omitted). Thus, Plaintiffs' suggestion that the application of a lenient "first stage" standard makes conditional certification an inevitability is badly misplaced. Indeed, although the Eighth Circuit has applied the "first-stage" analysis in appropriate cases, the Eighth Circuit courts, and in particular the courts in the Districts of Arkansas, routinely deny conditional certification—even under the "fairly lenient" first-stage standard advanced by Plaintiffs. *See Madden v. Lumber One Home Ctr. of Stuffgart, Inc.*, Case No. 4:10CV01162 JLH, 2010 U.S. Dist. LEXIS 127558, at *14-15 (E.D. Ark. Dec. 2, 2010); *Salter v. Onyx Corp.*, Case No. 4:10CV00906 JLH, 2011 U.S. Dist. LEXIS 23291, at *5 (E.D. Ark. Feb. 4, 2011); *Beasley v. Lee County School Dist.*, Case No. 2:02CV00112GH (E.D. Ark. Mar. 31, 2003) (Docket Entry 28);

15.

*Mason v. Marion School Dist.*, Case No. 3:02-cv-00277-JMM (E.D. Ark. Mar. 5, 2003) (Docket Entry 33); *Clark v. West Memphis City School System*, Case No. 3:02-cv-00279-WRW (E.D. Ark. March. 26, 2003) (Docket Entry 29); *Lotefield v. Earle School System*, Case No. 3:02-cv-00337-GTE (E.D. Ark. Mar. 28, 2003) (Docket Entry 22); *Freeman*, 256 F. Supp. 2d 941; *Farnsworth v. Welspun Tubular LLC*, No. 4:11-cv-619-DPM, 2012 U.S. Dist. LEXIS 115398 (E.D. Ark. Aug. 16, 2012).

Lastly, a "two-step" analysis should not apply at all here because such an analysis is incompatible with the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). In particular, the principles reiterated in *Dukes* make clear that the two-step approach violates two fundamental principles to achieving the overarching goals of efficiency and due process in all forms of aggregate litigation. The first – commonality – requires the identification of at least one common question that will generate a common answer "apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551. Second, the *Dukes* Court disapproved of "[t]rial by [f]ormula," a phrase that encompasses trial plans, specifically those based upon sampling methodologies, that impair a defendant's right to litigate its statutory defenses to individual claims. *Id.* at 2561. A two-step approach fails to address whether the litigation raises common questions *and a common answer* in the sense deemed essential by *Dukes*, or whether a trial plan could exist that will permit Defendant to raise individualized defenses to the collective claims. *See id.* at 2551, 2561.[69]

---

[69] Not surprisingly, these deficiencies in the two-step approach far too often lead to erroneous decisions that impose substantial and needless costs on employers while wasting precious judicial resources. *See, e.g., Proctor v. Allsups Convenience Stores, Inc.*, No. 2:06-CV-255-J, 2008 U.S. Dist. LEXIS 33707 (N.D. Tex. Apr. 24, 2008) (granting conditional certification of a class of thousands without analysis of whether the class could be effectively and/or efficiently managed and later decertifying the class because the court could not "coherently manage the class," but only after 1,072 opt-in plaintiffs joined the case and 34 depositions had occurred); *Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 2007 U.S. Dist. LEXIS 96151 (E.D. La. Aug. 21, 2007) (Plaintiffs in that case, which also involved allegations of misclassification under the FLSA, persuaded the court to assist in notifying other employees of the litigation. After significant discovery occurred, the employer moved, on three occasions, to decertify the class; the court, nevertheless, denied those motions. At trial, plaintiffs presented deposition testimony from 20 witnesses, two

16.

While the *Dukes* case dealt with class certification under Fed. R. Civ. P. 23, the analysis and rationale therein deals directly with the issues relevant in the instant matter.  As one court noted while considering conditional certification pursuant to § 216(b), "[w]hile this court recognizes that collective actions under the FLSA are 'not subject to the provisions generally associated with class actions under FRCP 23,' [. . .] the Supreme Court's reasoning in a recent Title VII class action, *Wal-Mart Stores, Inc. v. Dukes*, [. . .] is nonetheless illuminating." *MacGregor v. Farmers Ins. Exchange*, No. 2:10-CV-03088, 2011 U.S. Dist. LEXIS 80361, at *13 (D.S.C. July 22, 2011) (internal citations omitted).  The Court in *Blaney v. Charlotte-Mecklenburg Hosp. Auth.* also looked to *Dukes* in the context of notice stage § 216(b) certification, noting that decentralized management processes and enforcement decisions of individual supervisors do not equate to company-wide policy and should not result in class treatment.  No. 3:10-CV-592-FDW-DSC, 2011 U.S. Dist. LEXIS 105302, at *26 (W.D.N.C. Sep. 6, 2011).  Similarly, the court in *Ruiz v. Serco, Inc.*, No. 10-CV-394-bbc, 2011 U.S. Dist. LEXIS 91215 (W.D. Wis. Aug. 5, 2011), held that, with regard to the burden Plaintiffs bear in seeking notice stage certification under section 216(b), "[t]he Supreme Court's recent decision in [*Dukes*] is instructive."  *Id.* at *18-19 ("[a]lthough collective actions under the FLSA are not subject to the provisions generally associated with class actions under Fed. R. Civ. P. 23 [. . .], the Court's discussion of the propriety of class actions generally provides guidance in deciding when certification of a collection action under the FLSA is appropriate").  Defendant does not ask the Court to import Rule 23 analysis here with its several facets; however, the Supreme Court in *Dukes* has provided relevant guidance with regard to questions at issue in the instant matter.

---

corporate representatives, and two expert witnesses, and submitted more than 1,000 exhibits. In response to post-trial motions, the court found that there was no common question that could be decided by a jury or the court because the asserted exemptions may apply to some, but perhaps not all, of the class members for some, but perhaps not all, of the relevant time period).

Specifically, the *Dukes* Court held that there was no cohesive nature to the varied claims plaintiffs' class would present; that, while there was a common question, there was no way to generate a common answer to that question for the entire proposed class. *Dukes*, 131 S. Ct. at 2556.  The decision was based in large part on the fact that, though plaintiffs had proposed a common question, because the claims hinged on individual supervisor discretion, there could be no common answers. *Id*. at 2554.  The *Dukes* Court has made it clear that, before breaking from traditional litigation for the exception of a class action, the reviewing court must satisfy itself that such a departure will ensure a common answer to the critical questions of the proposed class.  *Id*. at 2550-54.  Where it is clear that litigation will not result in common answers to the claims plaintiffs seek to represent, class certification is wholly improper.  In such a case, there is no reason to depart from traditional litigation because, either individual litigation will nevertheless be required, or else binding decision will resolve claims which have not been properly addressed.[70]

Thus, while Rule 23 analysis may present a different level of inquiry than that traditionally adopted for § 216(b) certification, directly instructive parallels exist.[71]  Accordingly, where such universal class action issues are addressed, courts have used instances of Rule 23 analysis to inform their decision regarding class certification pursuant to § 216(b).  *See, e.g., Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 928 (D. Ariz. 2010) (finding that two Ninth Circuit cases brought pursuant to Rule 23 and analyzing the individual nature of claims, were instructive

---

[70] The *Dukes* Court also provides guidance with regard to the insufficiency of the type of anecdotal evidence on which Plaintiffs attempt to rely.  With regard to the *Dukes* plaintiffs' use of evidence from a few employees taken from approximately one fifteenth of defendant's locations (235 out of 3,400 stores), the Court held that such evidence "falls well short" and is "too weak" to establish the necessary common policy or practice.  *Id*. at 2555-2556.  Similar to the *Dukes* case, the instant matter involves the anecdotal evidence of three former employees only, a showing even lighter than the one fifteenth indication made in *Dukes*.  Accordingly, Plaintiffs' evidence represents a similarly weak showing to that made in *Dukes* and falls well short of establishing a common policy or practice.

[71] This is certainly underscored by the Supreme Court's earlier admonition in *Hoffmann-La Roche, Inc.* that, even in the § 216(b) context, it is critical that there be an "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [. . .] activity."  *Hoffmann-La Roche, Inc., supra,* at 170.

for the *Avnet* Court's § 216(b) analysis regarding similarly situated potential plaintiffs).   The *Dukes* decision squarely confronts issues fundamental to any class action and is instructive with regard to the certification question in this instance.

Accordingly, this Court should refuse to apply the lenient "first stage" standard urged by Plaintiffs.   In a case such as this, where the pleadings create an inherently individualized inquiry into whether particular defenses apply to each of numerous putative class members, deferral of the certification question inexorably leads to inefficiency and waste in the resolution of this case. *See Guillen*, 2012 U.S. Dist. LEXIS 4364, at *18 ("[I]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.") (quoting *Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 U.S. Dist. LEXIS 68942 at *9 (E.D. Wis. Sept. 11, 2008)).   These considerations further support the reasons this Court should dispense with the two-step approach endorsed by the Plaintiffs.[72]

**B.     Plaintiffs Cannot Establish That They And The Putative Class Members Are Similarly Situated**

---

[72] Moreover, the two-step approach endorsed by Plaintiffs finds no judicial purchase in either the FLSA or Supreme Court precedent.   In *Hoffmann-La Roche, Inc.*, the Supreme Court recognized that a collective action under the FLSA presented similar difficulties to those addressed by the principles of Rule 23.   493 U.S. at 171.   Additionally, what is commonly referred to as the "abrogation clause" in the Rules Enabling Act ("REA"), enacted in 1934, established the procedural supremacy of the Federal Rules of Civil Procedure.   28 U.S.C. §2072(b).   The REA demonstrates the clear intent of Congress that the Federal Rules should be the predominant and default procedural rules to govern such things as class certification.   There is nothing whatsoever in the FLSA that would permit the procedure set forth in Rule 23, explicitly for the certification of a class action, to be jettisoned and replaced with a *sui generis* and *ad hoc* court contrived two-step procedure heavily favoring plaintiffs and forcing unjustified costs on defendants and the judicial system.   Based on the REA, and in accordance with congressional intent and Supreme Court precedent, Rule 23's certification requirements must be applied to questions of class certification unless the rule is in conflict with an express statutory directive which was enacted after Rule 23.   In *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, the Supreme Court held that, "like the rest of the Federal Rules of Civil Procedure, Rule 23 automatically applies 'in *all* civil actions and proceedings in the United States district courts.'" 130 S. Ct. 1431, 1438 (2010) (emphasis added).   The Court also held that "[t]he fact that Congress has created specific exceptions to Rule 23 hardly proves that the Rule does not apply generally. In fact, it proves the opposite. If Rule 23 did not authorize class actions across the board, the statutory exceptions would be unnecessary." *Id*.   Accordingly, the Rule 23 standard as established in the Federal Rules of Civil Procedure is technically the correct standard to apply to Plaintiffs' Motion.   Also, as previously noted, the fact that the Fifth Circuit has recently taken the highly unusual step of ordering briefing in a mandamus proceeding addressing this very issue demonstrates the reasonable difference of opinion that may exist regarding the proper standard for certification under Section 216(b).   *See In re: Wells Fargo Banks, N.A.*, United States Court of Appeals for the 5th Circuit, No. 12-20605 (Docket Entries 3 and 4).

1.    **The Evidence Plaintiffs Have Submitted is Insufficient to Satisfy Their Burden of Demonstrating That They And The Putative Class Members Are Similarly Situated**

Regardless of the standard applied to Plaintiffs' Motion, Plaintiffs bear the burden of establishing "'similarity among the individual situations' and 'a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice.'" *Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *5; *Smith v. Frac Tech Servs., LTD*, No. 4:09CV000679 JLH, 2009 U.S. Dist. LEXIS 109930, at *13-*14 (E.D. Ark. Nov. 24, 2009). Even under a lenient standard, "unsupported assertions of widespread violations *are not sufficient* to meet Plaintiff's burden." *Fetrow-Fix*, 2011 U.S. Dist. LEXIS 150116, at *18 (emphasis added). That is, with regard to Plaintiffs' burden of showing they are similarly situated to other employees, "mere allegations will not suffice; some factual evidence is necessary." *Id.* (citation omitted). "A Plaintiff must provide *actual* evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations." *Prizmic*, 2006 U.S. Dist. LEXIS 42627, at *7; *see also Bonilla*, 61 F. Supp.2d at 1139 n.6; *Guillen*, 2012 U.S. Dist. LEXIS 4364, at *11-12.

Here, the evidence offered by Plaintiffs in an attempt to meet their burden consists of three declarations signed by Plaintiff Chad Lochridge, Plaintiff Patsy Pickel, and former Regional Supervisor Ray Danforth, which purport, among other things, to provide sworn testimony regarding: (1) the duties and responsibilities of all current and former Community Directors, Resident Managers, and Assistant Managers who worked in over 150 Communities over eight different states, and (2) the alleged impact of the Company's Nuts & Bolts guide on the duties and responsibilities of what Plaintiffs expect to total nearly 500 putative class members.[73] These declarations, however, are insufficient to satisfy Plaintiffs' burden because the allegations regarding other employees of the Company consist of conclusory and unsupported allegations, not based on any personal knowledge, and lack any "actual evidence" to show that

---

[73] Docket Entries 49-3, 49-4 and 49-5.

the Plaintiffs and all other Community Directors, Resident Managers, and Assistant Managers are similarly situated and victims of the same common, unlawful policy.

When faced with similarly unsupported allegations regarding other employees that were not based on any personal knowledge, courts have routinely denied motions for conditional certification. *See, e.g.*, *Madden*, 2010 U.S. Dist. LEXIS 127558, at *14-*15 (denying conditional certification where the plaintiffs offered only two affidavits to support their similarly situated claims); *Stiles v. FFE Transp. Servs.*, Case No. 3:09-CV-1535-B, 2010 U.S. Dist. LEXIS 24250 (N.D. Tex. Mar. 15, 2010) (holding that conclusory allegations contained in affidavits submitted by plaintiffs were insufficient to warrant conditional certification); *Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *3 (denying plaintiffs' motion for conditional certification of nationwide FLSA class where plaintiffs relied on their own declarations but admitted at deposition that they had "little personal knowledge of defendant's FLSA violations outside of Las Vegas"); *Banks v. Robinson*, No. 2:11-cv-00441-RLH-PAL, 2011 U.S. Dist. LEXIS 83939, at *17-18 (D. Nev. July 28, 2011) (denying motion for conditional certification supported by plaintiff's declaration which "simply does not provide sufficient factual evidence that others who worked for the Defendants were similarly situated"); *Dewitt v. Securitas Sec. Servs. USA, Inc.*, No. 4:11-cv-873-DPM, 2012 U.S. Dist. LEXIS 71590 (E.D. Ark. May 23, 2012) (denying motion for conditional certification because supporting evidence was "just too thin and conclusory" and single declarant could not testify about others' pay); *Songer*, 569 F. Supp. 2d 703 (denying certification and acknowledging the Court's duty to avoid stirring up litigation and unduly burdening employers by permitting frivolous fishing expeditions); *Davis v. Westgate Planet Hollywood Las Vegas, LLC*, No. 2:08-cv-00722-RCJ-PAL, 2009 U.S. Dist. LEXIS 5941, at *30-33 (D. Nev. Jan. 12, 2009) (denying plaintiffs' motion to conditionally certify a nationwide class, where "[t]he [plaintiffs'] declarations supporting the plaintiffs' motion to circulate simply do not provide any factual evidence that defendants' timeshare sales personnel outside of Nevada, Florida or Tennessee are similarly situated for purposes of circulation of notice of a collective action."); *Silva v. Gordon Gaming Corp.*, No. 2:06-cv-00696-JCM-PAL,

21.

2006 U.S. Dist. LEXIS 71847 (D. Nev. Sept. 27, 2006) (denying conditional certification of FLSA class where statements in the plaintiff's declaration in support of the motion regarding the treatment of other employees was merely based on his "information and belief" and, as such, was insufficient); *see also Tice v. AOC Senior Home Health Corp.*, No. 4:10-CV-400, 2011 U.S. Dist. LEXIS 113509, at *10 (E.D. Tex. Sept. 30, 2011) ("preliminary factual showing [relating to conditional certification] must be based on a personal knowledge of the facts") (citations omitted); *Trinh v. JP Morgan Chase & Co.*, No. 07-cv-1666, 2008 U.S. Dist. LEXIS 33016, at *10 (S.D. Cal. Apr. 22, 2008) (affiants' "speculative beliefs" that other workers were similarly situated are insufficient); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355-56 (E.D.N.Y. 2008) (denying class certification for Brooklyn-area stores where plaintiffs' factual support regarding the situation of the employees is reduced to hearsay. "Although plaintiffs' burden at this stage of the proceeding is modest, a court cannot justify certifying a class of plaintiffs, likely numbering in the hundreds, on the basis of such thin factual support."); *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865-66 (S.D. Ohio 2005) (holding that affidavits in support of conditional certification must constitute admissible evidence).

Because the statements in Plaintiffs' declarations here relating to alleged similarly situated Community Directors, Resident Managers, and Assistant Managers are not based on any personal knowledge, and are unsupported and conclusory, they do not rise to the level of "*actual* evidence of a factual nexus between [their] situation and those that [they] claim[] are similarly situated" required as a predicate to certification of collective action. *Prizmic*, 2006 U.S. Dist. LEXIS 42627, at *7. In the end, the evidence offered by the Company, and the lack of evidence offered by Plaintiffs, demonstrates that Plaintiffs have utterly failed to carry their burden of showing that they are similarly situated to other Community Directors, Resident Managers, and Assistant Managers.

**2.     Plaintiffs Are Not Similarly Situated Because Individualized Inquiries Germane To The Exemption Analysis Preclude Certification**

Regardless of whether a lenient standard is applied here, in order to evaluate Plaintiffs' request for judicial notice against the critical touchstone of commonality, economy, and efficiency, *see Hoffmann-La Roche, Inc.*, 493 U.S. 165, this Court must look beyond the alleged common corporate policies to consider how Plaintiffs' asserted statutory violation of the FLSA will be proven.  *See Bramble v. Wal-Mart Stores, Inc.*, 09-CV-4932, 2011 U.S. Dist. LEXIS 39457, at *19 (E.D. Pa. Apr. 12, 2011) (court must look to the actual duties performed by plaintiffs and proposed class members to determine whether they are similarly situated because "[p]laintiffs do not point to a job description that says that [retail loss prevention managers] are required to perform non-exempt tasks for a majority of their working hours") (citation omitted); *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 467 n.9 (S.D.N.Y. 2008) (scrutinizing the merits based on the developed record to the extent necessary to address plaintiff's motion for authorization of notice).  Plaintiffs challenge the exempt status of salaried employees under the FLSA, *see* 29 U.S.C. § 213(a)(1), and accordingly, those claims will be evaluated based upon whether the record shows, by a preponderance of the evidence, that they each were employed in a *bona fide* executive or administrative capacity – or a combination of both exemptions.  *Id.*  In the context of this case, accordingly, the record must be considered to determine whether the named or opt-in Plaintiffs' (or potentially hundreds of other Community Directors, Resident Managers, and Assistant Managers') primary duties consisted of the management of a Community; whether they customarily directed the work of two or more employees; whether they had authority to make recommendations regarding employees' change in status; or alternatively, whether their primary duty included non-manual work related to the management of the Community's business, including the exercise of discretion and independent judgment. *See* 29 C.F.R. § 541.100(a) (describing the requirements of the executive exemption);[74] 29 C.F.R. § 541.200(a) (administrative exemption);[75] 29 C.F.R. § 541.708 (combination exemption).[76]

---

[74] Employees working in a bona fide executive capacity are those (1) who are compensated on a salary basis at a rate of not less than $455 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who have the authority to hire or fire other employees or

23.

It follows logically, consistent with the principles discussed above, that before notice is authorized, Plaintiffs must at least present a plausible theory that their overtime claim (and perhaps those of hundreds of other Community Directors, Resident Managers, and Assistant Managers in the more than 150 Communities located in 8 states who will be allowed to join this litigation simply by signing a form) can be adjudicated based upon evidence or testimony. Both courts and the U.S. Department of Labor find that "[d]etermining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing [managerial] duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'" *Diaz v. Elec. Boutique of Am., Inc*., No. 04-CV-0840E (Sr), 2005 U.S. Dist. LEXIS 30382, at *8 (W.D.N.Y. Oct. 17, 2005) (quoting *Safeco Ins. Co. of Am.*, 274 F. Supp. 2d at 220); 29 C.F.R. § 541.2 ("[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations"). Critically, the Regulations provide that, where an employee performs concurrent duties[77], "[w]hether an employee meets the requirements" of the exemption "is determined on a case-by-case basis." 29 C.F.R. § 541.106(a). Against this legal backdrop, Plaintiffs must show that their claim that the Company misclassified Community Directors presents common questions of fact and law that may be answered – conceivably –

whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a). The regulations list a variety of management responsibilities which satisfy the primary duty test, such as  interviewing, selecting, and training of employees; setting and adjusting rates of pay and work hour; directing the work of subordinate employees; maintaining and using production or sales records; appraising employees' productivity and efficiency; addressing employee grievances; disciplining employees; planning and apportioning work among the employees;  determining the techniques and the type of materials, supplies, machinery, equipment or tools to be used; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; and ensuring legal compliance. 29 C.F.R. § 541.102.

[75] Employees who meet the requirements for the administrative exemption are those (1) who are compensated on a salary basis of not less than $455 per week; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer, (3) which includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).

[76] The FLSA regulations establish that employees who perform a combination of exempt duties under the administrative and executive exemptions may qualify for the exemption, if their primary duty includes a combination of exempt administrative and exempt executive work. 29 C.F.R. § 541.708.

[77] The regulations recognize that, since exempt managers remain responsible for success or failure of business operations under their management even while performing nonexempt work, such managers may need to perform nonexempt work concurrently with their management duties.  29 C.F.R. § 541.106.  As result, concurrent performance of both exempt and nonexempt work, such as simultaneously directing the work of employees while stocking shelves, does not disqualify an individual from the executive exemption.  *Id.*

24.

through representational proof.  Plaintiffs have not done so, as is abundantly clear by the record, which demonstrates the need for an individualized factual inquiry.

### 3.   Individualized Inquiries Into The Actual Duties Performed Further Render Collective Action Treatment Inappropriate

Courts refuse to permit FLSA suits to proceed as collective actions if the individualized inquiries required would eliminate "the economy of scale envisioned by the FLSA collective action procedure."  *See, e.g., Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1275 (M. D. Ala. 2004).  Here, the need for individualized inquiries to determine the exempt status of salaried putative class members is a certainty given: (1) legal authority mandating that an inquiry into the applicability of an exemption in a misclassification case must include an examination of the duties a plaintiff *actually* performs; and (2) the disparate evidence presented by the parties with respect to the duties performed by the putative class members.  Thus, the myriad individualized inquiries necessary to determine whether each putative class member was, in fact, performing exempt tasks render collective action treatment ineffective and inappropriate.

That these sorts of individualized inquiries are crippling to the certification of a collective action is more than mere speculation – courts routinely decline to certify collective actions, even under a first stage analysis, where the necessity of individualized inquiries becomes apparent.[78] Indeed, disparate job duties and responsibilities – like those attested to by the Plaintiffs and non-Plaintiff declarants here – are fatal to the conditional certification determination when the differences require individualized analysis to determine exempt status.  *See Aguirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 U.S. Dist. LEXIS 17259, at *43 (S.D. Tex. Mar. 12, 2007) ("[g]iven the fact-intensive nature of the exemption analysis, the plaintiffs have not shown

---

[78] *See Reich v. Homier Distrib. Co., Inc.*, 362 F. Supp. 2d 1009, 1013-15 (N.D. Ind. 2005) (denying motion for conditional certification because plaintiff and potential collective action members were not similarly situated, as application of FLSA exemption would depend on each employee's specific duties); *Safeco Ins. Co. of Am.*, 274 F. Supp. 2d at 220-21 (holding plaintiff failed to make adequate showing that "questions common to a potential group of plaintiffs would predominate a determination of the merits in the case," because merits of plaintiffs' claim would require factual analysis of their individual day-to-day work functions); *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 1053, 1067 (D. Colo. 1996) (court decertified class under § 216(b) where case was "fraught with questions requiring distinct proof as to individual plaintiffs, and defenses could not be addressed on a class-wide basis").

that they are similarly situated so as to make collective treatment of their claims proper under section 216(b) of the FLSA"); *Donihoo v. Dallas Airmotive, Inc.*, No. 3:97-CV-0109-P, 1998 U.S. Dist. LEXIS 2318, at *4-5 (N.D. Tex. Feb. 20, 1998) ("In deciding whether an employee fits into one of the many exempt categories delineated in the FLSA, the Court must conduct an inquiry into the employee's specific job tasks.  Such an inquiry is not appropriate in a class lawsuit under Section 216(b)."). Potential collective action members, thus, are not "similarly situated" as to FLSA status when their exempt status may differ depending on their job responsibilities and duties. *Clausman v. Nortel Networks, Inc.*, No. 02-0400-C-M/S, 2003 U.S. Dist. LEXIS 11501, at *10-13  (S.D. Ind. May 1, 2003).

This is all the more true in an FLSA misclassification case where the ultimate inquiry is whether the employee is exempt, and requires an examination of the duties that they actually performed.  *See In re Wells Fargo Home Mortg.*, 571 F.3d 953, 959 (9th Cir. 2009).  Likewise, the resolution of Plaintiffs' classification claims here "depends on the specific employment conditions in each [Community] and department in which each class member worked." *Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *8; *Brooks v. BellSouth Telecomm., Inc.*, 164 F.R.D. 561, 569 (N.D. Ala. 1995) (finding employees in nine states, working in separate departments and under separate supervisors, among other differences, did not meet the "similarly situated" standard due to "disparate factual and employment settings").  Similarly, an individualized examination into the hours worked and reported by the hourly non-exempt putative class members is also required in this case, as some individuals reported working few to no overtime hours, while some regularly worked 10-15 or more overtime hours per work week.  For all these reasons, certification of a collective action in this case is inappropriate. *See MacGregor*, 2011 U.S. Dist. LEXIS 80361, at *7 ("[i]f individualized determinations are likely to predominate, collective action will hinder, rather than promote efficient case management, and thus notice should not be granted"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (finding conditional certification inappropriate where adjudication of a collective action would have required factual inquiries into employment relationships involving different managers at

26.

different locations throughout the country, and where the court concluded that a finding of liability at one location would not necessarily lead to a finding of liability at another location).

>    **4.**   **Plaintiffs Are Not Similarly Situated and Individualized Inquiries Germane to Plaintiffs' Off-The-Clock Claims Cannot be Ignored**

>        **a.**   **No Similar Employment Setting Unites All Plaintiffs**

Among the factors frequently examined in analyzing whether putative class members are similarly situated is whether a similar employment setting united all Plaintiffs.  "This first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary to determine if the Plaintiffs are similarly situated."  *Reyes v. Tex. EZPawn, LP*, No. V-03-128, 2007 U.S. Dist. LEXIS 1461, at *8 (S.D. Tex. Jan. 8, 2007).

Here, Plaintiffs' claims arise from dissimilar employment settings.  The putative nonexempt class consists of individuals who have different job titles, are assigned to different communities, and report to different Regional Managers.  Putative class members have testified that the factual and employment settings for non-exempt individuals vary widely from community to community and even within their own experiences.[79]  In addition, the job duties of the putative nonexempt class vary according to position.[80]  The dissimilarities between the putative class members do not stop there.  Plaintiffs Patsy Pickel and Chad Lochridge claim they were "required to work many hours over and above the hours in which I was clocked in," while

---

[79] Def. App. 108, 114, 117 – [A. Crow Decl. ¶ 4 (For instance, Assistant Manager Ashley Crow typically works nine hours per day from Monday, Tuesdays, Thursdays and Fridays, and has every Wednesday off..  She also has every other weekend off (working approximately eight to nine hours on Saturday and 4 hours on Sundays during the weekends in which she works).  Declaration of Kevin Crow ("K. Crow Decl.") ¶ 2, 4 (On the other hand, Assistant Manager Kevin Crow works between 8:30 a.m. to 5:30 p.m. and takes one hour lunch break each day, for which he clocks out.  He usually works two weekends per month and, at times, is not required to work on a regularly scheduled Sunday if doing so will incur overtime pay); Carlat Decl. ¶ 9 (Also with a different work schedule, when Mary Carlat worked as an Assistant Manager she usually worked from 9:00 a.m. to 6:00 p.m. during five days per week (if she worked on Sundays, it was from 1:00 p.m. until 5:00 p.m.), and typically had two full days off per week.)]

[80] Def. App. 204 [J. Branch Decl. ¶ 25].

other putative class members testified they reported, and were paid, for all hours worked.[81] Former Regional Manager Ray Danforth testified, ". . . my people that I supervised, and in my own experience as a former Community Director, they get near the end of their week and they still have more work to be done, you just have to keep doing it though it's beyond the hours you're allowed to report."[82] In stark contrast, putative class members reporting to other Regional Managers testified that they have never been instructed, or in any way prevented or discouraged from reporting all hours actually worked.[83]   Some putative class members said they reviewed their time records and had the opportunity to notify managers or correct about any mistakes.[84] Additionally, putative class members have testified that some, but not all, time entries were corrected if employees reported errors.[85]

That Plaintiffs' FLSA claims involve different communities, different Regional Managers, different job duties, and different managerial pay practices readily shows divergent employment settings.  *See Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278, 284 (N.D. Tex. 2008) (granting decertification because plaintiffs "worked in settings that var[ied] from store to store, manager to manager, and day to day"); *Gatewood v. Koch Foods of Miss.,* LLC, No. 07-82, 2009 U.S. Dist. LEXIS 113896, at *53 (S.D. Miss. Oct. 20, 2009) ("It is readily apparent that the named plaintiffs have worked in divergent employment settings and have varying claims as a result of their work in different plants, in different departments, in different jobs, and under different pay practices."); *Basco v. Wal-Mart Stores, Inc.,* No. 00-3184 Section

---

[81] Docket Entries 49-4  ¶  15 and 49-5  ¶ 15; Def. App. 108-110, 112, 114-115, 121-122, 125-126, 133. [Compare to: M. Carlat Decl.¶  14-19; A. Crow Decl. ¶ 6-10; J. Carter Decl. ¶ 10 , 13-14; J. Willcutt Decl. ¶ 8-11;  L. Porter Decl. ¶ 12-14; C. Tucker Decl. ¶ 6-13].
[82] Docket Entry 49-3, ¶ 16.
[83] Def. App. 109-110, 112-113, 115-116, 122, 126, 133 [M. Carlat Decl. ¶ 16-19; A. Crow Decl. ¶ 11-12; J. Carter Decl. ¶ 15-17; J. Willcutt Decl. ¶ 12-13; L. Porter Decl. ¶ 15-16;  C. Tucker Decl. ¶14-15].
[84] Def. App.109, 112, 121, 126 [M. Carlat Decl. ¶ 17; J. Carter Decl. ¶ 13-14; L. Porter Decl. ¶ 11; C. Tucker Decl. ¶ 12]..
[85] Def. App. 109, 112, 121, 126 [M. Carlat Decl. ¶ 17; J. Carter Decl. ¶ 13-14; L. Porter Decl. ¶ 11; C. Tucker Decl. ¶ 12].

"K" (4), 2004 U.S. Dist. LEXIS 12441 at *26 (E.D. La. Jul. 1, 2004) (denying certification of proposed class because, *inter alia*, plaintiffs came from different departments, groups, and organizations within the employer, and potential plaintiffs "performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis"); *cf. Douglas v. First Student, Inc.,* No. 4:09CV00652 BSM, 2012 U.S. Dist. LEXIS 125219, at *10-11 (E.D. Ark. Aug. 23, 2012) (decertifying class because, despite the fact that all plaintiffs "worked for the same employer, in the same locations, and during the same time-frame" a determination of liability required "a highly individualized inquiry as to each class member's circumstances every day of every week").

That putative class members might share "some general similarities to one another" does not suffice when the evidence shows Plaintiffs work in different positions under different managers on different shifts with different schedules, have different amounts of allegedly uncompensated time and allege different methods for avoiding overtime compensation. *See Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 304 (E.D. Pa. 2010). Any liability determination necessarily will require the Court, and eventually a jury, to determine whether each individual Plaintiff actually worked off the clock, the frequency and duration of such work, whether each Plaintiff's supervisor advised the employee not to report off the clock work, whether the employee did in fact report the work and how much of this work was compensated. *See First Student, Inc.*, 2012 U.S. Dist. LEXIS 125219, at *10-11 ("The problem with granting FLSA class status . . . is that each plaintiff must individually prove that she worked more than forty hours in any given week for which she claims damages. Therefore, a determination of . . . liability under the FLSA would require a highly individualized inquiry as to each class member's circumstances every day of every week. Indeed, individualized inquiries would also have to be

conducted to determine whether any of the class members worked off-the-clock during any given week, and if so, how many hours were worked.").

"The necessity for independent inquiries into each alleged violation makes collective action likely to hinder rather than promote judicial economy." *MacGregor*, 2011 U.S. Dist. LEXIS 80361 at *16. Therefore, conditional certification should not be granted.

### b. Individualized Defenses Dominate Any Liability Determination

Another factor in the similarly situated analysis assesses "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff." *Reyes*, 2007 U.S. Dist. LEXIS 1461 at *25. This second factor correlates with the first. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he first two factors are like two sides of the same coin."). "Individualized inquiries into work practices and supervisor management decisions . . . cannot be addressed on a class-wide basis." *Gatewood*, 2009 U.S. Dist. LEXIS 113896 at *67.

Here, the complexity, inefficiency, and unfairness of trying this case as a collective action is readily apparent. As the District Court held in *Proctor*,

> The evidence shows a large factual variety among the individual Plaintiffs' claims and the times they allege they worked off the clock. These differences in the Plaintiffs' claims mean that the Defendant's defenses would also vary. Defenses to claims that individuals did not work off the clock but were not paid correctly will be distinct from the Plaintiffs alleging they were asked to work off the clock by management.

250 F.R.D. at 283. Defenses available to Defendants include, but certainly are not limited to: (1) a Plaintiff did not in fact work in excess of 40 hours in a particular week; (2) a Plaintiff never worked in excess of 40 hours in any week of his or her employment (3) if a Plaintiff did work off the clock, Defendants subsequently corrected it; (4) any instructions received to work off-the-clock were outside the scope of authority and contrary to Defendants' policies; (5) even if a Plaintiff did work off-the-clock, the employee unreasonably failed to avail himself of curative

30.

steps provided by Defendants; (6) a Plaintiff who had an actual and/or constructive knowledge of Defendants' policies banning off-the-clock work chose to violate that policy; (7) any off-the-clock work falls within the *de minimus* exception to the FLSA; (8) a Plaintiff's claims are barred by statute of limitations or technical defaults and (9) Plaintiffs are exempt from the FLSA's overtime requirements under the administrative exemption.  *See Proctor,* 250 F.R.D. at 283; *Basco,* 2004 U.S. Dist. LEXIS 12441 at *25-26; *First Student, Inc.* 2012 U.S. Dist. LEXIS 125219 (discussing that individualized defenses warrants decertification).  Imagine adding jury interrogatories for each of these defenses.  Because Defendants "cannot be expected to come up with 'representative proof' when the plaintiffs cannot reasonably be said to be representative of each other," conditional certification should not be granted.  *Johnson*, 561 F. Supp. 2d at 587.

### C.   Plaintiffs Cannot Demonstrate That The Putative Class Was Subjected To A Common Policy That Violated The Law

Even at the initial notice stage, Plaintiffs cannot prevail unless they make "substantial allegations that the putative class members were subject to *a single decision, policy or plan that violated the law*."  *Fetrow-Fix,* 2011 U.S. Dist. LEXIS 150116, at *17 (emphasis added); *see also Frac Tech Servs.*, 2009 U.S. Dist. LEXIS 109930, at *13.  Indeed, Plaintiffs must establish "'similarity among the individual situations' and 'a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice.'"  *Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *5 (citing *Bonilla*, 61 F. Supp. 2d at 1139 n.6).

### 1.   Plaintiffs' Argument That The Common Policy That Binds The Putative Exempt Class Together Is Exempt Classification Has been Uniformly Rejected

Regarding the Putative Exempt Class, Plaintiffs "[a]ll alleged that Defendant engaged in a common practice, policy, or plan of misclassifying 'salary' Plaintiffs."  Such an argument, however, has been rejected by numerous courts.  *See Avnet, Inc.*, 687 F. Supp.2d at 927 ("[T]he

mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes."); *see also In re Wells Fargo Home Mortg.*, 571 F.3d 953, at 959 (9th Cir. 2009); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, at 946 (9th Cir. 2009); *Bramble*, 2011 U.S. Dist. LEXIS 39457, at *19 ("the mere classification of a group of employees … as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common plan, policy, or practice that renders all putative class members as 'similarly situated' for §216(b) purposes."); *Harriel v. Wal-Mart Stores, Inc.*, 11-2510 (MLC), 2012 U.S. Dist. LEXIS 97527 (D.N.J. July 13, 2012); *Tahir v. Avis Budget Group, Inc.*, 09-3495 (SRC), 2011 U.S. Dist. LEXIS 37279 (D.N.J. Apr. 6, 2011); *Vasquez v. Vitamin Shoppe Indus., Inc.*, 10 Civ. 8820 (LTS) (THK), 2011 U.S. Dist. LEXIS 74376, at *9 (S.D.N.Y. July 11, 2011).   Indeed, courts in Arkansas have found that "a collective action certifying into the same class all salaried … employees regardless of job duties and position title would be inappropriate [even] at this [notice] stage." *Frac Tech Servs. Ltd.*, 2009 U.S. Dist. LEXIS 109930 at *21; *see also Freeman*, 256 F. Supp. 2d at 945 (rejecting plaintiff's view that employees were similarly situated simply because they claimed violations of the law by the same employer and noting that adopting plaintiff's position would require conclusion that if an employer has two or more employees who allegedly are not being paid overtime as required by the FLSA, then a collective action would be appropriate).

        **2.**     **Plaintiffs Cannot Rely On Conclusory And Unsupported Allegations Regarding "Off-The-Clock" Work To Establish The Existence Of A Common Policy, Plan or Practice**

Similarly, Plaintiffs cannot establish an unlawful common policy, plan or scheme with respect to the hourly employees because Defendants widely disseminate and publicize policies and materials that specifically prohibit the unlawful pay practices Plaintiffs claim to have been subjected to.  Plaintiffs allege that the Company "refus[ed] to pay hourly Plaintiffs regular wages

and overtime wages in violation of the FLSA."[86]  The Company's policies, however, specifically prohibit off-the-clock work and require employees to report and be compensated for all hours worked.  Therefore, far from maintaining an unlawful common policy, the Company maintains common policies that expressly refute Plaintiffs' claims. *See Basco,*  2004 U.S. Dist. LEXIS 12441 at *22 (where the plaintiffs essentially asked the court to deem "a corporate policy to keep employee wage costs low" as "sufficient proof to justify the creation of a class of all Wal-Mart employees that ha[d] not been properly paid over-time . . .," the court refused to certify a class of plaintiffs based merely on "anecdotal" allegations of off-the-clock work and time card manipulation because it was "obvious from the discovery presented that this 'policy' and its effects [were] neither homogeneous nor len[t] themselves to collective inquiry.").

Clearly, even if the hourly Plaintiffs could establish that they were owed overtime compensation as they allege, at most, Plaintiffs only establish that they were paid in a manner that was:  (i) in violation of Lindsey Management's policies and practices, and (ii) inconsistent with the way other Community Directors, Resident Managers, and Assistant Managers within the putative class were paid.  Consequently, they cannot establish that they are similarly situated to all the Community Directors, Resident Managers, and Assistant Managers that they seek to represent. *See Hinojos v. Home Depot, Inc.*, No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434, at **7-8 (D. Nev. Dec. 1, 2006) (where employer's policy and declarations of other employees contradict named plaintiffs' testimony, individualized determinations would require "separate mini-trials to resolve each individual's claim.  Such a result is the antithesis of collective action treatment").

3.     **Plaintiffs Cannot Rely On The Nuts & Bolts Guide To Bind The Putative Class Together**

---

[86] Docket Entry 50.

Throughout their Motion, Plaintiffs appear to suggest, without expressly stating, that the Nuts & Bolts guide constitutes an alleged common policy that binds the putative class together.[87] Plaintiffs cannot establish, however, that they and all Community Directors, Resident Managers, and Assistant Managers were subject to a common policy that violated the law because the undisputed record evidence presented by the Company demonstrates that the Nuts & Bolts guide is anything but a "common" policy, and Plaintiffs have produced no credible evidence demonstrating that the Nuts & Bolts guide impacted all Community Directors, Resident Managers, and Assistant Managers in the same way.[88]  Defendants' evidence on the other hand, demonstrates that many putative class members rarely, if ever, refer to the guide.[89]  For example, Community Director Andy Tody testified the last time he saw a copy of the Nuts & Bolts guide was over eight years ago.[90]

Unable to establish "'similarity among the individual situations' and 'a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice,'" *Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *5, Plaintiffs' Motion should be denied.

**D.    The Cases Cited By Plaintiffs Demonstrate That Conditional Certification Is Wholly Inappropriate Here**

Plaintiffs' Motion is filled with citations to cases that only underscore why conditional certification should be denied in this case.  First, in a number of the cases that Plaintiff cites, conditional certification was *denied*:

- *Allen v. Little Rock School Dist.,* Case No. 4:02-cv-00479-SWW (E.D. Ark. Mar. 10, 2003) (denying motion for conditional certification based on vague allegations of

---

[87] Docket Entry 50.
[88] Def. App. 206 [J. Branch Decl. ¶ 33].
[89] Def. App. 18, 29, 60-61, 69, 77-78, 94, 105 [C. Hite Dec. ¶ 37; B. Moon Dec. ¶ 25; L. Moon Dec. ¶ 26; E. Smith Dec. ¶ 32; K. Smith Dec. ¶ 39; A. Tody Dec. ¶ 23; B. Tody  ¶ 30].
[90] Def. App 77-78 [A. Tody ¶ 23].

34.

nonpayment of overtime without any showing of similar circumstances and on conclusory assertions in affidavits that other similarly situated persons exist and would join the action without any supporting evidence);

- *Beasley v. Lee County School Dist.*, Case No. 2:02CV00112GH (E.D. Ark. Mar. 31, 2003) (denying conditional certification based on one affidavit identifying two other similarly situated individuals and no evidence of a common plan or policy of denying them overtime pay);

- *Mason v. Marion School Dist.*, Case No. 3:02-cv-00277-JMM (E.D. Ark. Mar. 25, 2003) (denying conditional certification as the affidavits submitted provide no factual information to support the existence of potential plaintiffs);

- *Clark v. West Memphis City School System*, Case No. 3:02-cv-00279-WRW (E.D. Ark. Mar. 26, 2003) (same);

- *Lotefield v. Earle School System,* Case No. 3:02-cv-00337-GTE (E.D. Ark. Mar. 28, 2003) (same); and

- *Freeman v. Wal-Mart Stores, Inc.,* 256 F. Supp. 2d 941 (W.D. Ark. 2003) (denying conditional certification of overtime claim where plaintiff failed to present sufficient evidence that class of 7,000 employees with materially different duties were similarly situated ).

Plaintiffs cited to no case in which such a broad collective action was certified based on so little evidence. Indeed, the evidentiary records before the courts in cases cited by Plaintiffs in which conditional certification was granted bear no resemblance whatsoever to the threadbare record before the Court on this motion. *See, e.g., Smith v. Frac Tech Services, LLC*, Case No. 4:09-cv-00679-JLH, 2009 U.S. Dist. LEXIS 109930, at *5-6 (E.D. Ark. Nov. 24, 2009) (granting conditional certification as to service supervisor position based on nine affidavits from different

35.

geographic locations, but denying motion as to two other positions for which only two and one affidavits were submitted, respectively); *Resendiz-Ramirez v. P&H Forestry, LLC*, 515 F. Supp. 2d 937, 940 (W.D. Ark. 2007) (granting motion for conditional certification of claim alleging *de facto* wage deductions from six employees who worked at Defendant's farm, based on their submission of a copy of a Department of Labor investigation secured through a Freedom of Information request and two declarations attaching paystubs); *Perez-Benites v. Candy Brand, LLC*, 2008 WL 4809105 (W.D. Ark. Oct. 31, 2008) (defendant did not oppose conditional certification).[91]

In sum, Plaintiffs' own papers demonstrate that this motion is devoid of legal as well as evidentiary support and that it should be denied under the overwhelming weight of authority. Accordingly, Plaintiffs' Motion should be denied. *See Gomez v. United Forming, Inc.*, No. 6:09-cv-576-Orl-31GJK, 2009 U.S. Dist. LEXIS 101804 (M.D. Fla. Oct. 15, 2009) (denying plaintiffs' motion to conditionally certify a class of hourly employees under the FLSA where the conclusory allegations in the affidavits submitted by three other putatively similarly situated employees did not support certification, and the plaintiffs' claims were generally inappropriate for collective treatment because defendants' time keeping practices were not uniform and required an individualized inquiry into each employee's day-to-day activities).

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants Lindsey Management Co., Inc. and James E. Lindsey respectfully request that this Court deny Plaintiffs' Amended Motion for Certification of Collective Action and for Disclosure of Contact Information for Potential Opt-In Plaintiffs. Furthermore, Defendants submit that the Court should not order Court-supervised notice as

---

[91] Plaintiff's citation to *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) is inapposite, as in that case the court reversed an order at the second stage, decertifying an ADEA class where the district court had failed to recognize the pattern-or-practice nature of the class claim.

36.

conditional certification is unwarranted, and any argument regarding the terms of such notice should be moot and is certainly premature.  However, in the event the Court orders conditional certification, Defendants reserve the right to file objections to Plaintiffs' proposed Notice.

Dated: December 5, 2012

/s/ Kimberly Rives Miers
Eva C. Madison (98183)
Kim Flanery Coats (96267)
LITTLER MENDELSON, P.C.
3739 Steele Blvd., Suite 300
Fayetteville, Arkansas 72703
Telephone:  479.582.6100
Facsimile:  479.581.6111
emadison@littler.com
kcoats@littler.com

Kimberly Rives Miers (Texas Bar No. 24041482)
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas 75201.2931
Telephone:  214.880.8100
Facsimile:  214.880.0181
kmiers@littler.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Josh Sanford – josh@sanfordlawfirm.com
Anne Milligan – anne@sanfordlawfirm.com
Sanford Law Firm, PLLC
One Financial Center
650 S. Shackleford, Suite 400
Little Rock, AR  72211

David Hughes – dhughes@hardinhughes.com
Hughes Hardin, LLP
2121 14th Street
Tuscaloosa, AL  35401

/s/ Kimberly Rives Miers