**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

CHAD LOCHRIDGE, HEATHER LOCHRIDGE,
EVERETTE LOCHRIDGE, TWYLA
LOCHRIDGE, KEVIN KORNEGAY, LINDA
DANFORTH, PATRICIA LEACH, DEBRA
McKEE, BRIAN McKEE, PATSY PICKEL,
STEVEN PICKEL, CARLIS SMITH, LYDIA
SMITH, REBECCA SMITH, JUDY KATHRYN
HALE, SHERRY JENKINS, PEARSON
JENKINS, and RYAN AGEE, Each individually
and on behalf of all persons similarly situated                    PLAINTIFFS

V.
                                       Case No. 12-cv-05047

LINDSEY MANAGEMENT CO., INC. and                          DEFENDANTS
JAMES E. LINDSEY

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY
CONDITIONALLY CERTIFIED CLASS OF SALARIED EMPLOYEES**

Eva C. Madison (Bar No. 98183)
Kim F. Coats (Bar No. 96267)
LITTLER MENDELSON, P.C.
217 E. Dickson Street
Suite 204
Fayetteville, AR  72701
Telephone:      479.582.6100
Facsimile:      479.582.6111

Kimberly R. Miers (TX Bar No. 24041482)
Jeremy W. Hawpe (TX Bar No. 24046041)
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX 75201.2931
Telephone:      214.880.8100
Facsimile:      214.880.0181

ATTORNEYS FOR DEFENDANTS

**TABLE OF CONTENTS**

Page(s)

I.  INTRODUCTION.................................................................................. 1

II.  LEGAL STANDARD ........................................................................... 3

III.  FACTUAL BACKGROUND .................................................................. 6

    A.  Overview of Lindsey Management's Operations................................ 6

    B.  Overview of Community Directors, Resident Managers, and Assistant Managers ......................................................................................... 8

        1.  The actual job duties of Community Directors and Resident Managers vary widely depending on how they allocate their responsibilities ........................................................................ 10

        2.  The actual job duties of Community Directors and Resident Managers vary widely depending on the structure of the community they manage ........................................................ 12

    C.  Some Plaintiffs' and Opt-In Plaintiffs Do Not Even Fall Within Either of the Conditionally Certified Classes ............................................... 15

IV.  THE CONDITIONALLY CERTIFIED CLASS OF SALARIED COMMUNITY DIRECTORS AND RESIDENT MANAGERS SHOULD BE DECERTIFIED .................................................................................. 16

    A.  Plaintiffs' Lack of Common Evidence Compels Decertification ................... 16

    B.  Plaintiffs Cannot Show a Common, Unlawful Policy or Practice ................. 18

        1.  The "Nuts & Bolts of Property Management" and "A Roadmap to Success" manuals are not "policies" that can form the basis of a collective action .............................................. 19

    C.  The Primary Duty Must Be to Perform Managerial Functions ................... 21

    D.  Testimony Varies Regarding Management Tasks as Primary Duty............ 22

        1.  Testimony on Relative Freedom from Direct Supervision Varies ...................................................................................... 22

        2.  Testimony demonstrates wide variances in the types, frequency and importance of exempt work........................................... 24

        **3.**     **Interviewing and Selecting Employees—Some Do, Some Don't** ....... 26

        **4.**     **Evidence Regarding Directing Employees Is Diverse** ........................ 29

        **5.**     **Testimony Regarding Training and Discipline Conflicts** .................. 30

        **6.**     **Evidence as to Scheduling Work Is Contradictory** ........................... 31

        **7.**     **Testimony Regarding Discretion Dealing with Residents Varies** ...... 32

  **E.**     **Evidence Regarding the Administrative Exemption Differs** ........................ 33

  **F.**     **Testimony Varies Regarding Damages** ........................................................... 35

  **G.**     **Individualized Defenses Make a Collective Trial Impossible** ....................... 37

  **H.**     **Fairness and Procedural Considerations Preclude this Case from Being Tried Collectively** ....................................................................... 40

        **1.**     **Plaintiffs' Individual Claims Will Further Complicate this Litigation** ............................................................................. 40

        **2.**     **Proceeding Collectively Will Overwhelm the Factfinder** .................. 41

        **3.**     **Proceeding Collectively Will Violate Defendants' Due Process Rights** ........................................................................... 41

        **4.**     ***Johnson v. Big Lots Stores, Inc.* Exemplifies the Futility of Class Treatment** ............................................................... 42

        **5.**     **Defendants Have a Constitutional Right to Present the Factual Issues for Jury Consideration** .............................................. 44

**V.**     **CONCLUSION** ........................................................................................................ 48

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Hy-Vee, Inc.*,
   No. 11-00449, 2012 U.S. Dist. LEXIS 98590 (W.D. Mo. May 22, 2012) ............................29

*Anderson v. Cagle's, Inc.*,
   488 F.3d 945 (11th Cir. 2007) ........................................................................................4, 5

*Aquilino v. Home Depot, U.S.A., Inc.*,
   No. 04-04100, 2011 U.S. Dist. LEXIS 15759 (D.N.J. Feb. 15, 2011) ........................... passim

*Aschenbrenner v. Dolgencorp, Inc.*,
   No. 8:10-cv-153, 2011 U.S. Dist. LEXIS 60097 (D. Neb. Jun. 3, 2011) ..............................20

*Basco v. Wal-Mart Stores, Inc.*,
   No. 00-3184 K(4), 2004 U.S. Dist. LEXIS 12441 ................................................................38

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
   772 F. Supp. 2d 1111 (N.D. Cal. 2011) .............................................................................41

*Briggins v. Elwood Tri, Inc.*,
   882 F. Supp. 2d 1256 (N.D. Ala. 2012) .............................................................................39

*Carlson v. C.H. Robinson Worldwide, Inc.*,
   Nos. 02-3780, 02-4261, 2006 U.S. Dist. LEXIS 71483 (D. Minn. Sept. 26, 2006) ...............32

*Cimino v. Raymark Indus.*,
   151 F.3d 297 (5th Cir. 1998) ...........................................................................................44

*Comcast Corp. v. Behrend*,
   185 L. Ed. 515 (2013) ......................................................................................................36

*Crocker v. Piedmont Aviation, Inc.*,
   49 F.3d 735 (D.C. Cir. 1996) ............................................................................................44

*Cruz v. Lawson Software, Inc.*,
   764 F. Supp. 2d 1050 (D. Minn. 2011) ..........................................................................4, 18

*Dizer v. Dolgencorp., Inc.*,
   No. 3:10CV699, 2012 U.S. Dist. LEXIS 24025 (W.D. La. Jan. 12, 2012) ...........................25

*Donovan v. Burger King Corp.*,
   672 F.2d 221 (1st Cir. 1982) ............................................................................................25

*Douglas v. First Student, Inc.*
888 F. Supp. 2d 929 (E.D. Ark. 2012) ............................................................4, 38

*Espenscheid v. DirectSat USA, LLC*,
705 F.3d 770 (7th Cir. 2013) ..................................................................36, 39

*Fox v. Tyson Foods, Inc.*,
519 F.3d 1298 (11th Cir. 2008) .......................................................................5

*Freeman v. Wal-Mart Stores, Inc.*,
256 F. Supp. 2d 941 (W.D. Ark. 2003)...............................................................4

*Friend v. Hertz Corp.*,
No. C-07-5222, 2011 U.S. Dist. LEXIS 25196 ...........................................30, 32

*Gardner v. W. Beef Props., Inc.*,
No. 07-CV-2345, 2013 U.S. Dist. LEXIS 56511 (E.D.N.Y. Mar. 25, 2013).....................6, 29

*Gatewood v. Koch Foods of Mississippi, LLC*,
No. 3:07CV82, 2009 U.S. Dist. LEXIS 113896 (S.D. Miss. Oct. 20, 2009)....................37, 38

*Goff v. Bayada Nurses, Inc.*,
424 F. Supp. 2d 816 (E.D. Pa. 2006) .............................................................22

*Gover v. Best Buy Stores, Inc.*,
No. CV 10-9988-SVW, 2011 U.S. Dist. LEXIS 153653 (C.D. Cal. Nov. 22, 2011).............32

*Green v. Harbor Freight Tools USA, Inc.*,
888 F. Supp. 2d 1088 (D. Kan. 2012) ....................................................... passim

*Harriel v. Wal-Mart Stores, Inc.*,
No. 11-2510, 2012 U.S. Dist. LEXIS 97527 (D.N.J. July 13, 2012)..........................18

*Hartman v. Dolgencorp of Tex., Inc.*,
No. 6:09-CV-009-C, 2010 U.S. Dist. LEXIS 140314 (N.D. Tex. June 24, 2010) .................20

*Hill v. R+L Carriers, Inc.*,
No. C 09-1907, 2011 U.S. Dist. LEXIS 27997 (N.D. Cal. March 3, 2011) ..........................32

*Hoffman La-Roche Inc. v. Sperling*,
493 U.S. 165 (1989)...............................................................................16

*Hundt v. DirectSat USA, LLC*,
No. 08 C 7238, 2013 U.S. Dist. LEXIS 92458 (N.D. Ill. Jul 1, 2013) .........................5

*In re Schering Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009).......................................................................41

*Johnson v. Big Lots Stores, Inc.*,
  561 F. Supp. 2d 567 (E.D. La. 2008) ........................................................... passim

*Johnson v. Big Lots Stores, Inc.*,
  No. 04-3201, 2007 U.S. Dist. LEXIS 96151 (E.D. La. Aug. 21, 2007) .......................... 42, 43

*King v. W. Corp.*,
  No. 8:04CV318, 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006) ............................... 18

*Knott v. Dollar Tree Stores, Inc.*,
  897 F. Supp. 2d 1230 (N.D. Ala. 2012) ........................................................... 30, 41

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ............................................................................ 44

*Lusardi v. Xerox Corp.*,
  118 F.R.D. 351 (D.N.J. 1987) ................................................................... 41

*Martin v. Citizens Fin. Group, Inc.*,
  No. 10-260, 2013 U.S. Dist. LEXIS 43084 (E.D. Pa. Mar. 27, 2013) ................................ 5

*McAllister v. Transamerica Occidental Life Ins. Co.*,
  325 F.3d 997 (8th Cir. 2003) ................................................................... 19

*Morgan v. Family Dollar Stores, Inc.*,
  551 F.3d 1233 (11th Cir. 2008) ............................................................... 2, 5, 19

*Noble v. Dolgencorp, Inc.*,
  No. 5:09-cv-49, 2010 U.S. Dist. LEXIS 140387 (S.D. Miss. May 11, 2010) ......................... 19

*Oetinger v. First Residential Mortgage Network, Inc.*,
  No. 3:06-CV-381, 2009 U.S. Dist. LEXIS 61877 (W.D. Ky., July 16, 2009) ......................... 39

*Pedroza v. PetSmart, Inc.*,
  No. 11-298, 2013 U.S. Dist. LEXIS 53794 (C.D. Cal. Jan. 28, 2013) ............................... 32

*Prise v. Alderwoods Group, Inc.*,
  817 F. Supp. 2d 651 (W.D. Pa. 2011) ............................................................ 6

*Reyes v. Texas EZPawn*,
  No. 03-128, 2007 U.S. Dist. LEXIS 1461 (S.D. Tex. Jan. 8, 2007) ........................... passim

*Ruiz v. Serco, Inc.*,
  No. 10-cv-394, 2011 U.S. Dist. LEXIS 91215 (W.D. Wis. Aug. 5, 2011) ........................... 16

*Saleen v. Waste Mgmt.*,
  No. 08-4959, 2009 U.S. Dist. LEXIS 49891 (D. Minn. June 15, 2009) ............................. 41

*Slusser v. Vantage Builders, Inc.*,
    576 F. Supp. 2d 1207 (D.N.M. 2008) ..................................................22

*Smith v. Frac Tech Servs., LLC*,
    No. 4:09CV00679, 2011 U.S. Dist. LEXIS 3165 (E.D. Ark. Jan. 11, 2011) ..........................19

*Smith v. Heartland Auto. Servs.*,
    404 F. Supp. 2d 1133 (D. Minn. 2005)..........................................30, 41

*Soderberg v. Naturescape, Inc.*,
    No. 10-3429, 2011 U.S. Dist. LEXIS 156235 (D. Minn. Nov. 3, 2011)................................33

*Taylor v. Autozone, Inc.*,
    No. 3:10-cv-08125, 2012 U.S. Dist. LEXIS 10207 (D. Az. Jan. 27, 2012) ....................20, 25

*Thomas v. Speedway, LLC*,
    506 F.3d 496 (6th Cir. 2007) ..................................................19

*Tracy v. NVR, Inc.*,
    No. 04-CV-6541L, 2013 U.S. Dist. LEXIS 62407 ..................................................17

*Wacker v. Personal Touch Home Care, Inc.*,
    No. 4:08CV93, 2008 U.S. Dist. LEXIS 101079 (E.D. Mo. Nov. 6, 2008) ..........................29

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)..................................................16, 42

*Ward v. Family Dollar Stores, Inc.*,
    No. 3:08 MD 1932, 2011 U.S. Dist. LEXIS 119272 (W.D.N.C. Oct. 14, 2011) ..................22

*West v. Border Foods, Inc.*,
    No. 05-2225, 2006 U.S. Dist. LEXIS 96963 (D. Minn. June 12, 2006)..................................4

*White v. Baptist Mem'l Health Care Corp.*,
    No. 08-2478, 2011 U.S. Dist. LEXIS 52928 (W.D. Tenn. May 17, 2011) ..........................4, 5

*Wirtz v. Jones*,
    340 F.2d 901 (5th Cir. 1965) ..................................................44

*Zavala v. Wal-Mart Stores, Inc.*,
    691 F.3d 527 (3d Cir. 2012)..................................................4

*Zivali v. AT&T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011)..................................................6

STATUTES

Fair Labor Standards Act (FLSA)..................................................1

FLSA ................................................................................................................ passim

**OTHER AUTHORITIES**

29 C.F.R. ...............................................................................................................22

29 C.F.R. § 541.2 (2004) ...........................................................................18, 38, 48

29 C.F.R. § 541.100 ...............................................................................................17

29 C.F.R. § 541.102 ...............................................................................................22

29 C.F.R. § 541.200(a)(1)-(3) ................................................................................17

29 C.F.R. § 541.700(a) .......................................................................................2, 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

CHAD LOCHRIDGE, HEATHER LOCHRIDGE,
EVERETTE LOCHRIDGE, TWYLA
LOCHRIDGE, KEVIN KORNEGAY, LINDA
DANFORTH, PATRICIA LEACH, DEBRA
McKEE, BRIAN McKEE, PATSY PICKEL,
STEVEN PICKEL, CARLIS SMITH, LYDIA
SMITH, REBECCA SMITH, JUDY KATHRYN
HALE, SHERRY JENKINS, PEARSON
JENKINS, and RYAN AGEE, Each individually
and on behalf of all persons similarly situated                    PLAINTIFFS

V.                                        Case No. 12-cv-05047

LINDSEY MANAGEMENT CO., INC. and                        DEFENDANTS
JAMES E. LINDSEY

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY
CONDITIONALLY CERTIFIED CLASS OF SALARIED EMPLOYEES**

## I.  INTRODUCTION

A collective action under the Fair Labor Standards Act (FLSA) is based on "representative" proof leading to an all-or-nothing verdict.  Thus, this case cannot proceed as a collective action unless Plaintiffs prove that all of the members of the conditionally certified class of salaried employees are similarly situated with respect to their Community Director and Resident Manager job duties.  Because the 18 Plaintiffs cannot even establish that they are similarly situated to each other—much less the class they seek to represent—proceeding in a collective fashion would violate Defendants' due process rights and the Rules Enabling Act.

The Court granted conditional certification of two classes based upon the extremely lenient standard often applied in FLSA litigation.  At the conditional certification stage, when a Court applies the lenient standard for certification, it essentially accepts as true Plaintiffs' claim

that they are similarly situated to the individuals they seek to represent without reviewing and weighing the evidence of record.   The parties have since engaged in substantial discovery, including 18 depositions and the exchange of thousands of documents.  It is now time to apply the more stringent standard required for proceeding in a collective manner.   It is now time to determine whether the Plaintiffs are *in fact* sufficiently similarly situated to the Opt-In Plaintiffs so as to justify uniformly resolving their claims through representative proof.   On the basis of this more complete record, it is now clear that Plaintiffs' claims are unmanageable as a collective action and the two conditionally certified classes should be decertified.

Defendants have asserted several defenses to Plaintiffs' claims, including the executive and administrative exemptions to the FLSA or a combination of both.   Determining whether these exemptions apply is "an inherently fact-based inquiry that depends on the many details of the particular job duties and actual work performed by the employee seeking overtime pay."[1] Here, Plaintiffs are not similarly situated to each other—much less the Opt-In Plaintiffs they seek to represent.   In fact, several of the named Plaintiffs do not even fall within either of the classes they seek to represent.  Moreover, **Plaintiffs Heather and Twyla Lochridge admit that their job duties as Community Directors were very different than the job duties of Plaintiffs Chad and Everett Lochridge.**[2]  Based on this testimony alone, it is clear that this matter cannot be fairly tried in a representative matter.  Because Plaintiffs' job duties as Community Directors

---

[1] *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) ("Like the executive exemption, the focus of whether an employee is properly classified under the administrative exemption requires an individualized inquiry into a Plaintiff's day-to-day job responsibilities and tasks."); 29 C.F.R. § 541.700(a).

[2] Def. App. 385 [Deposition of Lochridge, Heather, (H. Lochridge Dep.) p. 125:12-20]; Def. App. 488 [Deposition of Lochridge, Twyla (T. Lochridge Dep.) p. 203:4-10].

were "very different," they cannot present common proof with respect to the job duties of *all* Community Directors.

Plaintiff Ryan Agee's own unique experiences over the relevant time period further demonstrate the futility of proceeding in a representative manner. Agee held three different job positions, reported to three different supervisors and worked at three different communities during the relevant time period. At various times during the relevant time period: Agee (1) does not fall within any putative class; (2) falls within the putative hourly class and (3) falls within the putative salaried class. The fact finder will necessarily be required to assess Agee's claims on a week-by-week basis, as required by the regulations to the FLSA.

The job duties of Community Directors and Resident Managers vary widely and require an individualized analysis in order to determine whether each Community Director or Resident Manager is exempt from the overtime requirements of the FLSA. Moreover, some Opt-In Plaintiffs' claims are barred by the statute of limitations and other Opt-In Plaintiffs do not even fall within either of the conditionally certified classes.

Because each putative class member must be considered on an individualized basis, *and* because many of those individuals will require an individualized week-by-week analysis due to variances in job titles and duties, *and* because a variety of individualized defenses apply to a variety of Plaintiffs and Opt-In Plaintiffs, *and* because they fall within more than one putative class, this case cannot efficiently proceed in a collective fashion. The inability to offer common proof on the contested issues means that the successful adjudication of Plaintiffs' claims cannot establish a right to recovery for other putative class members across the country who have vastly different factual settings with a variety of individualized defenses available to Defendants.

## II.     LEGAL STANDARD

Plaintiffs bear the burden of demonstrating that they are similarly situated to the putative

3

class members they seek to represent by a preponderance of the evidence. *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003); *West v. Border Foods, Inc.*, No. 05-2225, 2006 U.S. Dist. LEXIS 96963, at *24 (D. Minn. June 12, 2006); *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 537 (3d Cir. 2012). *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952-53 (11th Cir. 2007). Although the burden for *conditional* certification is extremely lenient, Plaintiffs' burden at the decertification stage is much higher. *Douglas v. First Student, Inc.* 888 F. Supp. 2d 929, 933 (E.D. Ark. 2012) (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001), *cert. denied*, 536 U.S. 934 (2002)). "To avoid decertification, the named plaintiffs must introduce 'substantial evidence' that the opt-in plaintiffs are similarly situated." *White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 U.S. Dist. LEXIS 52928, at *11 (W.D. Tenn. May 17, 2011). Plaintiffs must be similarly situated to the individuals they seek to represent because a collective action hinges on the assumption that a jury can rely on testimony from a few plaintiffs in deciding whether *every* plaintiff is entitled to recover. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587-88 (E.D. La. 2008) (discussing the "all or nothing" nature of collective actions).

Courts in the Eighth Circuit and elsewhere have identified several factors that should be considered at the decertification stage, including "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations." *Id.; Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1056 (D. Minn. 2011); *see also Anderson v. Cagle's, Inc.*, 488 F.3d 945, 53 (11th Cir. 2007) (quoting with approval *Thiessen*, 267 F.3d at 1103). The Court should also consider whether the Defendants had a common policy or plan in violation of the FLSA that negatively impacted both the Plaintiffs *and* Opt-In Plaintiffs. *Cruz*,

764 F. Supp. 2d at 1057 (citing *Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101, 1114 (D. Minn. 2009)).

The similarities "'must extend beyond the mere facts of job duties and pay provisions' and encompass the defenses to some extent." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1262 (11th Cir. 2008) (quoting *Anderson*, 488 F.3d at 953). The district court "must consider whether the defenses that apply to the opt-in plaintiffs are similar to one another or whether they vary significantly." *Morgan*, 551 F.3d at 1262. The availability of defenses to some, but not all, opt-in plaintiffs "poses significant case management concerns" that may justify decertification of the collective action. *See Anderson*, 488 F.3d at 594 n.8 (quoting *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir. 1986)).

In general, at the decertification stage, the court should focus on whether the claims are manageable at trial as a class. *See Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302 (11th Cir. 2008) (holding collective action neither manageable nor appropriate given evidence of inconsistencies and differences among proposed class members); *Hundt v. DirectSat USA, LLC*, No. 08 C 7238, 2013 U.S. Dist. LEXIS 92458, at *21-22 (N.D. Ill. Jul 1, 2013) (decertifying class because the "desire to litigate collectively for economic reasons . . . does not override the negative effects that certification is very likely to have on the fairness and manageability of the proceedings." (quoting *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 353 (N.D. Ill. 2012))); *Martin v. Citizens Fin. Group, Inc.*, No. 10-260, 2013 U.S. Dist. LEXIS 43084, at *10-11 (E.D. Pa. Mar. 27, 2013) (holding the "court must determine whether it can 'coherently manage the class in a manner that will not prejudice any party.'" (quoting *Andrako v. United States Steel Corp.*, 788 F. Supp. 2d 372, 384 (W.D. Pa. 2011))); *White v. Baptist Mem'l Health Care Corp*, No. 08-2478, 2011 U.S. Dist. LEXIS 52928, at *11 (W.D. Tenn. May 17, 2011)

5

(decertifying FLSA class because there was "no representative testimony before the Court that would resolve the fairness and manageability issues inherent in proceeding collectively").

At the decertification stage, the court "reconsiders the class certification question **after conducting a fact-specific review of each class member who has opted-in**, taking into account factors such as employment setting, termination procedures, defenses asserted against various plaintiffs, and other procedural issues." *Prise v. Alderwoods Group, Inc.*, 817 F. Supp. 2d 651, 671 (W.D. Pa. 2011) (emphasis added). Whether the claims require individualized determinations is an important factor in the analysis. *See, e.g.*, *Alderwoods Group, Inc.*, 817 F. Supp. 2d at 681 (decertifying five classes because the plaintiffs failed to establish a single decision, policy, or plan implemented on a corporate-wide basis that similarly affected plaintiffs); *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 468-69 (S.D.N.Y. 2011) (same and noting a lack of common issues of fact). When performing this analysis, the dispositive question for the Court to resolve is always the same: Is it possible to "generalize across" all of the plaintiffs who have opted into the action, such that a fair trial "could be achieved on the basis of representative evidence"? *Zivali*, 784 F. Supp. 2d at 459. If the answer to that question is "no," the Court must decertify the action.[3] *Id*. at 460. Here, the answer is unequivocally "no" and, therefore, the Court must decertify this case.

## III.   FACTUAL BACKGROUND

### A.   Overview of Lindsey Management's Operations

Lindsey Management Co., Inc. ("Lindsey Management" or "the Company"), based in

---

[3] This principle holds true regardless of whether the defendant employed a single policy or process to classify all employees in the collective as exempt. *Gardner v. W. Beef Props., Inc.*, No. 07-CV-2345, 2013 U.S. Dist. LEXIS 56511, at *20-23 (E.D.N.Y. Mar. 25, 2013); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1099 (D. Kan. 2012); *Aquilino v. Home Depot, U.S.A., Inc.*, No. 04-04100, 2011 U.S. Dist. LEXIS 15759, at *20-21 (D.N.J. Feb. 15, 2011).

Fayetteville, Arkansas, began its operations in 1985.[4]  The Company presently manages over 150 multi-million dollar apartment communities ranging from as few as 64 units to as many as 672 units.[5]  The communities, owned by a number of independent legal entities and individuals, are located in eight states across the country.[6]  Amenities vary by community.[7]  Some communities feature clubhouses, fitness centers, pools, tennis courts, and lakes.[8]  Other communities also feature business centers, game rooms, tanning beds, whirlpools, saunas, and resort-style pools.[9]  In addition, there are currently 42 communities with Pro Shops and golf courses in the eight-state area, and the golf courses range from 9-hole par 3s to 27-hole championship courses.[10]

Communities with over 300 apartment units are generally, ***but not always***, managed by a two-person Community Director team.[11]  Each community with less than 300 apartment units is managed by an individual Community Director or Resident Manager, or a two-person management team.[12]  Communities may also be staffed with up to two "Assistant Managers," and other non-exempt, hourly employees such as a "Senior Leasing Consultant," "Leasing Consultant," "Senior Maintenance Technician," "Maintenance Technician," "Clubhouse Attendant," and/or "Groundskeeper."[13]

---

[4] Def. App. 888 [Declaration of Job Branch ("J. Branch Decl."), ¶ 3; *Our Company*, Lindsey Management Co., Inc., available at http://www.lindseymanagement.com/cgi-bin/index.cgi?page=pub_company (last visited Nov. 29, 2012)].

[5] Def. App. 888 [J. Branch Decl. ¶ 4]; Def. App. 64 [Deposition of Job Branch (J. Branch Dep.), p. 16:5-9]

[6] Def. App. 888 [J. Branch Decl. ¶ 4].

[7] Def. App. 888-889 [ J. Branch Decl.  ¶ 5]; Def. App. 837 [Declaration of Eddie Smith (E. Smith Decl., ¶ 4)].

[8] Def. App. 888-889 [J. Branch Decl. ¶ 5].

[9] *Id*.

[10] *Id*.

[11] Def. App. 895-896 [Declaration of Betsy Fox ("B. Fox Decl.") ¶12]; Def. App. 383 [H. Lochridge Dep.  p. 117:17-21].

[12] *Id*.

[13] Def. App. 889 [J. Branch Decl. ¶ 8].

**B.      Overview of Community Directors, Resident Managers, and Assistant Managers**

Community Directors are classified as exempt and are paid on a salaried basis.[14] Resident Managers and Assistant Managers, on the other hand, are generally classified as non-exempt, and are paid on an hourly basis for all hours worked.[15] Resident Managers and Assistant Managers are paid overtime at the rate of one and one half times their regular rate for all hours worked over forty in a week.[16]

Due to the unique nature and multiple aspects of the apartment management business, two-person management teams are generally more efficient for larger apartment communities (above 300 units).[17] The two-person team is usually comprised of individuals sharing a personal relationship, such as two spouses.[18] However, that is not always the case, and the Company has staffed communities with individuals sharing no personal relationship, and it has staffed larger communities with only one Community Director, as opposed to a team of two.[19] Community Directors and Resident Managers report to different Regional Supervisors, and the degree and manner by which each individual interacts with their Regional Supervisor varies significantly.[20]

---

[14] Def. App. 889 [J. Branch Decl. ¶ 9]; Def. App. 1019 [Supplemental Dec. of Betsy Fox ("B. Fox Supp. Dec.") ¶ 6].

[15] Def. App. 832 [Declaration of La'Karen Porter ("L. Porter Decl."), ¶ 4; Def. App. 877 [Declaration of Cynthia Tucker ("C. Tucker Decl.") ¶3]; Def. App. 881 [Declaration of Megan Vanhoy ("M. Vanhoy Decl.") ¶5].

[16] Def. App. 889 [J. Branch Decl. ¶ 11]; Def. App. 895 [B. Fox Decl. ¶ 6].

[17] Def. App. 895-896 [B. Fox Decl. ¶ 12].

[18] Def. App. 846 [Declaration of Kathy Smith ("K. Smith Decl.") ¶2]; Def. App.836 [ E. Smith Decl. ¶2].

[19] Def. App.890 [J. Branch Decl. ¶ 13].

[20] Def. App. 890 [J. Branch Decl. ¶ 13]' Def. App. 837 E. Smith Decl. ¶ 9]; Def. App. 788 Declaration of Mary Carlat ("Carlat Decl."), ¶ 4]. Def. App. 527, 543, 551-552, 555-556 [Deposition of Pickel, Patsy (P. Pickel Dep.),; 37:12-16; 103:15-19; 134:4-12; 137:24-138:14, 151:14-152:13; 153:23-154:20] Def. App. 728, 732 [Deposition of Smith, Rebecca (R. Smith Dep.), p. 53:14-15; 71:3-17]; Def. App. 486 [T. Lochridge Dep., p. 196:7-13]; Def. App. 364-365, 411 [H. Lochridge, Heather, p. 44:24-45:13; 229:21-25]; Def. App. 45 [Deposition of Agee, Ryan  (R. Agee Dep.), 177:1-20]; Def. App. 219-220 [Deposition of Leach, Patricia (P. Leach Dep.), p. 176:9-177:8]; Def. App. 677 Deposition Smith, Lydia (L. Smith Def.), 209:3-17

Assistant Managers, who are classified as non-exempt and are paid on an hourly basis, work under the supervision of Community Directors or Resident Managers.[21]

Community Directors assume responsibility for all aspects of managing larger apartment communities, which may also include managing a 9-hole golf course, Pro Shop and/or grill.[22] Community Directors regularly perform exempt functions specific to the unique community they manage and to the unique role that they fulfill within that community.[23]  Community Directors are told to run their communities as if they owned them.[24]  In fact, when Plaintiff Patricia Diane Leach decided to end her employment with the Company in May 2012, she sent a resignation letter to Mr. Lindsey thanking him for the opportunity to manage a community and stating,

> **When you promoted me to Manager at the Fairways at Marion, I didn't realize it at first, but this was my opportunity to run my own business. I have certainly enjoyed the opportunity to manage the Fairways all of these years and want to thank you from the bottom of my heart for the trust you have shown in me**.[25]

Community Directors also supervise and manage anywhere from 2 to 14 other employees within a community.[26]

---

[21] Def. App. 885 [Declaration of Janet Willcutt ("J. Willcutt Decl.") ¶2].
[22] Def. App. 890 [J. Branch Decl. ¶ 15].
[23] Def. App. 890 [J. Branch Decl. ¶ 16].
[24]  Def. App. 688 [L. Smith Dep, 253:25-254:14]; Def. App. 166  [Deposition of Danforth, Linda (L. Danforth Dep), 196:21-23]; Def. App. 408 [H. Lochridge Dep., 218:2-22]; Def. App. 487 [T. Lochridge Dep., 200:7-9.  *See also* Def. App. 837 [E. Smith Decl. ¶ 10]; Def.App. [K. Smith Decl. at ¶ 50]; Def. App. 898, 905 [B. Fox Decl. ¶ 22 and Exh. 3 (attaching letter from Leach stating "I didn't realize it at first, but this [promotion to Manager] was my opportunity to run my own business.  I will always be grateful to you for allowing me to fulfill that dream."]
[25] (emphasis added) Def. App. 898, 905 [B. Fox Decl. ¶ 22 and Exh. 3]
[26] Def. App. 890 [J. Branch Decl. ¶ 18]; Def. App. 838 [E. Smith Decl. ¶ 11].

1. **The actual job duties of Community Directors and Resident Managers vary widely depending on how they allocate their responsibilities.**

The job duties of Community Directors vary significantly.[27]   Heather Lochridge admits that she held the same job *title* as Chad Lochridge, but that their job *duties* on a day-to-day basis were different.[28]  Twyla Lochridge likewise testified that her job as a Community Director was different from that of another Community Director:[29]

> Q.    (Ms. Miers continued.)   Your job was very different from Everette's job; right.
>
> MS. HURST:  Object to form.
>
>  A.   I worked in the office, and he worked in maintenance.
>
> Q.   (Ms. Miers continued.)  Is that a yes?
>
> A.   Yes.

Community Directors determine, among themselves, how to allocate the various tasks associated with managing a community.[30]  For instance, some Community Directors divide their responsibilities by having one assume responsibility for "inside" duties, such as leasing, marketing, and staffing related to same, while the other assumes responsibility for "outside" duties, such as overseeing and supervising maintenance, grounds keeping, addressing resident complaints, and compliance issues, as well as assessing and overseeing the repair of vacated units.[31]  However, this is not always the case.  In some communities, one individual has taken the

---

[27] Def. App. 385 [H. Lochridge Dep,  p. 125:12-20]; Def. App. 488 [T. Lochridge Dep., p. 203:4-10].

[28] Def. App. 385 [H. Lochridge Dep,  p. 125:12-20].

[29] Def. App. 488 [T. Lochridge Dep, p. 203:4-10].

[30] Def. App. 890-891 [J. Branch Decl. ¶ 19, 20]; Def. App. 446 [T. Lochridge Dep,  p. 33:17-34:18]; Def. App. 384-385 [H. Lochridge, p. 124:5-125:1.]

[31] Def. App. 890-891 [J. Branch Decl.¶20]. Def. App. 284, 287, 290, 300 [Deposition of Lochridge, Chad (C. Lochridge Dep), 121:23-122:1; 134:4-7; 146:15-25; 187:10-14]; Def. App. 307-308, 323, 328 [Deposition of Lochridge, Everett (E. Lochridge Dep.), 24:23-25:17; 85:3-

full responsibility for the majority of the Community Director's responsibilities rather than splitting it with another Community Director, due to their personal needs, such as when undergoing marital separation or due to the health conditions of one of the partners.[32]   For example, when Heather Lochridge separated from her husband, Chad, they both resigned and Heather was subsequently hired as a solo Community Director.[33]

The significance of this difference in the job duties between proposed class members— even those holding the same position—cannot be understated.   To be clear, one Community Director might manage all aspects of a community related to leasing, marketing, and staffing while another might oversee maintenance, which sometimes involves varying degrees of manual labor, while yet another might manage all of these aspects alone.[34]   Some management teams make the decision to handle all of the job duties together without dividing them up at all.[35]   It is therefore impossible to determine whether the proposed class members were properly classified as exempt under the executive, administrative, or combination exemptions to the FLSA without conducting an individualized analysis of each class member's own job duties.

Even among Community Directors who have divided the management of a community in a similar manner, there is significant variance in the way the Community Directors carry out their responsibilities.[36]   Therefore, the job duties and responsibilities entailed in managing a

---

86:6; 106:2-106:24]; Def. App. 384, 396, 417-418 [H. Lochridge Dep., p. 123:21-124:11; 169:25-170:15; 171:6-171:19; 256:10-256:21; 257:25-258:18].
[32] Def. App. 896-897 [B. Fox Decl. ¶ 13-15].
[33] Def. App. 383 [H. Lochridge Dep., p. 117:4-21].
[34] Def. App. 890-891 [J. Branch Decl. ¶20]; Def. App. 284, 287, 290, 300 [C. Lochridge Dep, p. 121:23-122:1; 134:4-7; 146:15-25; 187:10-14]; Def. App. 307, 3223, 328 [E. Lochridge Dep., 24:23-25:17; 85:3-86:6; 106:2-106:24]; Def. App. 384, 396, 417-418 , [H. Lochridge Dep., p. 123:21-124:11; 169:25-170:15; 171:6-171:19; 256:10-256:21; 257:25-258:18]; Def. App. 446 [T. Lochridge Dep., p. 33:17-34:18
[35] Def. App. 194 [P. Leach Dep., p. 73:20-74:11].
[36] Def. App. 891 [J. Branch Decl. ¶21].

multi-million dollar apartment community vary from manager to manager and from community to community based on a variety of factors including, but not limited to, the division of labor amongst the Community Directors, the individual manager's management style, the individual preferences of the particular Regional Supervisor, whether the community was in a "lease-up" stage or full, the number of units in a community, the number of employees working at a community, whether the community was a tax-credit community, the skill-set of the Community Director, the age of the community, the location of the community, the onsite facilities, the vacancy rate, training responsibilities, whether the community includes executive suites, and the hours of operation of the community.[37]

> **2.  The actual job duties of Community Directors and Resident Managers vary widely depending on the structure of the community they manage.**

Plaintiffs acknowledge that their tasks and duties varied depending on the type of community in which they lived and worked.  Perhaps most directly pertinent is the age of the community.  For example, when Twyla Lochridge was hired at The Links at Starkville, it was a "lease-up property" under construction.[38]  Only four prospective tenants had paid a deposit and residents did not move into the property until she had worked there for several months.[39]  The property office was initially housed in a construction trailer located some distance from the property, and she maintained only temporary office hours there.  She travelled between the construction trailer and the property in a golf cart.[40]  Because there was not a model unit available during construction, Lochridge showed the property to prospective tenants by using "a

---

[37] *See infra*; Def. App. 891 [J. Branch Decl ¶22].
[38] Def. App. 441-442 [T. Lochridge Dep., p. 16:22-17:1].
[39] Def. App. 443 *Id*. at 21:7-19.
[40] Def. App. 442, 443 *Id*. at 20:7, 21-24.

poster board with pictures" of the rooms and pool.[41]  She had not yet hired a leasing agent or a maintenance manager, so she and her husband Everett Lochridge, the other Community Director, were the only employees.[42]  Her duties required her to do "what had to be done to get [the property] ready for people to move in."[43]  Her typical day started in the construction trailer and, because none of the units were ready for occupancy, "[t]here was just a lot of preliminary work."[44]  Lochridge testified that she spent two weeks putting furniture together.[45]

Twyla Lochridge agreed that *most* Community Director teams divided the work so that one team member oversaw and managed the maintenance of the community and the other one oversaw the leasing and accounting responsibilities.[46]  However, that did not occur at The Links at Starkville until after the complex was leased:  "before then, no.  You did what had to be done . . . to get things ready for people to move in."[47]

Community Directors at other properties, on the other hand, performed entirely different tasks.  While Twyla and Everette Lochridge testified they spent a great deal of time putting together furniture, Ryan Agee identified only one occasion in which he put together furniture, and none of the other Plaintiffs who were Community Directors even identified putting furniture together as a job duty.[48]  Other Community Directors identified job duties that Twyla Lochridge did not have when she managed a property during the initial stages of "lease-up phase," such as handling resident complaints, balancing books, collecting rent, preparing leases, drafting and

---

[41] Def. App. 442 *Id*. at 20:12-18.
[42] Def. App. 443  *Id*. at 21:19-25.
[43] Def. App. 451 *Id*. at 53:11-17.
[44] Def. App. 442 *Id*. at 17:24-18:11
[45] Def. App. 447 *Id*. at 38:11-23.
[46] Def. App. 446 *Id*. at 34:9-15.
[47] Def. App. 446 *Id*. at 34:17-18, 20-21.
[48] Def. App. 20 [R. Agee Dep., p. 77:18-20].

distributing lease renewal forms, preparing late notices and pest control notices, and drafting and submitting daily and monthly accounting reports.[49]

Besides the obvious differences in the day-to-day responsibilities required to manage a property under construction as compared to an established property, Community Directors who worked at both older and newer properties know how much the age of the property impacts the tasks and responsibilities they had to perform.  Plaintiff Carlis Smith, for example, worked as a Community Director for both older and newer properties, including an older property named the Greens at Irene and a newer property named The Links in Tuscaloosa.[50]  For a period of time, he simultaneously managed both The Links in Tuscaloosa and The Greens at Tuscaloosa while The Greens was under construction.[51]  When combined, those two properties had a total of 864 units, but he felt that one management team could manage them simultaneously because the Greens was a new property and "had less problems than every other property that were ten to 14 years old."[52]  He had to deal with more maintenance issues at The Greens at Irene because it was an older property.[53]  Similarly, Plaintiff Patsy Pickel worked as a Resident Manager for the older Fountain Lakes and West Wood properties as well as the newer West Wood property.[54]  She also found that as a property aged, it developed more maintenance issues that she had to monitor.

Another example of the varying community structures was apparent in the varied tasks encountered in managing tax credit properties and non-tax-credit properties.  Plaintiff Patsy Pickel worked at both types of properties.[55]  For tax credit properties, she had to oversee

---

[49] Def. App. 751[R. Smith Dep,  p. 147:6-148:23]; Def. App. 238 [P. Leach Dep, p. 250:14-18].
[50] Def. App. 585, 594 [C. Smith Dep. pp. 39:14-17; 74:23].
[51] Def. App. 594 [C. Smith Dep. p. 74:16-19].
[52] Def. App. 594 [C. Smith Dep. p. 74:12-14].
[53] Def. App. 605 [C. Smith Dep. p. 118:5-12].
[54] Def. App. 528 [P. Pickel Dep. p. 44:3-21].
[55] Def. App. 541 [P. Pickel Dep.,p. 93:10-23].

different screening requirements, such as the completion of forms to verify employment and income, including child support and social security.[56]  Plaintiff Leach noticed even more significant differences in her duties at tax credit properties and non-tax-credit properties than between older and newer properties.[57]  A tax credit property typically had more vacancies, had to devote more time to repairing damage, experienced more resident complaints and had residents that were described as "more needy."[58]

## C.   Some Plaintiffs' and Opt-In Plaintiffs Do Not Even Fall Within Either of the *Conditionally* Certified Classes.

Further demonstrating Plaintiffs' inability to show that they are similarly situated to the class members they seek to represent, some Plaintiffs have never even held job titles that fall within either of their proposed classes.  Plaintiffs seek to represent Community Directors, Resident Managers, and Assistant Managers.  However, some of the Plaintiffs who are asking this Court to allow them to represent the proposed classes do not even fall within the Plaintiffs' own proposed classes because they never held any of the relevant job positions.  Plaintiffs Judy Kathryn Hale, Kevin Kornegay, and Linda Danforth never held *any* of the relevant positions and are not members of either class *conditionally* certified by the Court.[59]  Moreover, several Opt-In Plaintiffs do not fall within either of the proposed classes.  Opt-In Plaintiff Vachelle Wheaton was a Leasing Consultant.[60]  She never held any of the relevant positions.[61]  Opt-In Plaintiffs Ronald Dodgen, Kenneth Martin, and David E. Cummins, Jr. also never held any of the relevant job positions.[62]

---

[56] *Id.*
[57] Def. App. 179 [P. Leach Dep. p. 15:6-8].
[58] Def. App. 198, 202,-203 [P. Leach Dep.,p. 89:16-19; 105:21-106:1; 112:8-22].
[59] Def. App. 897 [B. Fox Dec. ¶16, 18-19].
[60] Def. App. 898 [B. Fox. Decl. ¶21].
[61] *Id.*
[62] Def. App. 1020 [B. Fox. Supp. Decl. ¶ 7].

Plaintiffs cannot credibly deny the need to conduct an individualized analysis of each individual's claims on this basis alone.

## IV.   THE CONDITIONALLY CERTIFIED CLASS OF SALARIED COMMUNITY DIRECTORS AND RESIDENT MANAGERS SHOULD BE DECERTIFIED.

The Court should decertify the conditionally certified class defined by the Court as:

> All current and former employees of apartment communities managed by Lindsey Management Co., Inc., who were employed as Community Directors, Resident Managers, or Assistant Managers in Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma or Tennessee at any time during the three (3) years preceding the filing of Plaintiffs' Complaint on March 15, 2012, until the present who were paid on a salary basis.

Dkt. No. 71.

### A.   Plaintiffs' Lack of Common Evidence Compels Decertification.

Courts may not allow an FLSA misclassification case to proceed to a collective trial unless the plaintiffs prove that common evidence would generate a common answer to the ultimate question:  Were the named and opt-in plaintiffs misclassified?  *Ruiz v. Serco, Inc*., No. 10-cv-394, 2011 U.S. Dist. LEXIS 91215, at *18-19 (W.D. Wis. Aug. 5, 2011); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (holding that proceeding on a class-wide basis requires that the dispositive question be "capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").  In other words, a prerequisite to a collective action is that Plaintiffs prove they are "similarly situated."  *Hoffman La-Roche Inc. v. Sperling*, 493 U.S. 165, 168 (1989).

This Court must determine whether Plaintiffs are similarly situated through the prism of the exemptions on which the Defendants rely.  *See, e.g.*, *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1094 (D. Kan. 2012).  Here, Defendants rely on the executive and

administrative exemptions (or a combination of both) in defending their decision to classify Plaintiffs as exempt.  Employees qualify for the executive exemption if they:

> (a)   are compensated on a salary basis at a rate of not less than $455 per week;
>
> (b)   have the primary duty of management;
>
> (c)   customarily and regularly direct the work of two or more other employees; and
>
> (d)   have the authority to hire or fire other employees or make suggestions as to the hiring, firing, advancement, promotion or any other change of status of other employees and their suggestions are given particular weight.

29 C.F.R. § 541.100.  Employees qualify for the administrative exemption if:

> (a)   they are paid a salary of at least $455 per week;
>
> (b)   their primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (c)   their primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1)-(3).

Plaintiffs claim that the job duties they actually performed rendered them non-exempt employees.  The task, therefore, of the trier of fact in this case is to evaluate the job duties actually performed by the Plaintiffs and determine whether (1) Defendants are correct and the job duties satisfy one of the asserted exemptions or (2) Plaintiffs are correct and they were misclassified.  *See Tracy v. NVR, Inc.*, No. 04-CV-6541L, 2013 U.S. Dist. LEXIS 62407, at *9 (granting decertification notwithstanding a common job description); *Aquilino v. Home Depot, Inc.*, No. 04-04100, 2011 U.S. Dist. LEXIS 15759, at *21 (D.N.J. Feb. 15, 2011) (decertifying class because plaintiffs could not rely on common evidence at trial); *Reyes v. Texas EZPawn*, No. 03-128, 2007 U.S. Dist. LEXIS 1461, at *13 (S.D. Tex. Jan. 8, 2007) (decertifying class of

assistant store managers because testimony revealed differences in job duties depending on their supervisors' individual practices, store demographics, and location).

Plaintiffs' testimony about their job duties falls on a continuum, with the experiences of Plaintiffs on one end being radically different from Plaintiffs on the other end.  Resolution of this case will be determined based on Plaintiffs' varying individual testimony.  Such testimonial evidence can never be "common."  *See Harriel v. Wal-Mart Stores, Inc*., No. 11-2510, 2012 U.S. Dist. LEXIS 97527, at *17 (D.N.J. July 13, 2012) (denying certification where "[u]ltimately establishing an FLSA violation under Plaintiff's theory of the case will require examination of each individual [manager's] experiences").

### B.    Plaintiffs Cannot Show a Common, Unlawful Policy or Practice.

In evaluating whether Plaintiffs are similarly situated to the Opt-In Plaintiffs, the Court must consider whether Defendants implemented a common policy, plan, or decision that violated the FLSA.  *Lawson Software, Inc*., 764 F. Supp. 2d at 1057.  A common job position and exempt classification is insufficient to establish a common policy or practice.  *Id.* (holding common job descriptions "do not weigh in favor of classification"); *Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *22 (same); *King v. W. Corp*., No. 8:04CV318, 2006 U.S. Dist. LEXIS 3926, at *43 (D. Neb. Jan. 13, 2006) (holding "employees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially."); 29 C.F.R. § 541.2 (2004) (stating "[a] job title alone is insufficient to establish the exempt status of an employee" and noting that exempt status must be determined based on the actual duties of the employee).    While Plaintiffs and Opt-In Plaintiffs may have the same overarching responsibilities—managing all aspects of multi-million dollar apartment communities—the record shows wide variances in the way Plaintiffs actually carried out those responsibilities. Likewise, a uniform job position classification is not strong evidence that employees are

similarly situated for purposes of analyzing whether Plaintiffs' actual job duties were similar enough to justify collective treatment. *Family Dollar Stores, Inc.*, 551 F.3d at 1246 n.46 ("Just because a business classifies all employees in a particular job as exempt does not mean that those employees are necessarily 'similarly situated'").

"[A]pplying the executive exemption is 'an inherently factbased inquiry' that depends on the many details of the particular job duties and actual work performed by the employee seeking overtime pay." *Smith v. Frac Tech Servs., LLC*, No. 4:09CV00679, 2011 U.S. Dist. LEXIS 3165, at *18 (E.D. Ark. Jan. 11, 2011) (quoting *Family Dollar Stores, Inc.*, 551 F.3d at 1263).

> 1.     **The "Nuts & Bolts of Property Management" and "A Roadmap to Success" manuals are not "policies" that can form the basis of a collective action.**

Plaintiffs rely heavily on the existence of two manuals designed to provide guidance for managing multi-million dollar properties to support their allegation that (1) they are similarly situated to the individuals they seek to represent and (2) that they did not exercise discretion. However, the mere existence of these manuals does not automatically render Plaintiffs similarly situated nor does it negate the need to determine whether management was Plaintiffs' primary duty. *See Thomas v. Speedway, LLC*, 506 F.3d 496, 506-08 (6th Cir. 2007) (holding that individual in charge of a store has management as his primary duty even if a company implements detailed operating procedures); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) ("Just because McAllister was required to follow detailed manuals does not mean she did not exercise discretion and independent judgment."); *Noble v. Dolgencorp, Inc.*, No. 5:09-cv-49, 2010 U.S. Dist. LEXIS 140387, at *23-24 (S.D. Miss. May 11, 2010) ("Noble had considerable discretion regarding the supervision and management of her employees. The fact that the company had procedures that it wished for its employees to follow does not tend to show that Noble had no authority to manage her store."); *Taylor v. Autozone*,

19

*Inc.*, No. 3:10-cv-08125, 2012 U.S. Dist. LEXIS 10207, at *27-28 (D. Az. Jan. 27, 2012) ("Thus, that the [store managers] lack discretion due to nationwide corporate policies, to the extent that this is relevant under the current regulations, does not mean that their primary duty is something other than management."); *Aschenbrenner v. Dolgencorp, Inc.*, No. 8:10-cv-153, 2011 U.S. Dist. LEXIS 60097, at *43-47 (D. Neb. Jun. 3, 2011) (holding that the fact that an employer maintained [Standard Operating Procedure] manuals for the sake of consistency did not mean that the store manager never exercised discretion); *Hartman v. Dolgencorp of Tex., Inc.*, No. 6:09-CV-009-C, 2010 U.S. Dist. LEXIS 140314, at *16-17 (N.D. Tex. June 24, 2010) ("Because she was required to follow a standard operating procedures manual in performing certain tasks, Plaintiff argues that she had limited managerial discretion.  However, the mere fact that certain standard operating procedures are to be followed in a formulaic way does not imply a lack of discretion but instead is the very nature of supervision.").

Lindsey Management created the "Nuts & Bolts of Property Management" and "A Roadmap to Success" manuals to provide a resource that assists Community Directors and Resident Managers in managing multi-million dollar apartment communities and to achieve a consistent experience for residents.  The manuals do not represent a list of required day-to-day tasks.[63]  Rather, they serve as reference guides that managers may utilize or completely ignore.[64]  Indeed, as Heather Lochridge testified, with respect to the Daily, Weekly, Monthly and 90-Day Inspection lists, the "Nuts & Bolts" manual expressly states "[y]ou may need to adapt these to

---

[63] Def. App. 893 [J. Branch Decl. ¶ 33].
[64] Def. App. 421, 422 [H. Lochridge Dep., p. 269:18-270:14; 272:25-273:7]; Def. App. 777 [R. Smith Dep., p. 252:19-253:4].

your specific property."[65]  Even if the existence of the manuals were relevant to decertification, Plaintiffs must prove that they were used in a sufficiently similar way so as to justify representative testimony.  Defendants' evidence demonstrates that many Community Directors rarely, if ever, refer to the guide.[66]  For example, Community Director Andy Tody testified the last time he saw a copy of the Nuts & Bolts guide was over eight years ago.[67]  Given the vastly divergent testimony from Community Directors, it is apparent that Plaintiffs should not be permitted to testify on behalf of all 154 Opt-In Plaintiffs.

### C.     The Primary Duty Must Be to Perform Managerial Functions.

The first disputed issue is whether Plaintiffs had the primary duty of management.  The FLSA regulations describe a non-exclusive list of tasks constituting "management" as including:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102; *Ward v. Family Dollar Stores, Inc.*, No. 3:08 MD 1932, 2011 U.S. Dist.

---

[65] Def. App. 421-422 [H. Lochridge Dep., p. 269:18-270:14; 272:25-273:7]; Def. App. 777-778 [R. Smith Dep., p. 252:19-253:4]; Def. App. 387  [H. Lochridge Dep., p. 134:23-135:2], Def. App. 981 [Ex. 11 to P. Pickel Dep., p. 29].

[66] Def. App. 811 [Declaration of Candece Hite (C. Hite Decl.) ¶ 37]; Def. App. 819 [Declaration of Blake Moon (B. Moon Decl.) ¶ 25]; Def. App. 830 [Declaration of Leslie Moon (L. Moon Decl.) ¶ 26]; Def. App. 843 [E. Smith Dec. ¶ 32]; Def. App. 856 [K. Smith Dec. ¶ 39]; Def. App. 865-866 [Declaration of Andy Tody (A. Tody Decl.),  ¶ 23]; Def. App. 874 [Declaration of Beth Tody (B. Tody Decl.),  ¶ 30].

[67] Def. App 865 [A. Tody Decl. ¶ 23].

21

LEXIS 119272, at *37-38 (W.D.N.C. Oct. 14, 2011) (customer complaints); *Slusser v. Vantage Builders, Inc.*, 576 F. Supp. 2d 1207, 1216 (D.N.M. 2008) (management meetings).  With respect to most of these tasks, Plaintiffs present extensively diverging scenarios.

An employee is treated as having management as a primary duty—even if she spends less than fifty percent of her time performing exempt duties—if management is the employee's "principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Courts typically weigh four factors in assessing whether management is an employee's primary duty: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  29 C.F.R. *d*. §§ 541.700(a), 541.700(b).

### D.    **Testimony Varies Regarding Management Tasks as Primary Duty**.

In determining whether any combination of an employee's tasks was "primary," the key inquiry is the "character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  Factors to consider include, but are not limited to, (a) "the employee's relative freedom from direct supervision"; (b) the amount of time spent performing exempt work; and (c) the relative importance of the exempt duties.  *Id*.  Plaintiffs present differing fact patterns regarding each of these considerations.

#### 1.    **Testimony on Relative Freedom from Direct Supervision Varies.**

Regarding "relative freedom from direct supervision," a variety of testimony calls for decertification.  *See Big Lots Stores, Inc.*, 561 F. Supp. 2d at 581; *see also Goff v. Bayada Nurses, Inc.*, 424 F. Supp. 2d 816, 823 (E.D. Pa. 2006) (because plaintiff was the only manager

on duty, she "had no choice but to direct" other employees).  Once again, such variety exists here.

- Patsy Pickel would go weeks without seeing her Regional Supervisor, who might visit her property once or twice a month.  She recalled talking to her Regional Supervisor "a couple of times a month."[68]  She rarely sought guidance from her supervisor, and recalled only one incident when she felt that she needed help managing a situation when someone yelled at a leasing consultant.[69]  She made decisions regarding hiring outside painters, allowing tenants to sign a six-month lease, and approving employee time off.[70]

- Rebecca Smith testified that "the [Regional Supervisors] managed everything that we did," but when asked what decisions her supervisors made, she was initially unable to identify a single management decision made by a supervisor.[71]  Smith testified she received several phone calls a day from her Regional Supervisor, who also visited her property at least once a week.[72]

- Twyla Lochridge's Regional Supervisor visited her property three or four times a month, and they talked on the phone about three times a day.[73]

- Heather Lochridge testified that Regional Supervisor Anne Chapman Martin was at her community almost every day, but when Ray Danforth was her supervisor, he only visited 2 or 3 times a month for about half a day.[74]

- Ryan Agee testified his Regional Supervisors visited his community anywhere from 5 to 10 times a month, exchanged emails every other day, and "periodically" talked over the phone.[75]

- Patricia Leach's supervisor visited her property about 2 times a week for about 4 hours, called several times a day, and emailed "all the time."[76]

- Lydia Smith wasn't sure how often her supervisor visited, but could recall that visits varied from about 1 hour to 4 or 5 hours and that sometimes her supervisor visited the community once a week.[77]

---

[68] Def. App. 555 [P. Pickel Dep., p.151:14-152:13].

[69] Def. App. 555-556  *Id*. at 153:23-154:20.

[70] Def. App. 527, 543, 441-552 *Id*. at 37:12-16; 103:15-19; 134:4-12; 137:24-138:14].

[71] Def. App. 728, 732 [R. Smith Dep. p. 53:14-15; 71:3-71:17].

[72]  *Id*.

[73] Def. App. 486 [T. Lochridge Dep., p. 196:7-13].

[74] Def. App. 364-365, 411 [H. Lochridge Dep, p.  44:24-45:13; 229:21-25].

[75] Def. App. 45 [R. Agee Dep, p. 177:1-177:20].

[76] Def. App. 219-220 [P. Leach Dep., p.  176:9-177:8].

### 2. Testimony demonstrates wide variances in the types, frequency and importance of exempt work.

There is a wide disparity in the testimony regarding the performance of exempt work:

- Lydia Smith admits she was the highest level employee on site and was responsible for managing her community, but claims "I didn't have final authority."[78]

- Rebecca Smith testified that the Regional Supervisors managed the communities. She generally denied responsibility for most aspects of managing a community, but admitted she was responsible for balancing the books.[79]

- Heather Lochridge generally denied having any management or supervisory duties, but admitted she and her husband Chad had ultimate responsibility for the property.[80]

- Ryan Agee, Heather Lochridge, Lydia Smith, and Rebecca Smith acknowledged they were eligible for bonuses based on their communities' profitability.[81]

- Everett Lochridge testified he had no authority to make decisions.[82]

Twyla Lochridge, on the other hand, testified[83]:

> Q.   Well, you were responsible for managing your staff; right?
>
> MS. HURST:  Object to form.
>
> A.   I made them aware of what their duties were at -- working for Lindsey.
>
> Q.   (Ms. Miers continued.)  And you trained them?
>
> MS. HURST:  Object to form.
>
> A.   I familiarized them with the policies and procedures.  And . . . showed them what Lindsey -- what Lindsey expected of them and what Lindsey's way of doing things were.

---

[77] Def. App. 677 [L. Smith Dep, p. 209:3-17].
[78] Def. App. 676 [L. Smith Dep.p. 206:18-207:20].
[79] Def. App. 728, 756-757 [R. Smith Dep., p. 53:22-53:24; 63:1-4; 68:18-169:11].
[80] Def. App. 396, 403 [H. Lochridge Dep., p. 171:20-172:2; 199:17-199:23].
[81] Def. App. 51 {R. Agee Dep., p. 201:3-201:5]; Def. App. 416 [H. Lochridge Dep., p. 251:20-251:24]; Def. App. 701 [L. Smith Dep., p. 306:15-306:25]; Def. App. 767 [R. Smith Dep, p. 211:14-211:20].
[82] Def. App. 319 [E. Lochridge Dep., p. 71:12-21].
[83] Def. App. 477 [T. Lochridge Dep., p.  157:17-158:15; see also 161:17-162:15].

> Q.    (Ms. Miers continued.)  You directed their work on a day-to-day basis?
>
> A.    All I did was over -- is, you know, make sure that every -- everything was done the way it was supposed to be done.  Because like I said before, you know, for everything you do, there was either an oral, written, or whatever you want to call it, policy that it be done that way.
>
> Q.    And you were the one on property that was responsible -- ultimately responsible for all those things getting done; right?
>
> A.   Yes.

Furthermore, the concurrent exercise of managerial duties is a factor that supports the exemption because an employee who performs "concurrent duties" "will be considered to have management as his primary duty."  *Dizer v. Dolgencorp., Inc.*, No. 3:10CV699, 2012 U.S. Dist. LEXIS 24025, at *27-28 (W.D. La. Jan. 12, 2012) (citing 29 C.F.R. § 541.103); *accord Donovan v. Burger King Corp.*, 672 F.2d 221, 227 (1st Cir. 1982) ("[T]he person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions."); *Taylor*, 2012 U.S. Dist. LEXIS 10207, at *25-26 (holding eligibility for profitability bonus "suggests that plaintiffs were concurrently performing exempt and nonexempt tasks as envisioned by the Department of Labor.").  Thus, even if the Court finds Plaintiffs are similarly situated with respect to the *amount* of time they spent performing exempt duties, the inquiry does not end there.  In order to determine whether the executive exemption applies, the Court must examine whether and to what extent concurrent duties were performed.  *Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *23 (holding that even if the plaintiffs could establish through common proof that they spent the majority of their time performing non-exempt tasks, this "does not establish sufficient similarities to warrant class certification").

### 3. Interviewing and Selecting Employees—Some Do, Some Don't

With respect to interviewing and selecting employees, wide divergence exists in numerous examples. Plaintiffs' collective testimony regarding interviewing employees was inconsistent and varied.

- One Plaintiff testified he was involved in the interviewing process, that he was interviewed by Community Directors (a position that falls within the class) when he was initially hired, and that he made "informal recommendations" about hiring;[84]

- One Plaintiff denied authority to interview or hire, but admitted she was directed by Regional Supervisor Anne Chapman Martin to interview an employee on one occasion;[85]

- One Plaintiff testified that she was involved in interviewing employees and that she was the only person who received information from Human Resources regarding the results of background checks and drug screens;[86]

- Two Plaintiffs testified they did nothing more than pass on applications to their Regional Supervisors and perhaps sit in on an interview;[87]

Other Plaintiffs insisted they had no authority to interview or hire employees, but made admissions that undermine the credibility of their testimony. For example, Rebecca Smith initially testified that she did not interview employees, but then subsequently admitted twice that she did interview employees and could make hiring recommendations.[88] Twyla Lochridge denied having authority to hire anyone, claiming that "Lindsey Management" hired employees, but could not identify any specific person at Lindsey Management who hired employees, but

---

[84] Def. App. 264, 283 [C. Lochridge Dep., p. 42:6-43:11; 117:25-118:7; 119:22-120:8]
[85] Def. App. 426 [H. Lochridge Dep., p. 291:10-292:15].
[86] Def. App. 662-663 [L. Smith Dep., p.152:11-153:1; 154:13-22].
[87] Def. App. 234 [P. Leach, Patricia Dep., p. 233:2-233:24]; Def. App. 559 [P. Pickel Dep., p. 165:16-166:2].
[88] Def. App. 742, 778 [R. Smith Dep., p. 110:9-111:19; 254:25-255:16].

"would assume someone in human resources."[89]   When pressed on the issue, Lochridge claimed[90]:

> Q.   And Anne [Regional Supervisor] didn't even meet T.J. Dalton until after he was hired; right?
>
> MS. HURST:  Object to form.
>
> A.     I don't know when Anne met him, but I do know that Lindsey -- or human resource was the one that hired him.  I just passed along the message that he was hired.
>
> Q.   Anne had nothing to do with the hiring of T.J. Dalton; right?
>
> MS. HURST:  Object to form.
>
> A.     I think all she had to do is we told her that we needed someone.
>
> . . .
>
> Q.   (Ms. Miers continued.)  You located T.J. Dalton, you selected T.J. Dalton, and you worked with human resources to get the paperwork through; right?
>
> MS. HURST:  Object to form.
>
> A.   How else would he have gotten it?  . . .

The testimony of Linda Danforth, wife of former Regional Supervisor Ray Danforth, drives home the vast differences in testimony.  Ray Danforth is alleged to have conducted interviews and made the hiring decisions for the various communities that were in his region.[91] Yet, his wife, who traveled with him and worked alongside him frequently, verified that Ray Danforth hired Community Directors and Resident Managers, but had no idea who hired the non-management employees who reported to Plaintiffs[92]:

---

[89] Def. App. 449 [T. Lochridge Dep., p. 46:15-21].
[90] Def. App. 449 [T. Lochridge Dep., p. 46:12-48:20].
[91] Def. App.170 [L. Danforth Dep., p. 211:1-10].
[92] Def. App. 170-171 [L. Danforth Dep. p. 211:5-213:5].

27

A.    I've heard them say that in the corporate meeting that they were the ones that interviewed and did the hiring.

Q.    For community directors and resident managers.

. . .

Q.    What about maintenance technicians and leasing agents?

A.    I don't know that for sure.  I don't know.

Q.    That wasn't something that regional supervisors did; right?

A.    I don't know.

MS. HURST:  Object to form.

Q.    (MS. MIERS):  At the end of the day community directors and resident managers had the final decision on who worked at their property; right?

MS. HURST:  Object to form.

Q.    (MS. MIERS): -- because it wouldn't make sense to force an employee on a community director or resident manager if they didn't want to work with them; right?

MS. HURST:  Object to form.

THE WITNESS:  I don't know.

Moreover, numerous Community Directors who did not opt into the litigation testified that they were responsible for hiring and selecting their employees.[93]

Plaintiffs may argue that the testimony of Community Directors who did not opt into this case is not relevant to whether Plaintiffs are similarly situated to individuals who *did* opt in. However, Plaintiffs admit that they do not even know all of the Opt-In Plaintiffs or even some of

---

[93] Def. App. 816  [B. Moon Decl., ¶11], Def. App. 826 [L. Moon Decl., ¶13], Def. App. 848 [K. Smith Decl., ¶14], Def. App. 862 [A. Tody Decl. ¶11], Def. App. 869 [B. Tody Decl. ¶9], Def. App. 804-805 [C. Hite Decl. ¶12], Def. App. 794 [Declaration of Kim Carter (K. Carter Dec.), ¶13].

their co-Plaintiffs, much less have personal knowledge regarding their actual job duties.[94] Therefore, evidence from other Community Directors who did not opt into this litigation should be considered in determining whether all Community Directors have the substantially similar job duties on a day-to-day basis.  It is inappropriate for Plaintiffs to testify in a representative manner on behalf of *all* Community Directors and Resident Managers across the country if they do not know those individuals or possess any knowledge whatsoever of their job duties.  *See Adams v. Hy-Vee, Inc.*, No. 11-00449, 2012 U.S. Dist. LEXIS 98590, at *10-11 (W.D. Mo. May 22, 2012) (stating "Unsupported assertions or those not based on personal knowledge will not establish that plaintiffs are similarly situated.");  *see also Wacker v. Personal Touch Home Care, Inc.*, No. 4:08CV93, 2008 U.S. Dist. LEXIS 101079, at *8-9 (E.D. Mo. Nov. 6, 2008) (denying conditional certification where Plaintiff "was not involved in, and would have no knowledge of, operations in [other] particular areas" of Defendant's business and where "the affidavit provides nothing specific to explain how, from [Plaintiff's] office in Missouri, [Plaintiff] learned the facts she purports to know about the operations of the other affiliates").

Interviewing prospective employees strongly suggests exempt status.  *See Gardner v. W. Beef Props., Inc.*, No. 07-CV-2345, 2013 U.S. Dist. LEXIS 56511, at *27 (E.D.N.Y. Mar. 25, 2013).   Therefore, divergence in testimony as to interviewing and selecting employees commands decertification.  *See, e.g., id.* at *27-28; *Green*, 888 F. Supp. 2d, at 1102-03; *Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *10.

### 4.    Evidence Regarding Directing Employees Is Diverse.

Disparate evidence concerning the role of Community Directors in directing other

---

[94] Def. App.  373-374 [H. Lochridge Dep. pp. 77:10-81:4]; Def. App. 460-461 [T. Lochridge Dep, pp. 91:7-94:16]; Def. App. 747-748 R. Smith Dep., pp. 132:23-133:16, 134:3-21]; Def. App.302-313 [E. Lochridge Dep., pp. 4:16-45:7, 48:19-46:3, 47:5-14]; Def. App. 585 [C. Smith Dep., pp. 37:1-38:3, 38:13-39:2]; Def. App.632, 633,634 [L. Smith Dep. pp. 31:5-3:17, 35:16-22, 37:25-38:24, 39:8-16].

employees warrants decertification.  *See, e.g., Green*, 888 F. Supp. 2d at 1101 (disparate testimony regarding plaintiffs' "discretion in the direction of employees" favored decertification); *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1237-38 (N.D. Ala. 2012); *Friend v. Hertz Corp.*, No. C-07-5222, 2011 U.S. Dist. LEXIS 25196, at *17-18; *Smith v. Heartland Auto. Servs.*, 404 F. Supp. 2d 1133, 1152 (D. Minn. 2005).

While Plaintiffs generally deny directing the work of their employees and claim that community employees just decided what to do on a day-to-day basis on their own without any direction, their testimony and documents tell a different story.  For example, when Twyla Lochridge was asked whether she directed the work of her employees, she testified that she ensured that "everything was done the way it was supposed to be done . . . and that she was the one person at the community that was ultimately responsible."[95]  She also acknowledged that she and her husband Everette were counseled in writing for "failure to efficiently manage the leasing office personnel."[96]  Rebecca Smith admitted that her Regional Supervisor referred to the hourly community employees as her "staff," that others from Lindsey Management referred to them as her "staff," and that when she attended manager meetings they discussed methods for dealing with her "staff."[97]  Lydia Smith was counseled in writing and reminded that "it is your responsibility to manage the Links office in such a manner that prohibits residents or occupants from treating **your staff** disrespectfully."[98]

### 5.    Testimony Regarding Training and Discipline Conflicts.

Varied testimony regarding the training of employees calls for decertification.  *See Knott*, 897 F. Supp. 2d at 1237-38; *Reyes*, 2007 U.S. Dist. LEXIS 1461, at *13; *see also Aquilino*, 2011

---

[95] Def. App. 502 [T. Lochridge Dep. p. 258:10-18].
[96] Def. App. 1014 Smith Counseling Memo.
[97] Def. App. 741 R. Smith Dep. pp. 106:16-107:8].
[98] Def. App. 1015 Smith Counsel Memo.

U.S. Dist. LEXIS 15759, at *11 (diverging experiences regarding planning for employees' "professional development" favored decertification).   Once again, such varied testimony is present here.   Despite the fact that salaried class members were eligible for a bonus for training Assistant Managers, whether Plaintiffs actually trained their employees varied widely.[99]   Some Community Directors, including Twyla Lochridge and Patricia Leach, testified that they did not train any of their employees at all.[100]   Others disagreed, including Rebecca Smith who testified that she trained two assistant managers who became community directors at another location, and as a result, she received the training bonus.[101]   Rebecca Smith also testified that community directors trained assistant managers at each of the three properties where she worked.[102]   When asked about a training bonus, Linda Danforth testified that it was available at some, but not all, properties.[103]

### 6.   Evidence as to Scheduling Work Is Contradictory.

Divergent levels of authority pertaining to scheduling work warrant decertification.   *See Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *7; *Reyes*, 2007 U.S. Dist. LEXIS 1461, at *14. Here, the evidence could not be more divergent.

- Lydia Smith spent about 10 minutes a week making schedules.[104]

- Carlis Smith testified, "Lydia prepares the schedule.  I don't touch it."[105]

- Heather Lochridge and Ryan Agee testified that they made schedules with assistance from Assistant Manager Sam Cook.[106]

---

[99] Def. App. 1020 [B. Fox. Supp. Decl. ¶ 8].
[100] Def. App. 479 [T. Lochridge Dep, p.168:21-24]; Def. App. 238 [P. Leach Dep, p. 249:l4-19].
[101] Def. App. 733 [R. Smith Dep, p. 75:1-7].
[102] *Id.*  at 73:7-24.
[103] Def. App. 165 [L. Danforth Dep., p. 189:13-17].
[104] Def. App. 706 [L. Smith Dep, p. 325:15-18; 326:1-3; 326:7-9].
[105] Def. App. 621 [Deposition of Smith, Carlis (C. Smith Dep.), 181:24-182:1].
[106] Def. App. 425 [H. Lochridge Dep, p. 285-4-11]; Def. App. 10, 45 [R. Agee Dep., p. 40:1-2.; 178:1-5.

- Rebecca Smith used the schedule that was in place when she became the Community Director at her property and it generally stayed the same until the day she left. At Smith's property, everyone worked the 1st through the 5th.[107]

- Patricia Leach did not even utilize a schedule at her property.[108]

### 7.   Testimony Regarding Discretion Dealing with Residents Varies.

Handling customer complaints is a discretionary function that lies at the core of management duties. *See Pedroza v. PetSmart, Inc*., No. 11-298, 2013 U.S. Dist. LEXIS 53794, at *24 (C.D. Cal. Jan. 28, 2013); *Gover v. Best Buy Stores, Inc*., No. CV 10-9988-SVW (RZx), 2011 U.S. Dist. LEXIS 153653, at *25-26 (C.D. Cal. Nov. 22, 2011) (citing *Palazzolo-Robinson v. Sharis Mgmt. Corp*., 68 F. Supp. 2d 1186, 1191 (W.D. Wash. 1999)). Variation regarding degrees of discretion with respect to the handling of customer complaints, therefore, commands decertification. *Reyes*, 2007 U.S. Dist. LEXIS 1461, at *12, *16; *see also Hill v. R+L Carriers, Inc*., No. C 09-1907, 2011 U.S. Dist. LEXIS 27997, at *19-20 (N.D. Cal. March 3, 2011) (decertifying collective action because plaintiffs "exercised varying amounts of discretion in performing their duties," which made them not similarly situated); *see also Friend*, 2011 U.S. Dist. LEXIS 25196, at *23-24 (location managers' varying testimony regarding the discretion and judgment they exercised weighed against proceeding on a class-wide basis); *Carlson v. C.H. Robinson Worldwide, Inc*., Nos. 02-3780, 02-4261, 2006 U.S. Dist. LEXIS 71483, at *18-22 (D. Minn. Sept. 26, 2006) (granting decertification in part based upon evidence that opt-in plaintiffs exercised various degrees of discretion with regard to customer issues). Here, once again, the evidence is miles apart. Chad Lochridge testified that he only handled complaints regarding noise and maintenance and that his wife, Heather, or a leasing consultant handled all other

---

[107] Def. App. 768-770 [R. Smith Dep., p. 216:6-12; 217:18-20; 221:2-5].
[108] Def. App. 229 [P. Leach Dep., p. 214:19-215:15].

resident complaints.[109]   Other Plaintiffs utilized Lindsey Management's Resident Relations Department as opposed to directly handling resident complaints to varying degrees.[110]   Turning to the broader issue of ensuring customer satisfaction, Rebecca Smith, testified that she typically handled resident complaints, including complaints about maintenance, and testified that she tried to address resident complaints and held resident retention parties to increase occupancy rates at her properties.[111]   Everett Lochridge also testified that he worked hard to ensure residents were happy.[112]   While most Community Director Plaintiffs testified that they utilized their entertainment budgets to hold resident retention events, Twyla Lochridge testified, "You know, I heard of that, but the only time I ever did anything for the residents was one time.  And that was pizzas were bought.  And that's it."[113]

### E.   Evidence Regarding the Administrative Exemption Differs.

The facts discussed above are equally relevant to the administrative exemption, because those facts also bear on whether the employee's primary duty involves non-manual work directly related to management and the exercise of discretion and independent judgment.  *Green*, 2012 U.S. Dist. LEXIS 115985, at *29-30 (taking same facts into account vis-à-vis executive and administrative exemptions); *see also Soderberg v. Naturescape, Inc.*, No. 10-3429, 2011 U.S. Dist. LEXIS 156235, at *28 (D. Minn. Nov. 3, 2011) (stating that the administrative exemption

---

[109] Def. App. 270 [C. Lochridge Dep., p. 65:4-66:7].

[110] Def. App. 48-49 [R. Agee Dep., p. 192:23-193:24; 197:8-19]; Def. App. 216-217 [P. Leach Dep., p. 164:1-165:23]; Def. App. 387, 403 [H. Lochridge Dep., p. 134:23-135:2; 198:13-20; 199:4-6]; Def. App. 764-765 [R. Smith Dep., p. 200:25-201:17; 202:3-11]; Def. App. 700 [L. Smith Dep., p. 303:2-303:20]; Def. App. 478 [T. Lochridge Dep., p. 162:2-15].

[111] Def. App. 737 [R. Smith Dep., p. 89:18-90:6].

[112] Def. App. 314 [E. Lochridge Dep., p. 52:3-52:9].

[113] Def. App. 703 [L. Smith Dep., p. 315:23-25]; Def. App. 408 [H. Lochridge Dep., p. 219:12-17]; Def. App. 295 [C. Lochridge Dep., p. 168:7-23]; Def. App. 231 [P. Leach Dep., p. 224:3-16]; Def. App. 53 [R. Agee Dep., p. 211:5-11]; Def. App. 500 [T. Lochridge Dep., p. 250:1-4].

"analysis closely mirrors the executive-exemption standard").  Further *examples* as to the differing testimony pertaining to the exercise of discretion include:

- Ryan Agee, Heather Lochridge, and Twyla Lochridge would disregard the policy regarding lease renewals and allow residents to renew leases after the deadline passed, while Lydia Smith did not recall ever letting a resident renew a lease after the deadline.[114] Everette Lochridge, Chad Lochridge, and Carlis Smith did not deal with lease renewals at all.[115]

- Ryan Agee, Lydia Smith, Patricia Leach, Rebecca Smith, Heather Lochridge, Everette Lochridge, and Twyla Lochridge handled the legal proceedings associated with evictions to varying degrees,[116] while Carlis Smith and Chad Lochridge did not have anything to do with legal proceedings related to evictions.[117]

- Some Community Directors spent time marketing their communities,[118] while others had no involvement in marketing.[119]  The amount of time Heather Lochridge spent marketing her community varied from month to month and season to season, but she spent at least 4 hours a month marketing her community.[120]  Rebecca Smith, on the other hand, relied almost exclusively on the Lindsey Management marketing department.[121]  Ryan Agee knew he was supposed to spend time marketing his community, but chose not to do so.[122]

- Heather Lochridge exercised discretion in negotiating rates for executive units by offering a discount of up to $200 a month, while others testified that they never did

---

[114] Def. App. 39 [R. Agee Dep., p. 155:7-156:1]; Def. App. 411-412 [H. Lochridge Dep., p. 232:7-233:7]; Def. App. 489 [T. Lochridge Dep., p. 206:9-24]; Def. App. 692 [L. Smith Dep., p. 269:6-270:2]; *see also* Def. App. 762 (R. Smith Dep., p. 189:15-190:1].

[115] Def. App. 326 (E. Lochridge Dep., p. 98:7-9]; Def. App. 279 [C. Lochridge Dep., p. 101:10-14]; Def. App. 613 [C. Smith Depo.,p.149:15-16].

[116] Def. App. 42-43 [R. Agee Dep. p. 167:20-169:18; 172:16-173:21]; Def. App. 693-694[L. Smith Dep., p. 276:6-279:10]; Def. App. 218 [P. Leach Dep., p. 169:5-170:22; Def. App. 490 [T. Lochridge Dep., p. 209:4-210:5]; Def. App. 763 [R. Smith Dep., p. 195:2-8]; Def. App. 412-413 [H. Lochridge Dep., p. 236:19-238:12].

[117] Def. App. 695 [L. Smith Dep., p. 282:22-23]; Def. App. 287 [C. Lochridge Dep. p. 133:9-134:3].

[118] Def. App. 701-702 [L. Smith Dep., p. 307:5-11;309:15-310:4; 311:1-8]; Def. App. 204-205 [P. Leach Dep., p. 115:11-117:5]; Def. App. 479 [T. Lochridge Dep., p. 167:20-168:10].

[119] Def. App. 619 [C. Smith Dep., p. 174:2-4]; Def. App. 277 [C. Lochridge Dep., p. 95:2-3].

[120] Def. App. 358 [H. Lochridge Dep, p. 17:16-25].

[121] Def. App. 768 [R. Smith Dep., p. 213:2-10].

[122] Def. App. 33, 40 [R. Agee Dep., p. 129:16-130:16; 157:2-11].

that or that they did not have the same discretion to rent executive suites at a discount as Heather did.[123]

- Twyla Lochridge never allowed pets over the weight limit outlined in the lease and community policies and even terminated an employee for having a pet snake in violation of her lease.[124]  However, she is aware that other community directors did not adhere as strictly to the pet policy and allowed residents to keep pit bulls in their units.  Heather Lochridge described the pet policy as "a pick-your-battle-type thing" and allowed pets over the weight limit.[125]

- Rebecca Smith waived late fees as long as she could collect the rent due.[126]  Twyla Lochridge testified that her employees could not waive late fees, but she could with approval from the Lindsey Management corporate office or her supervisor, and her recommendation to waive late fees was accepted every time but one. [127]  Lydia Smith and Ryan Agree did not have authority to waive late fees.[128]  Heather Lochridge did not waive late fees because she believed it was a violation of Fair Housing laws to do so.[129]

It follows, therefore, that a collective determination of whether Plaintiffs satisfy the administrative exemption is equally impracticable and unfair as a collective trial regarding whether Plaintiffs meet the executive exemption.

### F.     Testimony Varies Regarding Damages.

Putting aside the diversity of evidence pertaining to liability, there is also a divergence of evidence with respect to the average hours that the Plaintiffs worked per week, which is a critical component of damages.   As fully explained in Defendants' Motion for Summary Judgment Concerning Plaintiffs' Damages, Plaintiffs' evidence regarding damages is insufficient to survive summary judgment, much less to justify representative testimony on behalf of 154 Opt-In

---

[123] Def. App. 395 [H. Lochridge Dep., p. 165:2-25]; Def. App. 682 [L. Smith Dep., p. 229:25-230:8]; Def. App. 484 [T. Lochridge Dep., p. 187:5-188:17].

[124] Def. App. 455-456, 489 [T. Lochridge Dep., p. 40:3-8; 71:4-72:4; 207:4-207:13; 208:5-15].

[125] Def. App. 412 [H.  Lochridge Dep., p. 233:12-234:3].

[126] Def. App. 762 [R. Smith Dep., p. 191:25-192:11].

[127] Def. App. 491 [T. Lochridge Dep., p. 213:21-214:6; 215:21-216:20].

[128] Def. App. 692, 693 [L. Smith Dep., p. 272:15-274:13]; Def. App. 44 [R. Agee Dep., p. 175:8-176:7].

[129] Def. App. 412 [H. Lochridge Dep., p. 234:14-20].

Plaintiffs.   The number of hours allegedly worked by Plaintiffs varied widely and all of the Plaintiffs who were paid on a salary basis were unable to testify with any particularity about the amount sought or the hours allegedly worked:

- Heather Lochridge claimed she worked an average of 70 and 75 hours per week, but admitted it varied week-to-week and she sometimes worked less than 120 hours in a two-week period.[130]

- When asked about damages, Twyla Lochridge testified that she has not "figured up those hours yet" and does not "know how they're going to come up with those hours."[131]

- Everette Lochridge stated, "I honestly don't remember from week to week what my hours was."   He claimed at one point in his deposition that he "worked about 160 hours per pay period" and at another point he was averaging 200-205 hours per pay period.   In any event, this information does not assist in determining how many hours he worked each week.[132]

- Chad Lochridge testified that he worked 80 hours a week.[133]

- Patricia Leach testified that she worked 65-70 hours a week, but this time includes lunch breaks.[134]

- Lydia Smith testified she worked "around" 60-70 hours per week.[135]

- Carlis Smith claimed he worked 70-80 hours per week.[136]

There is simply no basis for representational evidence with respect to liability or damages.  *See Comcast Corp. v. Behrend*, 185 L. Ed. 515, 522 (2013); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773-77 (7th Cir. 2013) (holding the plaintiffs' varying hours and tasks rendered ascertaining damages via a collective trial impracticable).   If evidence in this case were submitted on a representational basis and liability were found in favor of Plaintiffs, whose

---

[130] Def. App. 429, 389 [H. Lochridge Dep., p. 304:6-11; 144:3-5].
[131] Def. App. 441, 465-466 [T. Lochridge Dep., p. 16:21-24; 112:13-113:16].
[132] Def. App. 305-306 [E. Lochridge Dep., p. 15:10-16; 16:15-17; 18:19-19:8].
[133] Def. App. 298 [C. Lochridge Dep., p. 177:16-178:11].
[134] Def. App. 241-242, 247 [P. Leach Dep., p. 264:14-265:8; 286:17-287:10].
[135] Def. App. 638-640 [L. Smith Dep., p. 56:11-57:10;59:8-14; 61:6-12].
[136] Def. App. 581 [C. Smith Dep., p. 23:1-17; 22:7-23].

testimony would be used to determine the number of hours of overtime to use in calculating damages?  If, for example, Twyla Lochridge's testimony were used, the fact finder would have no way of determining overtime.  Plaintiffs would surely claim that would be unfair to the individuals represented by them.  On the other hand, if Chad Lochridge's testimony were used and 20 hours of overtime per week were awarded across the board, that result would also obviously be unfair to Defendants.

### G.    Individualized Defenses Make a Collective Trial Impossible.

Another factor in the similarly situated analysis assesses "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff."   *Reyes*, 2007 U.S. Dist. LEXIS 1461, at *25. "Individualized inquiries into work practices and supervisor management decisions . . . cannot be addressed on a class-wide basis."  *Gatewood v. Koch Foods of Mississippi, LLC*, No. 3:07CV82, 2009 U.S. Dist. LEXIS 113896, at *67 (S.D. Miss. Oct. 20, 2009).

Here, the complexity, inefficiency, and unfairness of trying this case as a collective action is readily apparent.  As the District Court held in *Proctor v. Allsups Convenience Stores, Inc.*,

> The evidence shows a large factual variety among the individual Plaintiffs' claims and the times they allege they worked off the clock.  These differences in the Plaintiffs' claims mean that the Defendant's defenses would also vary.  Defenses to claims that individuals did not work off the clock but were not paid correctly will be distinct from the Plaintiffs alleging they were asked to work off the clock by management.

250 F.R.D. 278, 283 (N.D. Tex. 2008).  Defenses available to Defendants include, but certainly are not limited to: (1) Plaintiffs did not in fact work in excess of 40 hours in a particular week; (2) Plaintiffs' claims are barred by statute of limitations or technical defaults; (3) Plaintiffs are exempt from the FLSA's overtime requirements under the administrative exemption; (4) Plaintiffs are exempt from the FLSA's overtime requirements under the executive exemption and

(5) Plaintiffs are exempt from the FLSA's overtime requirements under a combination of the administrative and executive exemptions.  *See id*.; *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184 K(4), 2004 U.S. Dist. LEXIS 12441, at *25-26; *First Student, Inc*., 888 F. Supp. 2d at 935-36 (discussing that individualized defenses warrant decertification).   Imagine adding jury interrogatories for each of these defenses.   The defenses identified above are not merely speculative.  By way of example, Opt-In Plaintiff Christopher Hughes had an extended leave of absence during his employment, which precludes any finding of damages for the weeks in which he was on leave. [137] Further, the claims of Opt-In Jesse Shelton and Elizabeth Shelton are barred by the statute of limitations because they opted into this litigation more than three years after their last dates of employment.[138]

Finally, "[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's [compensation] and duties meet the requirements of the" cited exemption.  29 C.F.R. § 541.2.  What that means, in the context of a misclassification case that hinges on the executive or administrative exemptions, is that the defendant "is entitled to question each individual Opt-In about his or her managerial responsibilities to illustrate that [Plaintiffs] qualify as exempt managers."  *Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *27.   Here, presenting such a defense would render the case unmanageable as a collective action for at least two reasons.

First, at trial, Plaintiffs will attempt to establish the job duties they performed through testimonial evidence.  The deposition testimony discussed above, however, reveals that it is impossible to develop common facts from the named and opt-in Plaintiffs regarding their daily responsibilities and duties.  Indeed, the record in this case establishes the very opposite point:

---

[137] Def. App. 1021 [B. Fox. Supp. Decl. ¶ 20].
[138] Def. App. 1020 [B. Fox. Supp. Decl. ¶ 13, 14].

the daily duties of Plaintiffs were hopelessly disparate, which means that the central dispute of this case—i.e., whether Plaintiffs were improperly classified as exempt—"cannot be determined on a class-wide basis." *Oetinger v. First Residential Mortgage Network, Inc.*, No. 3:06-CV-381, 2009 U.S. Dist. LEXIS 61877, at *10-11 (W.D. Ky., July 16, 2009); *see Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *26-27; *Big Lots Stores, Inc.*, 561 F. Supp. 2d at 587 ("Big Lots cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other."); *see also Espenscheid*, 705 F.3d at 773-77 (holding that, in the absence of a feasible method of trying a class action with many variances in each employee's situation, class treatment was inappropriate).

Second, Defendants will challenge the veracity of certain Plaintiffs' testimony about the duties they performed and the hours they worked by pointing to inconsistencies between Plaintiffs' positions in this action and their statements in résumés and other documents. This defense will be critical to Defendants, because a contradiction between the job that a plaintiff described in (for example) a résumé and the plaintiff's self-serving testimony is, at a bare minimum, powerful evidence for the defense. At trial, Defendants intend to cross-examine thoroughly each Plaintiff who described his or her role at work in glowingly managerial terms (when it suited him to do that) and then turned around in this lawsuit and described his role at the communities in menial terms (when it suited him to do that), thereby impeaching those Plaintiffs. Because that exercise would require the factfinder to concentrate not on representative evidence, but on evidence germane to only one Plaintiff at a time, the existence of contradictory evidence requires decertification. *See Green*, 888 F. Supp. 2d, at 1103 (decertification warranted where defendant intended to probe inconsistencies between individual plaintiffs' deposition testimony and "resumes touting their managerial responsibilities"); *Briggins v. Elwood Tri, Inc.*, 882 F.

Supp. 2d 1256, 1275-76 (N.D. Ala. 2012) (decertification warranted where defendant intended to rely at trial on the discrepancies between plaintiffs' depositions regarding time spent working "off the clock" and the record of time plaintiffs swiped in to work); *Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *26 (decertification warranted where "Defendant intends to bring to light contradictions between individual Plaintiffs' resume statements . . . and deposition testimony"). Once impeached, such Plaintiffs' testimony could not fairly be used as representative evidence in support of some other Plaintiff's claim.

Because Defendants "cannot be expected to come up with 'representative proof' when the plaintiffs cannot reasonably be said to be representative of each other," the *conditionally* certified class of salaried employees should be decertified. *See Big Lots Stores, Inc.*, 561 F. Supp. 2d at 587.

### H. Fairness and Procedural Considerations Preclude this Case from Being Tried Collectively.

"[W]hen there are significant differences in employment experiences, the procedural advantages of a collective action evaporate, and the Court's confidence that a jury verdict on the merits can be rendered is seriously undermined," decertification is warranted. *See Big Lots Stores, Inc.*, 561 F. Supp. 2d at 588. Here, several fairness and procedural considerations preclude collective treatment.

### 1. Plaintiffs' Individual Claims Will Further Complicate this Litigation.

Three Plaintiffs seek to litigate purely individual claims that have nothing to do with the claims that Plaintiffs seek to prosecute collectively. Linda Danforth, Kevin Kornegay, and Kathryn Hale are not members of either class that was conditionally certified by the Court.[139] The attempt of individual Plaintiffs to prosecute claims that are not raised by the collective

---

[139] Def. App. 1020 [B. Fox. Supp. Decl. ¶ 9].

claims "creates cumbersome defense issues that weigh against certifying the class for collective action." *Smith*, 404 F. Supp. 2d at 1154. Further, permitting certain Plaintiffs to prosecute highly individualized claims will serve as a distraction—to the detriment of the others in the collective action. *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009). "Where the collective action requires such significant individual considerations, it may be inappropriate for conditional certification." *Saleen v. Waste Mgmt.*, No. 08-4959 (PJS/JJK), 2009 U.S. Dist. LEXIS 49891, at *22 (D. Minn. June 15, 2009) (internal quotations omitted).

### 2. Proceeding Collectively Will Overwhelm the Factfinder.

Trying this case as a collective action will overwhelm the Court with individual factual scenarios. There is no feasible way for a judge or jury at one trial to follow and to digest every single Named and Opt-In Plaintiffs' unique factual differences—i.e., length of employment, various duties, personal experiences at different locations and under different Regional Supervisors, individual claims that are separate from the wage and hour action, and statute of limitations barriers, along with individual credibility determinations—so as to be able to make a just assessment of the merits of this action. *See Big Lots Stores, Inc.*, 561 F. Supp. 2d, at 588; *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1127-28 (N.D. Cal. 2011) (holding that proceeding collectively would be unmanageable, chaotic, and counterproductive due to plaintiffs' varying factual and employment settings) (internal citations omitted).

### 3. Proceeding Collectively Will Violate Defendants' Due Process Rights.

Allowing a collective action to proceed where, as here, Plaintiffs present an array of varying and inconsistent factual assertions will be so "fundamentally unfair" as to compromise Defendants' "due process rights." *Knott*, 897 F. Supp. 2d at 1241; *see also Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 382 (D.N.J. 1987) (granting decertification and citing *Baldwin v. Hale*, 68 U.S. 223, 233 (1863), for the proposition that **"the central meaning of due process is**

simple:  **parties whose rights are to be affected are entitled to be heard.**”).  Defendants are

“entitled to question each individual Opt-In about his/her managerial responsibilities” and also

“entitled to impeach the credibility of individual Opt-Ins by bringing to light misrepresentations

about duties that they may have made . . . .”  *Aquilino*, 2011 U.S. Dist. LEXIS 15759, at *27; *see*

*also Dukes*, 131 S. Ct. at 2560-61 (holding that an employer defending against claims is “entitled

to individualized determinations of each employee’s eligibility for backpay” and “to litigate its

statutory defenses to individual claims”).  Because it is practically impossible to conduct

approximately 172 mini-trials under the rubric of one lawsuit, if this case were to be tried

collectively, Defendants would be denied these rights.  Trying this case collectively will also be

unfair to Plaintiffs to the extent that an individual Plaintiff’s claims could be implicated by those

who testified to working fewer hours per week or to performing more exempt duties than other

Plaintiffs.  Each individual Plaintiff’s unique case should be decided on its own merits—and not

on a hodgepodge of evidence that may have nothing to do with an individual Plaintiff’s

particular circumstances.

> 4.     ***Johnson v. Big Lots Stores, Inc.* Exemplifies the Futility of Class
> Treatment.**

The complexity, inefficiency, and unfairness of trying this case as a collective action is

not mere speculation, as discovered by the Eastern District of Louisiana in *Johnson v. Big Lots*

*Stores, Inc.*, No. 04-3201, 2007 U.S. Dist. LEXIS 96151 (E.D. La. Aug. 21, 2007).  Plaintiffs in

that case, which also involved allegations of misclassification under the FLSA, persuaded the

court to assist in notifying other employees of the litigation.  After significant discovery

occurred, the employer moved, on three occasions, to decertify the class.  The court,

nevertheless, denied those motions, explaining:

> The plaintiffs seek to prove that they were indeed misclassified by
> presenting statistical evidence from representative samples of the

> plaintiff class and anecdotal testimony from deposed plaintiffs. Big Lots can meet plaintiffs' arguments with the same type of evidence that plaintiffs will offer. It does not have to inquire into every individual plaintiff's work experiences to establish that it lacks a corporate policy aimed at deliberate misclassification. Big Lots' arguments about individual defenses go to the amount of damages due to each plaintiff for unpaid overtime. The record demonstrates that the plaintiffs are similarly situated with respect to their job duties. Because this is true, the less room there is for individualized defenses.

*Id*. at *9.

At trial, the plaintiffs presented deposition testimony from 20 witnesses, two corporate representatives, and two expert witnesses and submitted more than 1,000 exhibits. *Big Lots Stores, Inc*., 561 F. Supp. 2d 567, 569 (E.D. La. 2008). In response to post-trial motions, the court felt compelled to reconsider its prior rulings with respect to decertification. From that vantage point, the court observed:

> At a high level of generality opt-in plaintiffs' job duties may be similar in that they are subject to a uniform job description, are required to run individual stores according to corporate policies, and are supervised by store managers. But in terms of individual job duties, the evidence shows that the opt-in plaintiffs have different responsibilities from one another and that individuals themselves will have different duties from day-to-day and within a single day. Such diversity in individual employment situations inhibits Big Lots from proving its statutory exemption defense as to all 936 opt-in plaintiffs on the basis of representative proof. And, because the plaintiffs are dissimilar, the Court cannot confidently adjudicate plaintiffs' claims or Big Lots' defense on the merits.

*Id*. at 578-79. The court was quite clear about the source of its difficulty:

> After the Court considered all of the evidence that the parties submitted, it became obvious that it could not draw any reliable inferences about the job duties of plaintiffs as a class. . . . [T]he Court reaches the inescapable conclusion that the all or nothing posture of this case makes ruling on the merits fundamentally unfair to both sides.

*Id*. at 587-88.

The problem encountered by the *Big Lots* court is that the FLSA prohibits making class-wide decisions regarding exemptions without first determining that all class members necessarily must fall on the same side of the claimed exemption.  There is no common question that can be decided by a jury or the court, no matter how "similarly situated" these employees initially seemed, when the asserted exemptions may apply to some, but perhaps not all, of the class members.

### 5.     Defendants Have a Constitutional Right to Present the Factual Issues for Jury Consideration.

The back-pay remedy under the FLSA is a legal, not equitable, right.  "The Supreme Court has held that as a general rule awards of pecuniary relief such as backpay are legal." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 746 (D.C. Cir. 1996).  As a result, a Seventh Amendment right to a jury trial attaches to these claims.  *Lorillard v. Pons*, 434 U.S. 575, 583 (1978) ("In cases in which legal relief is available and legal rights are determined, the Seventh Amendment provides a right to jury trial."); *Wirtz v. Jones*, 340 F.2d 901, 904 (5th Cir. 1965) ("Such cases are analogous to actions at law, e.g. debt or assumpsit, and, on proper demand, are triable before a jury.").  Moreover, there is a "Seventh Amendment right to have a jury determine the distinct and separable issues of the actual damages of each of the [absent] plaintiffs." *Cimino v. Raymark Indus.*, 151 F.3d 297, 321 (5th Cir. 1998).

As this Court can discern from the evidence submitted in support of decertification, potential class members hold different views of their job duties.  The disparity in this testimony arises for one of two reasons—either one group is untruthful or the groups truly differ in how they perform their jobs.  In the face of this divergent testimony, however, the pattern charge to the jury (i.e., "Has the employer carried its burden of proving the claimed exemption?") would prejudicially and unfairly constrain the jury to characterize the entire class by the same answer.

Such differences and fact-specific inquiries dash any hope of submitting questions to the jury that will permit a common answer.  The jury could learn that some class members perform primarily non-exempt duties and others perform primarily exempt duties.  By focusing on the jury questions that will ultimately be submitted if the case is tried collectively, the Court can easily assess whether proceeding in a representative manner will promote efficiency or create enormous manageability problems.  With respect to the class of salaried employees, Plaintiffs allege that they were classified as exempt from the FLSA's overtime pay requirement when their job duties fail to satisfy a statutory exemption.  Accordingly, Plaintiffs seek unpaid overtime. According to the Eighth Circuit's Model Civil Jury Instructions, the jury interrogatories that pertain to *each* individual class member's claim are as follows:

**Special Verdict Form for Damages**

Your verdict in this case will be determined by your answers to the following questions.  Make sure that you read the questions and notes carefully because they explain the order in which the questions should be answered and which questions may be skipped.

<u>**Question No. 1**</u>: Was plaintiff employed by defendant on or after _____?

**Yes ____ No ____**
(Mark an "X" in the appropriate space)

<u>**Question No. 2**</u>: In plaintiff's work for defendant, was plaintiff employed by an enterprise engaged in commerce or the production of goods for commerce that had annual gross sales of at least $500,000?

**Yes ____ No ____**
(Mark an "X" in the appropriate space)

<u>**Question No. 3**</u>: Did defendant fail to pay plaintiff minimum wage or overtime pay for all hours worked by plaintiff?

**Yes ____ No ____**
(Mark an "X" in the appropriate space)

45

Note: If you answered "No" to any of the above questions, you should have your foreperson sign and date this form and turn it in because you have completed your deliberations on this claim. If you answered "Yes" to all of the above questions, please proceed to Question No. 4.

**Question No. 4**: Do you find for defendant under Instruction No. 9? (i.e., the "Executive Exemption")

**Yes \_\_\_\_ No \_\_\_\_**
(Mark an "X" in the appropriate space)

Note: If you answered "Yes" to Question No. 4, you should have your foreperson sign and date this form because you have completed your deliberations on this claim. If you answered "No" to Question No. 4, please proceed to Question No. 5.

**Question No. 5**: Do you find for defendant under Instruction No. 10? (i.e., the "Administrative Exemption")

**Yes \_\_\_\_ No \_\_\_\_**
(Mark an "X" in the appropriate space)

Note: If you answered "Yes" to Question No. 5, you should have your foreperson sign and date this form because you have completed your deliberations on this claim. If you answered "No" to Question No. 5, please proceed to Question No. 6.

**Question No. 6**: For each workweek on the attached table, state plaintiff's hours worked, as that term is defined in Instruction No. 6.



(Number of hours worked)

**Question No. 7**: For each workweek on the attached table, state the amount that plaintiff should have been paid in minimum wage, as set forth in Instruction No. 2.



(State the amount)

**Question No. 8**: For each workweek on the attached table, state the amount that plaintiff should have been paid in overtime compensation, as set forth in Instruction No. 4.



(State the amount)



**Question No. 9**: For each workweek in the attached table, state the amount of wages that you find plaintiff was actually paid by defendant.

_____
(State the amount)

**Question No. 10**: For each of the periods set forth below, state the amount of plaintiff's damages as that term is defined in Instruction No. 11:

$_____ for the period [date three years prior to filing suit] to [day before date two years prior to filing suit]

$_____ [date two years prior to filing suit] to the date of your verdict.

**Question No. 11**: Do you find that defendant's failure to pay minimum wage and overtime was willful as defined in Instruction No. 12?

Yes ____ No ____
(Mark an "X" in the appropriate space)


_____
Foreperson

Date: _____


8TH CIR. CIVIL JURY INSTR. § 16.90-16.91 (2013).

If these interrogatories are considered in terms of the common questions that might be feasibly posed in a collective action, only Questions (2) and (11) seem amenable to a common answer.  Beyond that, a jury's answer will necessarily be different for each plaintiff.  The Eighth Circuit is certainly aware of this—given that their pattern jury interrogatories include detailed charts for keeping track of each plaintiff.[140]  In the case at bar—with 172 unique plaintiffs—the Eighth Circuit's proposed pattern jury charge would become unwieldy (*and unjust*) should the collective action remain certified.

_____

[140] Def. App.  1016-1018 [Eighth Circuit Model Jury Charge Charts].

In "misclassification cases" such as this, in which the employer has the burden to prove that a particular exemption applies, the regulations state that this issue is not to be resolved categorically, but individually. *See* 29 C.F.R. § 541.2  That is, an employer may establish that a given employee's job duties qualify for an exemption although another employee with the same job title may perform duties that are determined to be non-exempt. *Id*. Consequently, an employer should not be compelled to prove its claimed exemption in an across-the-board manner, but rather should have its evidence considered with respect to each employee—because the strength of that evidence may differ in each instance and the regulations state that this issue is not to be resolved categorically, but individually. *Id*.

## V.      CONCLUSION

The evidence demonstrates the enormous difficulties this Court will face in managing this case consistent with the due process rights of the parties.  Moreover, it is obvious that the factfinder cannot possibly draw any reliable inferences about the job duties of Plaintiffs and Opt-In Plaintiffs as a class.

For the reasons set forth above, Defendants Lindsey Management Co., Inc. and James E. Lindsey respectfully request that the Court reach the same "inescapable conclusion that the all or nothing posture of this case makes ruling on the merits fundamentally unfair to both sides" and grant their Motion to Decertify Plaintiffs' Conditionally Certified Salaried Class.[141]

---

[141] Big Lots Stores, Inc., 561 F. Supp. 2d at 587-88.

Respectfully submitted,


*/s/ Kimberly Rives Miers*
Eva C. Madison (Bar No. 98183)
Kim F. Coats (Bar No. 96267)
LITTLER MENDELSON, P.C.
217 E. Dickson Street
Suite 204
Fayetteville, AR  72701
Telephone:        479.582.6100
Facsimile:        479.582.6111
emadison@littler.com
kcoats@littler.com

Kimberly R. Miers (TX Bar No. 24041482)
Jeremy W. Hawpe (TX Bar No. 24046041)
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX 75201.2931
Telephone:        214.880.8100
Facsimile:        214.880.0181
kmiers@littler.com
jhawpe@littler.com


ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2013, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Josh Sanford – josh@sanfordlawfirm.com
Vanessa Kinney – vanessa@sanfordlawfirm.com
Sanford Law Firm, PLLC
One Financial Center
650 S. Shackleford, Suite 400
Little Rock, AR  72211

David Hughes – dhughes@hardinhughes.com
Hughes Hardin, LLP
2121 14th Street
Tuscaloosa, AL  35401

<em>/s/ Kimberly Rives Miers</em>

Firmwide:123376783.6 054984.1002

50